sxb

**FILED**

JUN 15 2020 sxb

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------------------

JOHNSON & JOHNSON, ETHICON, INC.,
ETHICON US, LLC, and JOHNSON &
JOHNSON HEALTH CARE SYSTEMS INC.,

                   Plaintiffs,

v.

ADVANCED INVENTORY MANAGEMENT,
INC. d/b/a ESUTURES.COM, ANTHONY
IADEROSA JR., JASON EINHORN, MIKE
PHIPPS, and MUDASSAR SHAH,

                   Defendants.

------------------------------------------------------------

: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 

**1:20-cv-03471
Judge Robert M. Dow, Jr
Magistrate Judge Jeffrey Cummings**

FILED *EX PARTE* AND UNDER SEAL

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTIONS FOR *EX PARTE* SEIZURE ORDER,
TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER,
EXPEDITED DISCOVERY ORDER, ALTERNATIVE SERVICE, AND
ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

<div align="right">Page</div>

INTRODUCTION ..........................................................................................................1

STATEMENT OF FACTS ...........................................................................................5

I.  Ethicon's Industry-Leading Surgical Devices .........................................5

    A.  Ethicon's SURGICEL® Absorbable Hemostat ...........................5

    B.  Ethicon's SURGICEL® FIBRILLAR™ Absorbable
        Hemostats....................................................................................6

    C.  Ethicon's LIGACLIP® Surgical Devices.....................................7

    D.  ETHICON SECURESTRAP® Surgical Devices .........................7

    E.  Ethicon's Trademarks .................................................................8

II.  eSutures's Counterfeiting of Ethicon's Surgical Devices ......................8

    A.  eSutures's Sale of Counterfeit SURGICEL® Absorbable
        Hemostat Devices in the U.S. Market .......................................10

        1.  Ethicon Files the Florida Action After Discovering
            Counterfeits at the University of Kentucky Medical Center.........10

        2.  Ethicon's Investigation Leads to eSutures's Supplier and
            Counterfeiting Partner: Medserve in Delhi, India ......................11

        3.  The Counterfeit SURGICEL® Absorbable Hemostat
            Devices Are Contaminated, Defective, and Dangerous...............13

            a.  The Counterfeits Are Made from Plain Gauze that
                Will Not Properly Function as an Absorbable
                 Hemostat.........................................................................13

            b.  The Counterfeit SURGICEL® Devices Are
                Bacterially Contaminated .................................................14

            c.  The Counterfeit SURGICEL® Devices Have in Fact
                Caused Brain and Other Infections ...................................14

         4.  The Counterfeit SURGICEL® Absorbable Hemostats
            Closely Resemble the Authentic Device......................................15

<div align="center">ii</div>

B.  eSutures Willfully Conceals Its Trafficking of Counterfeit
SURGICEL® Devices in Response to a Federal Subpoena ...................... 16

   1.  eSutures Conceals All Documents Concerning Its
       Counterfeiting and Falsely Portrays Defendant Shah as an
       Outside Vendor ........................................................................... 16

   2.  eSutures Conceals the Counterfeits It Has in Stock, and
       Instead Produces a Handful of Authentic Boxes .......................... 18

   3.  After Concealing the Obvious Counterfeits from Ethicon,
       eSutures Attempts to Sell Them Overseas .................................... 19

C.  eSutures's Manufacture and Sale of Counterfeit
SURGICEL® FIBRILLAR™ Devices ..................................................... 19

   1.  Ethicon Instructs eSutures to Stop Selling Expired Ethicon
       Surgical Devices .......................................................................... 20

   2.  Ethicon's Acquisition and Testing of eSutures's Expired
       Devices in Counterfeit Packaging ................................................ 20

   3.  The Counterfeit Repackaged SURGICEL® FIBRILLAR™
       Is Dangerous and Contaminated ................................................... 22

   4.  eSutures Partnered with Medserve to Manufacture the
       Counterfeits and to Falsify Documents to Evade Detection ......... 23

       a.  eSutures Attempts to Use Decade-Expired Product,
           Which Medserve Warns Would Kill Patients ................... 23

       b.  eSutures Knew the Expired Products Would Be
           Used to Manufacture Counterfeits, and Received
           the Counterfeits Back as Payment .................................... 24

       c.  eSutures and Medserve Work Together to Falsify
           Records to Conceal their Counterfeiting .......................... 25

D.  eSutures's Sale of Counterfeit Ethicon LIGACLIP®
Devices ............................................................................................... 28

E.  eSutures's Sale of Counterfeit ETHICON
SECURESTRAP® Devices ..................................................................... 31

III.  Additional Evidence of eSutures's Willfulness and Unlawful
Activity ............................................................................................... 32

A.    Medserve is a Known Counterfeiter of American Surgical
Devices ................................................................................................32

B.    eSutures Shipped the Counterfeits to Employees' Homes to
Evade Detection ..................................................................................32

C.    Upon Learning that Ethicon Sued Another Member of the
Counterfeiting Network, eSutures Begs Its Co-Conspirator
to Delete the Evidence ........................................................................33

D.    eSutures Supplements Its Counterfeiting with Other
Unlawful Schemes to Obtain Ethicon Devices ...................................33

ARGUMENT.....................................................................................................35

I.    Ethicon Is Entitled to an *Ex Parte* Seizure Order ..................................35

A.    Ethicon Satisfies All the Requirements for an *Ex Parte*
Seizure Under the Counterfeiting Act. ................................................37

1.    An order other than an *ex parte* seizure order is not
adequate to achieve the purposes of the Lanham Act (15
U.S.C. § 1116(d)(4)(B)(i)). ............................................................37

2.    Ethicon has not publicized the requested seizure (15 U.S.C.
§ 1116(d)(4)(B)(ii))........................................................................38

3.    Ethicon is likely to succeed in showing that the person
against whom seizure would be ordered used a counterfeit
mark in connection with the sale, offering for sale, or
distribution of goods or services (15 U.S.C.
§ 1116(d)(4)(B)(iii)).......................................................................38

4.    An immediate and irreparable injury will occur if such
seizure is not ordered (15 U.S.C. § 1116(d)(4)(B)(iv)). ...............38

5.    The matter to be seized will be located at the place
identified in the application (15 U.S.C. § 1116(d)(4)(B)(v)). .......39

6.    The harm to the applicant of denying the application
outweighs the harm to the legitimate interests of the person
against whom seizure would be ordered of granting the
application (15 U.S.C. § 1116(d)(4)(B)(vi)). ................................39

7.    Defendants would destroy, move, hide, or otherwise make
such matter inaccessible to the court, if the applicant were
to proceed on notice to such person (15 U.S.C.
§ 1116(d)(4)(B)(vii))......................................................................40

|  | B. | The Proposed Seizure Order Provides for Additional Protections to Protect eSutures's Attorney-Client Privilege | 42 |
|  | C. | The Seizure Must Include Copying Mobile Devices to Capture WhatsApp Messages | 44 |
|  | D. | The Seizure Should Include the Two Residences that eSutures Used to Receive and Conceal the Counterfeits | 45 |
|  | E. | The Seizure Order Should Include All Ethicon Products | 46 |
| II. | Ethicon is Entitled to a Temporary Restraining Order and a Preliminary Injunction | | 47 |
|  | A. | Ethicon Has a Strong Likelihood of Success on the Merits | 47 |
|  | B. | Ethicon Is Suffering Irreparable Harm as a Result of Defendants' Activities | 50 |
|  | C. | The Balance of Equities Tips Decisively in Ethicon's Favor | 51 |
|  | D. | An Injunction Is in the Public Interest | 52 |
|  | E. | Ethicon Has Moved Expeditiously to Investigate the Counterfeiting and Bring This Action | 53 |
|  | F. | The Temporary Restraining Order Should Encompass All Ethicon Products | 55 |
| III. | Ethicon Is Entitled to Expedited Discovery | | 55 |
| IV. | Ethicon is Entitled to an *Ex Parte* Order Freezing Certain Defendants' Assets | | 57 |
| V. | The Court Should Order Alternative Email Service for the Pakistan-Based Defendant Shah | | 61 |
| CONCLUSION | | | 64 |

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*4SEMO.com Inc. v. S. Illinois Storm Shelters, Inc.*,
  939 F.3d 905 (7th Cir. 2019) ................................................................................48

*Abbott Labs. v. Adelphia Supply USA*,
  No. 15-CV-5826, 2015 WL 10906060 (E.D.N.Y. Nov. 6, 2015)...........................54

*Abbott Labs. v. H&H Wholesale Servs., Inc.*,
  No. 17 CV 3095 (CBA)(LB), 2018 WL 2459271 (E.D.N.Y. Mar. 9, 2018)............42, 43

*Abbott Labs. v. Mead Johnson & Co.*,
  971 F.2d 6 (7th Cir. 1992) ....................................................................................50

*Allied Van Lines, Inc. v. iMove, Inc.*,
  No. 1:17-CV-08021, 2018 WL 572510 (N.D. Ill. Jan. 25, 2018)...........................47

*Bliss Salon Day Spa v. Bliss World LLC*,
  268 F.3d 494 (7th Cir. 2001) ................................................................................48

*Brockmeyer v. May*,
  383 F.3d 798 (9th Cir. 2004) ................................................................................62

*Bulgari, S.p.A. v. Partnerships & Unincorporated Ass'ns Identified On Schedule
  "A,"*,
  No. 14-CV-4819, 2014 WL 3749132 (N.D. Ill. July 18, 2014)........................50, 52

*Burger King Corp. v. Majeed*,
  805 F. Supp. 994 (S.D. Fla. 1992) .......................................................................52

*Commodity Futures Trading Comm'n v. Caniff*,
  No. 19-cv-2935, 2020 WL 956302 (N.D. Ill. Feb. 27, 2020)...........................62, 63

*CSC Holdings, Inc. v. Redisi*,
  309 F.3d 988 (7th Cir. 2002) ................................................................................58

*Dangler v. Imperial Mach. Co.*,
  11 F.2d 945 (7th Cir. 1926) ..................................................................................48

*Deckers Outdoor Corp. v. Partnerships & Unincorporated Ass'ns*,
  No. 13-cv-2167, 2013 WL 1337616 (N.D. Ill. Mar. 27, 2013) .......................*passim*

*Desmond v. Chicago Boxed Beef Distributors, Inc.*,
  921 F. Supp. 2d 872 (N.D. Ill. 2013).....................................................................49

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
806 F.2d 392 (2d Cir. 1986) ........................................................................................49

*Eli Lilly & Co. v. Natural Answers, Inc.*,
233 F.3d 456 (7th Cir. 2000) ......................................................................................52

*Entm't One UK Ltd. v. 2012Shiliang*,
384 F. Supp. 3d 941, 949 (N.D. Ill. 2019).................................................................48

*Federal Express Corp. v. Federal Espresso, Inc.*,
No. 97 CV 1219, 1997 WL 736530 (N.D.N.Y. Nov. 24, 1997)...........................57

*FTC v. PCCare247 Inc.*,
2013 WL 841037 (S.D.N.Y. Mar. 7, 2013)...........................................................63

*H-D U.S.A., LLC v. Guangzhou Tomas Crafts Co., Ltd.*,
No. 16-CV-10096, 2017 WL 6733685 (N.D. Ill. Dec. 18, 2017)...........................48

*Hard Drive Prods., Inc. v. Doe*,
283 F.R.D. 409 (N.D. Ill. 2012).................................................................................56

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*,
955 F.2d 1143 (7th Cir. 1992) ....................................................................................49

*Helene Curtis Indus., Inc. v. Church & Dwight Co.*,
560 F.2d 1325 (7th Cir. 1977) ....................................................................................50

*Ibarra v. City of Chicago*,
816 F. Supp. 2d 541 (N.D. Ill. 2011)..........................................................................57

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
846 F.2d 1079 (7th Cir. 1988) ....................................................................................53

*Iron Maiden Holdings Ltd. v. Partnerships & Unincorporated Ass'ns Identified
on Schedule "A"*,
No. 1:18-cv-1098, 2018 WL 2077732 (N.D. Ill. Mar. 6, 2018) ...........................60

*Johnson & Johnson et al. v. XS Supply, LLC et al.*,
No. 8:19-cv-1673-T-33AEP (M.D. Fla. 2019) ................................................*passim*

*Krause Int'l, Inc. v. Reed Elsevier, Inc.*,
866 F. Supp. 585 (D.D.C. 1994)................................................................................52

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
51 F.3d 982 (11th Cir. 1995) ...............................................................................57, 59

*Life After Hate, Inc. v. Free Radicals Project, Inc.*,
410 F. Supp. 3d 891, 909 (N.D. Ill. 2019)...........................................................50, 54

vii

*Lorillard Tobacco Co. v. Div. & Noble Amoco Corp.*,
   390 F. Supp. 2d 678 (N.D. Ill. 2005)........................................................................49

*Lorillard Tobacco Co. v. Montrose Wholesale Candies*,
   No. 03-cv-4844, 2005 WL 3115892 (N.D. Ill. Nov. 8, 2005)......................................... 58, 59

*Luxottica Grp. S.p.A. v. Li Chen*,
   No. 16-cv-6850, 2017 WL 836228 (N.D. Ill. Mar. 2, 2017)..................................................52

*Luxottica Grp. S.p.A. v. Partnerships & Unincorporated Ass'ns*,
   391 F. Supp. 3d 816, 826 (N.D. Ill. 2019)...............................................................................62

*McLean-Fogg Co. v. Ningbo Fastlink Equip. Co.*,
   No. 08-cv-2593, 2008 WL 5100414 (N.D. Ill. Dec. 1, 2008) .................................... 61, 62, 63

*Michael Kors, L.L.C. v. Wang*,
   No. 15-CV-124, 2015 WL 12683830 (N.D. Ill. Feb. 18, 2015)............................................60

*Monco v. Zoltek Corp.*,
   No. 17-cv-6882, 2018 WL 3190817 (N.D. Ill. Apr. 24, 2018)..............................................62

*Monster Energy Co. v. Jing*,
   No. 15-cv-277, 2015 WL 4081288 (N.D. Ill. July 6, 2015)..................................................49

*Montres Rolex, S.A. v. Snyder*,
   718 F.2d 524 (2d Cir. 1983) .................................................................................................36

*Neopost Indus. B.V. v. PFE Int'l, Inc.*,
   403 F. Supp. 2d 669 (N.D. Ill. 2005).....................................................................................47

*Oakley, Inc. v. The Partnerships*,
   No. 14-CV-7714, 2014 WL 12573678 (N.D. Ill. Oct. 30, 2014) ..........................................60

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*,
   896 F.3d 809 (7th Cir. 2018) ................................................................................................51

*Re/Max N. Cent., Inc. v. Cook*,
   272 F.3d 424 (7th Cir. 2001) ..........................................................................................47, 50

*Redbox Automated Retail, LLC v. Xpress Retail LLC*,
   310 F. Supp. 3d 949, 952 (N.D. Ill. 2018).............................................................................50

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.*,
   970 F.2d 552 (9th Cir. 1992) ..........................................................................................58, 59

*Restoration Hardware, Inc. v. Haynes Furniture Co.*,
   No. 16-cv-10665, 2017 WL 3597518 (N.D. Ill. Mar. 13, 2017) ...........................................57

*Rio Props., Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th Cir. 2002) ........................................................................62

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ..........................................................................51

*Roth v. Lutheran Gen. Hosp.*,
    57 F.3d 1446 (7th Cir. 1995) ..........................................................................52

*Santiago v. Anderson*,
    496 F. App'x 630 (7th Cir. 2012) ....................................................................62

*Thorogood v. Sears, Roebuck & Co.*,
    678 F.3d 546 (7th Cir. 2012) ..........................................................................60

*Tony Jones Apparel, Inc. v. Indigo USA LLC*,
    No. 03-cv-0280, 2005 WL 1667789 (N.D. Ill. July 11, 2005) .............................48

*Top Tobacco, L.P. v. Midwestern Cash & Carry, LLC*,
    No. 11-cv-4460, 2014 WL 243431 (N.D. Ill. Jan. 22, 2014) ...............................50

*Tory Burch LLC v. Partnerships & Unincorporated Ass'ns
    Identified on Schedule A*,
    No. 13-cv-2059, 2013 WL 1283824 (N.D. Ill. Mar. 27, 2013) .............................56

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995) ............................................................................54

*United States v. Boender*,
    719 F. Supp. 2d 951 (N.D. Ill. 2010)............................................................42, 43

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965) ...................................................................................20, 60

*United States v. New York Tel. Co.*,
    434 U.S. 159 (1977) ......................................................................................60

*In re Uranium Antitrust Litig.*,
    617 F.2d 1248 (7th Cir. 1979) ........................................................................61

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*,
    402 F. Supp. 3d 427, 437 (N.D. Ill. 2019).........................................................50

*W. Capra Consulting Grp., Inc. v. Snyder*,
    No. 1:19-cv-4188, 2019 WL 3935045 (N.D. Ill. Aug. 20, 2019) ..........................50

*Weifang Tengyi Jewelry Trading Co. v. Intuii LLC*,
    No. 18-cv-4651, 2019 WL 1200776 (N.D. Ill. Mar. 14, 2019) .............................51

*Winter v. Natural Res. Def. Council,*
  555 U.S. 7 (2008) .................................................................................................................47

**Statutes**

15 U.S.C. § 1116 .............................................................................................................*passim*

18 U.S.C. § 2320 ........................................................................................................................42

21 U.S.C. § 331 ..........................................................................................................................42

28 U.S.C. § 1657 ........................................................................................................................55

x

Plaintiffs Johnson & Johnson, Ethicon, Inc., Ethicon US, LLC, and Johnson & Johnson Healthcare Systems Inc. (collectively, "Ethicon" or "Plaintiffs") submit this memorandum of law in support of their application seeking immediate injunctive relief against Defendants Advanced Inventory Management, Inc. d/b/a eSutures.com, Anthony Iaderosa Jr., Jason Einhorn, Mike Phipps, and Mudassar Shah (collectively, "eSutures"). Ethicon seeks (1) an *ex parte* seizure order; (2) a temporary restraining order, to be followed by a preliminary injunction; (3) an expedited discovery order; (4) an asset freeze order; and (5) an order allowing alternative service on one overseas individual defendant, Mudassar Shah. Proposed orders are being filed herewith.

## INTRODUCTION

Ethicon brings this anti-counterfeiting action in an urgent effort to remove dangerous and defective counterfeit surgical devices from the U.S. market. Since discovering these counterfeits, Ethicon has been investigating, taking legal action against, and shutting down members of an international counterfeiting network. That investigation has now led to eSutures, the largest U.S.-based member of the counterfeiting network, which is responsible for importing and selling thousands of defective, bacterially contaminated counterfeits of Ethicon surgical devices in the United States.

The most critical relief Ethicon seeks is an *ex parte* seizure order pursuant to the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d). Ethicon has already executed multiple court-ordered *ex parte* seizure orders against other members of eSutures's counterfeiting network, both in the United States and – with the support of a Letter of Request from a U.S District Court – in India. A seizure order against eSutures is vital to Ethicon's continuing efforts to shut down this counterfeiting network and remove these dangerous counterfeit surgical devices from the market. The need for an *ex parte* seizure is especially apparent here, because before Ethicon knew the extent of eSutures's involvement in

1

counterfeiting, Ethicon attempted to obtain information about the counterfeits by issuing Rule 45 subpoenas to eSutures. In response, eSutures intentionally concealed responsive information that Ethicon subsequently obtained from eSutures's collaborators, including the fact that eSutures knowingly had hundreds of counterfeits in stock.

In addition to an *ex parte* seizure order, Ethicon seeks a temporary restraining order and a preliminary injunction to prevent eSutures from continuing to import, distribute, and assist in the manufacture of counterfeit Ethicon medical devices. Ethicon also seeks an asset freeze to prevent eSutures – which also runs an illegal online casino using eSutures.com as a front – from dissipating their unlawful profits. Ethicon also seeks an order authorizing limited expedited discovery so that it can find others who have bought or sold counterfeit Ethicon medical devices and remove the counterfeits from the market. Finally, Ethicon seeks an order permitting service by email upon an eSutures employee based in Pakistan who facilitated eSutures's importation of counterfeits from India. Samples of similar orders granted against other members of this counterfeiting network by the U.S. District Court for the Middle District of Florida, as well as that Court's Letter of Request to the Hon'ble High Court of Delhi, are attached as Exhibits 1-4 of the declaration of Geoffrey Potter, dated June 15, 2020 ("Potter Decl.").

The authentic versions of the Ethicon devices at issue are quality surgical devices that are used in millions of surgeries each year. Ethicon's investigation has conclusively determined that eSutures is selling counterfeits of at least **four different** Ethicon surgical devices: SURGICEL® Absorbable Hemostat, SURGICEL® FIBRILLAR™ hemostats, LIGACLIP® Extra Ligating Clips, and ETHICON SECURESTRAP® fixation devices. All of these devices are designed to remain in the human body after surgery, and most of them are specially designed to dissolve harmlessly into the bloodstream. Ethicon's analysis of the counterfeits shows that they are

2

critically defective, will not absorb into the body, and are contaminated with bacteria. These counterfeit surgical devices pose an extreme risk to human health and safety.

To obtain the vast majority of the counterfeits at issue, eSutures worked closely with the counterfeit manufacturer at the center of the international network, a company called M/S Medserve ("Medserve") in Delhi, India. With the support of a Letter of Request from the U.S. District Court for the Middle District of Florida, Ethicon obtained an *ex parte* seizure order against Medserve from the Hon'ble High Court of Delhi. At that seizure, Ethicon's agents (including the undersigned counsel) found hundreds of counterfeits in the process of being assembled on a dirty apartment floor. Ethicon also seized documents and communications showing eSutures to be Medserve's biggest U.S. customer, and its knowing counterfeiting partner.

eSutures advertises itself as a legitimate trader in U.S. hospital overstock, claiming to simply be a middleman buying one U.S. hospital's excess inventory and selling it to another. Under this guise, eSutures imported thousands of contaminated and nonfunctional counterfeits into this country and sold them to American medical centers at discount prices. Medserve provided the counterfeits; eSutures provided the pipeline to sell them to U.S. hospitals and surgery centers. Both counterfeiters profited enormously at the cost of causing great risk to the health and lives of American patients. Counterfeiting is a strict-liability offense under the Lanham Act, and the injunctive relief Ethicon seeks in this motion – including a temporary restraining order and *ex parte* seizure – would be warranted even if eSutures were somehow an unwitting seller of these counterfeits. But as set forth below, the evidence of eSutures's willfulness is overwhelming. For example:

- Medserve expressly told eSutures in a recorded voice message that it sold counterfeit Ethicon products.

3

- After having the first few shipments of counterfeits sent to its company warehouse, eSutures started having them shipped directly to high-ranking employees' personal homes, asking Medserve to remove all references to eSutures from its paperwork.

- eSutures complained to Medserve that one batch of counterfeits was too obviously fake, because "[t]he packaging is really suspicious," with a "[r]eally bad print job" and "[n]o Ethicon seal" – and then attempted to ship those obviously fake counterfeits abroad.

- eSutures directed one of its customers to destroy all of its communications with eSutures and not produce those communications to Ethicon.

eSutures's willful engagement in counterfeiting is not uncharacteristic. Counterfeiting is just one of a variety of criminal schemes that eSutures runs behind its front of being a legitimate distributor of surgical overstock. eSutures is, in fact, currently under federal criminal investigation not only for counterfeiting, but also for bribing low-level employees of surgery centers to unlawfully supply it with discounted surgical devices. Moreover, in recent months, several eSutures employees – including Defendant Iaderosa Jr., the founder and owner – have asserted their Fifth Amendment privileges against self-incrimination in a host of lawsuits accusing them of using eSutures.com as cover for operating an illegal online casino.

In addition to regularly engaging in illegal activity, eSutures has already flouted its federal discovery obligations in connection with the counterfeits at issue. At an earlier stage of the investigation, before Ethicon knew of eSutures's central role in the counterfeiting, Ethicon served eSutures with non-party Rule 45 subpoenas about the counterfeits. eSutures's response was grossly fraudulent. eSutures withheld **all** its documents showing their purchase and sale of the counterfeits, and instead produced only a handful of documents irrelevant to its counterfeiting. Even more egregiously, eSutures voluntarily agreed to send Ethicon SURGICEL® devices it had in stock for testing – and produced a handful of boxes, all of which were authentic. In reality, eSutures had in stock at the time **several hundred** counterfeit SURGICEL® devices that it concealed from Ethicon. There is no doubt that eSutures knew those

4

devices were counterfeit, because in contemporaneous communications they complained to Medserve that this batch was so obviously fake that it couldn't sell them to American hospitals. (eSutures tried to sell them abroad instead.)

eSutures's subpoena response was calculated not only to hide all evidence of its counterfeiting, but also to lull Ethicon into believing eSutures was a legitimate distributor selling only authentic product. And eSutures almost got away with it. Its scheme would have worked but for the fact Ethicon conducted a seizure in India, where it collected eSutures's communications with Medserve from Medserve itself. As detailed below, the evidence Ethicon now has against eSutures is overwhelming and indisputable.

Courts routinely grant *ex parte* seizure orders, temporary restraining orders, and asset freezes against counterfeiters. But rarely is the evidence against the counterfeiter so compelling, or their subversion of the discovery process so well-documented, or the physical danger to the public so manifest. Ethicon respectfully urges the Court to issue a seizure order, as well as the other relief it requests in this motion, so that Ethicon can put an immediate stop to eSutures's counterfeiting and quickly track down the counterfeit devices it has already put into commerce.

## STATEMENT OF FACTS

## I.  ETHICON'S INDUSTRY-LEADING SURGICAL DEVICES

### A.  Ethicon's SURGICEL® Absorbable Hemostat

Ethicon has been selling SURGICEL® surgical devices for 60 years. (Decl. of Ben Russo, dated June 9, 2020 ("Russo Decl.") ¶ 3.) SURGICEL® products are hemostats, used to control bleeding in surgery. (*Id.*)

SURGICEL® Absorbable Hemostats are made of oxidized regenerated cellulose, a specially treated material that has several qualities that are useful for surgery. (*Id.*). First, SURGICEL® devices are highly effective hemostats used for controlling bleeding during

5

surgery. (Decl. of Benjamin D. Fitz, dated June 10, 2020 ("Fitz Decl.") ¶ 4.) Second,

SURGICEL® devices are absorbable in the body, so they can be left inside of the patient after

surgery, where they will harmlessly dissolve. (*Id.*). Third, SURGICEL® devices act as an

antimicrobial agent. (*Id.*). Notably, all of these properties are attributable to the oxidized state of

the regenerated cellulose material used to make SURGICEL® devices. (*Id.* ¶ 5). Regenerated

cellulose fiber that is not oxidized or is insufficiently oxidized does not have hemostatic or

antimicrobial properties and it is not absorbable in the body. (*Id.*). All authentic SURGICEL®

devices are produced in a state-of-the-art facility with rigorous quality control and specialized

equipment. (Russo Decl. ¶¶ 18, 19).

When it launched in 1960, SURGICEL® Absorbable Hemostat was the first oxidized

regenerated cellulose hemostat available on the market, setting a new standard of care for

controlling bleeding. (*Id.* ¶ 3). Today, the SURGICEL® brand remains the #1 trusted brand of

adjunctive hemostats, and is widely trusted by surgeons for its consistent safety and

performance. (*Id.* ¶ 4). SURGICEL® Absorbable Hemostats are a staple in the operating room:

they are used in millions of procedures a year, and have been used more than 150 million times

worldwide. (*Id.* ¶ 5).

## B. Ethicon's SURGICEL® FIBRILLAR™ Absorbable Hemostats

In addition to the flagship SURGICEL® Absorbable Hemostats, the SURGICEL® family

of surgical devices includes other device lines, including SURGICEL® FIBRILLAR™. (*Id.* ¶ 4).

Like SURGICEL® Absorbable Hemostats, SURGICEL® FIBRILLAR™ devices are designed to

stop bleeding in surgery, be left inside the patients' body, and then dissolve harmlessly into the

bloodstream. (*See* Fitz Decl. ¶ 4). SURGICEL® FIBRILLAR™ has more complex, multi-

layered structural composition that allows it to stop bleeding more quickly than SURGICEL®

Absorbable Hemostats. (*Id.*).

6

## C. Ethicon's LIGACLIP® Surgical Devices

Ethicon's LIGACLIP® surgical devices are top-of-the-line surgical clips and clip appliers, used to clip – *i.e.*, occlude – vessels and ducts in a wide variety of surgeries. (Decl. of Kurt Bally, dated June 10, 2020 ("Bally Decl.") ¶¶ 3, 5). As with SURGICEL® devices, LIGACLIP® devices are fundamental surgical tools commonly stocked in operating rooms throughout the nation and the world. (*Id.* ¶ 5). The LIGACLIP® family of surgical devices is the only product family offering a suite of ligating clips for both open and endoscopic surgery. (*Id.* ¶ 4). Among the portfolio of LIGACLIP® devices are LIGACLIP® Extra Ligating Clips, which are loaded into clip bases that allow surgeons to easily and safely load clips into reusable clip appliers. (*Id.* ¶ 7).

In the United States, LIGACLIP® is the market leader in open and endoscopic ligation. (*Id.* ¶ 10). LIGACLIP® devices are industry leaders because Ethicon has invested significant time and money in developing clips that securely affix to vessels while minimizing vessel damage. (*Id.* ¶ 22). All authentic LIGACLIP® Extra Ligating Clips are manufactured according to stringent specifications at Ethicon factories. (*Id.*).

## D. ETHICON SECURESTRAP® Surgical Devices

The ETHICON SECURESTRAP® Absorbable Strap Fixation Device is a multi-use laparoscopic absorbable fixation device used by surgeons to affix mesh used to repair hernias inside the abdominal wall. (Decl. of Jeffrey Rauso, dated June 9, 2020 ("Rauso Decl.") ¶ 3). The ETHICON SECURESTRAP® Absorbable Strap Fixation system uses temporary tacks to adhere the mesh, which then absorb into the body within 12 to 18 months, once the tissue has integrated the mesh into the abdominal wall. (*Id.*).

When the ETHICON SECURESTRAP® Absorbable Strap Fixation Device was launched in April 2011, it was the first fixation device to feature an absorbable "strap" design for

7

laparoscopic and open hernia repair procedures. (*Id.* ¶ 6). It remains the market-leading absorbable fixation device. (*Id.* ¶ 7).

All authentic ETHICON SECURESTRAP® devices are manufactured in an Ethicon factory according to stringent specifications. (*Id.* ¶ 16). Because the ETHICON SECURESTRAP® devices are multi-fire products with preloaded tacks, each device has to be able to reliably function multiple times during a single operation. (*Id.* ¶ 17). The complexity of the device is such that a lesser-quality counterfeit poses a high risk of malfunctioning during surgery. (*Id.*).

### E.    Ethicon's Trademarks

Plaintiff Johnson & Johnson, the parent of Plaintiff Ethicon, Inc., is the owner of eight different registered, well-established, and famous trademarks that appear on the packaging of genuine Ethicon surgical devices at issue. Those trademarks and proof of their registration are set forth as exhibit 12 of the Potter Declaration. Evidence of the marks' famousness and use is set forth in the accompanying declarations of Messrs. Russo, Bally, and Rauso.

## II.    ESUTURES'S COUNTERFEITING OF ETHICON'S SURGICAL DEVICES

eSutures operates primarily through its website, eSutures.com. As noted above, eSutures runs an illegal online casino using eSutures.com as a front. At least five different lawsuits have named both the company and its high-ranking officers as defendants, accusing them of collecting bets but not paying out winnings. (*See* Potter Decl. Ex. 14). Individual defendants in those lawsuits, including Defendant Iaderosa Jr., the owner and founder of eSutures, have taken the Fifth Amendment in refusing to answer the most basic questions posed in those lawsuits, such as whether they are affiliated with eSutures.com. (Potter Decl. Ex. 15).

8

Putting its gambling operation aside, eSutures advertises itself as the "global online leader in providing discounted surgical supplies," and "a wholesale liquidator of surgical supplies & sutures from such top brands such as Ethicon."[1] In a promotional video on its website, Defendant Iaderosa Jr. – the founder, CEO, and owner of eSutures – claims that eSutures simply purchases unwanted overstock surgical supplies from U.S. medical centers and then sells it to other medical centers "in the same market."[2] At the end of the video, Defendant Iaderosa Jr. looks into the camera and says, with cascading piano music playing in the background: "Someone is having surgery tomorrow, and that product is going in them. Every order gets treated with that type of care. And we understand that these items are needed next day. They are going into a person, and that person has a family."

In reality, eSutures is a large-scale counterfeiter who in the past two years has sold thousands upon thousands of unsafe and contaminated counterfeits of Ethicon surgical devices, putting untold number of American patients' lives at risk. eSutures imported most, but not all, of its counterfeits from Medserve in India. Without a willing partner like eSutures, an Indian counterfeiter like Medserve would never have had meaningful access to purchasing agents for American medical centers. eSutures created the U.S. market for the Indian counterfeits by advertising the counterfeits as legitimate overstock purchased from American hospitals. While it produced slick advertisements talking about the care it provides for products that are "going into a person" who "has a family," eSutures knowingly flooded American hospitals and surgery centers with defective, contaminated surgical devices. eSutures has thus directly caused

---

[1] *See* https://www.prnewswire.com/news-releases/esuturescom-opens-new-headquarters-and-distribution-center-company-continues-to-meet-growing-customer-demand-300301131.html; https://www.esutures.com/about-us/.

[2] https://www.youtube.com/watch?v=a4n79c-lN8I (also posted on https:// www.esutures.com/about-us/ under "play video").

9

immeasurable harm to innocent patients who believed, along with their doctors, that they were being treated with authentic, top-of-the-line medical devices.

### A. eSutures's Sale of Counterfeit SURGICEL® Absorbable Hemostat Devices in the U.S. Market

The backbone of eSutures's and Medserve's illegal operation has been their trafficking in counterfeit SURGICEL® Absorbable Hemostats, which eSutures sold in the United States by the thousands. At enormous effort and expense, Ethicon has conducted a worldwide investigation into the manufacture and distribution of the counterfeit SURGICEL® devices. Prior to filing this action, Ethicon filed lawsuits in two countries against over a dozen defendants, executed three *ex parte* seizures, and conducted extensive non-party discovery and on-the-ground surveillance. Through that investigation, Ethicon has gathered incontrovertible evidence that eSutures is at the epicenter of the U.S. distribution of the defective and contaminated counterfeit SURGICEL® devices.

### 1. Ethicon Files the Florida Action After Discovering Counterfeits at the University of Kentucky Medical Center

Ethicon first became aware of counterfeit SURGICEL® devices in the United States when it received a complaint from a neurosurgeon at the University of Kentucky Medical Center. (Potter Decl. ¶ 4). The neurosurgeon informed Ethicon that while he was performing a craniectomy – the removal of a portion of the patient's skull – he noticed that a unit of SURGICEL® in his operating room felt different and performed differently than expected. Ethicon retrieved a sample of the offending product, and through a series of tests and outside analysis, confirmed that the packaging was counterfeit and that the product itself was counterfeit, critically defective, and bacterially contaminated. (Decl. of Daniel Burkley, dated June 10, 2020 ("Burkley Decl.") ¶ 13; Decl. of Denise Dacey, dated June 11, 2020 ("Dacey Decl.") ¶ 10; Fitz Decl. ¶¶ 10-15).

10

Ethicon promptly investigated and then initiated a federal anti-counterfeiting lawsuit against the Florida counterfeiter who directly supplied the University of Kentucky: *Johnson & Johnson et al. v. XS Supply, LLC et al.*, No. 8:19-cv-1673-T-33AEP (M.D. Fla. 2019) (the "Florida Action").[3] In the Florida Action, Ethicon requested and received an *ex parte* seizure order against the known counterfeiter. (Potter Decl. Ex. 1). Information from the seizure allowed Ethicon to identify upstream members of the counterfeiting network, whom Ethicon added as defendants and against whom Ethicon received another *ex parte* seizure order. (Potter Decl. Ex. 2). Eventually, information obtained from the seizures, from third-party discovery, and by Ethicon's investigators allowed Ethicon to name fifteen members of the counterfeiting network as defendants in the Florida Action. Among those defendants were the Indian counterfeiter Medserve and its principal, Pritamdas Arora, who were at the top of the counterfeit supply chain that led to the University of Kentucky Medical Center. (*Id.* ¶ 8).

### 2. Ethicon's Investigation Leads to eSutures's Supplier and Counterfeiting Partner: Medserve in Delhi, India

Medserve and Mr. Arora failed to appear in the Florida Action, and so Ethicon retained Indian counsel and investigators, who worked in conjunction with U.S. counsel to locate and surveil Medserve's operations. (Potter Decl. ¶ 9). That investigation culminated with Ethicon filing a separate action against Medserve and Mr. Arora in the Hon'ble High Court of Delhi on October 10, 2019 (the "Indian Action.") (*Id.* ¶ 12). The U.S. District Court presiding over the Florida Action issued a formal Letter of Request requesting that the Indian courts issue an *ex parte* seizure order against Medserve and Mr. Arora. (*Id.* ¶¶ 10-11 & Ex. 4). On October 12, 2019, the Indian Court ordered such an *ex parte* seizure, which Ethicon executed with its Indian

---

[3] The Florida Action, like the instant action, was filed under seal pursuant to 15 U.S.C. § 1116. As of the date of this filing, the Florida Action is ongoing and remains under seal.

11

and American counsel, including the undersigned counsel, in attendance. (*Id.* ¶¶ 12-13 & Ex. 5). The seizure simultaneously occurred at Medserve's storefront, its warehouse, and Mr. Arora's apartment. (Potter Decl. Ex. 5).

Medserve was caught red-handed in the middle of a large counterfeit manufacturing operation it was running out of Mr. Arora's unsanitary apartment. Ethicon found piles of empty, never-sealed counterfeit SURGICEL® Absorbable Hemostat pouches, along with similar amounts of a third-party manufacturer's plain, non-sterile gauze cut and folded into a shape resembling SURGICEL® Absorbable Hemostats. (*Id.* ¶ 14).



These counterfeits were being assembled on the floor of Mr. Arora's unkempt and certainly non-sterile apartment. (*Id.* ¶¶ 14-15). Ethicon subsequently confirmed that the plain gauze located in Mr. Arora's apartment matched the counterfeit SURGICEL® recovered in the University of Kentucky Medical Center. (Burkley Decl. ¶ 41).

As described in more detail below, documents seized from Medserve and Mr. Arora revealed that they were close business partners of eSutures and worked closely with them to distribute thousands of counterfeit SURGICEL® Absorbable Hemostat devices, as well as other counterfeit Ethicon products, in the United States. (Potter Decl. Ex. 13).

### 3. The Counterfeit SURGICEL® Absorbable Hemostat Devices Are Contaminated, Defective, and Dangerous

The counterfeit SURGICEL® Absorbable Hemostat devices are non-sterile gauze, stuffed by unwashed hands into counterfeit packaging. Unsurprisingly, testing has confirmed that these counterfeits are defective and contaminated and cause tremendous risk when sewn into a patient's body in the place of an authentic SURGICEL® device. Surgeons who received these counterfeits intended to use a high-tech, specially treated hemostat to stop patient bleeding before dissolving into the bloodstream; instead, they unknowingly sewed dirty gauze into their patients' bodies.

### a. The Counterfeits Are Made from Plain Gauze that Will Not Properly Function as an Absorbable Hemostat

Ethicon has tested counterfeit SURGICEL® Absorbable Hemostats from two different sources: the original samples retrieved from the University of Kentucky Medical Center operating room, as well as a test purchase made by Ethicon's investigators and received directly from Medserve. The scientific testing conclusively determined the SURGICEL® Absorbable Hemostats to be counterfeit and defective. The results of those scientific tests are detailed in the accompanying declarations of Daniel Burkley and Denise Dacey.

Importantly, the results demonstrate that the counterfeit SURGICEL® Absorbable Hemostats are significantly less oxidized than the genuine device. (Fitz Decl. ¶ 10). The oxidation levels of the counterfeit product are well below the minimum levels required for genuine SURGICEL® products and would be considered a critical manufacturing defect if measured at an Ethicon factory. (*Id.*). Because the oxidization of a SURGICEL® hemostat is what gives it its antimicrobial, hemostatic, and absorption profiles, the counterfeits will simply not function the way surgeons expect and need SURGICEL® devices to function. (*Id.* ¶¶ 11, 14). For example, the counterfeits lack sufficient oxidation to be reliably absorbed by the body after

13

surgery. (*Id.* ¶¶ 6-7, 11). The counterfeit device will thus remain in the body after surgery as a foreign object, which creates a host of serious risks to the patient, including infection, foreign body granuloma, and surgical adhesions. (*Id.* ¶ 7).

### b. The Counterfeit SURGICEL® Devices Are Bacterially Contaminated

Ethicon sent several counterfeit SURGICEL® samples to an outside laboratory to test for bacterial contamination. The outside laboratory reports show that the counterfeits are teeming with a host of bacteria, including: *bacillus licheniformis, bacillus aerius, bacillus sonorensis, bacillus siamensis, bacillus amyloliquefaciens, bacillus atrophaeus, bacillus cereus, bacillus thuringiensis, bacillus subtilis, bacillus mojavensis. bacillus circulans, staphylococcus aureus, enterococcus hirae, enterococcus faecium, lysinibacillus pakistanensis, lysinibacillus fusiformis, lysinibacillus sphaericus,* and *bacillus toyonensis.* (Fitz Decl. ¶ 14; Potter Decl. Ex. 16).

It is, of course, crucially important that surgical devices be sterile and free from bacterial contamination. (Fitz Decl. ¶ 13). Using a contaminated surgical device on a patient, especially one designed to be left inside the body, creates a serious risk of infection and related complications for the patient. (*Id.* ¶¶ 13, 14). Moreover, given that the counterfeits were assembled on a dirty apartment floor, it is likely they were also contaminated with small particulates, such as lint or dust, which would also create risks of serious complications for patients. (*Id.* ¶ 15; *see* Potter Decl. ¶¶ 14-15).

### c. The Counterfeit SURGICEL® Devices Have in Fact Caused Brain and Other Infections

At the Medserve seizure, Ethicon recovered communications that confirm patients have been infected by the counterfeit SURGICEL® Absorbable Hemostats. For example, one of Medserve's Chinese customers wrote: "hospitals have a large number of patients infected. Suspicion is our 1952" – 1952 being the product code for the counterfeited SURGICEL®

14

Absorbable Hemostats. (Potter Decl. Ex. 31). The Chinese customer specified the patients were suffering from "head infections," which is consistent with the common use of SURGICEL® Absorbable Hemostats in neurosurgery. (*Id.*; *see also* Potter Decl. Ex. 32). And in a separate communication, Medserve noted that a hospital who had received its counterfeit SURGICEL® "told us it cause[d] infection," which prompted Mr. Arora to note that "[w]hen we pack material, we use our hands to pack, may be it created problem." (Potter Decl. Ex. 33).

### 4. The Counterfeit SURGICEL® Absorbable Hemostats Closely Resemble the Authentic Device

Although Ethicon's scientists were able to conclusively prove the supposed SURGICEL® Absorbable Hemostats to be counterfeit, the counterfeits are convincing fakes. For example, the sealed outer pouch of the counterfeits very closely resembles authentic packaging. Ethicon's testing revealed several differences, but they are subtle, and would be apparent only to an expert paying careful attention:



(Burkley Decl. ¶ 8).

Similarly, authentic SURGICEL® Absorbable Hemostats are made from regenerated cellulose, which resembles medical gauze. (*Id.* ¶ 5). Although authentic SURGICEL® Absorbable Hemostats are specially treated, the effects of that treatment are not apparent to the naked eye. (*Id.*) With the plain gauze cut and folded to mimic SURGICEL® Absorbable Hemostats, the counterfeits closely resemble the authentic device.

## B.  eSutures Willfully Conceals Its Trafficking of Counterfeit SURGICEL® Devices in Response to a Federal Subpoena

During the course of discovery in the Florida Action, eSutures was identified as a business partner of known distributors of counterfeit SURGICEL® products. Accordingly, in August 2019, Ethicon served on eSutures two non-party subpoenas seeking information about its purchases and sales of SURGICEL® devices. (Potter Decl. ¶¶ 24, 26 & Exs. 6, 7). Ethicon also informed eSutures's outside counsel, who handled the subpoena response, that its client had likely trafficked in counterfeit SURGICEL® devices, and explained the serious danger those counterfeits posed to the lives of unsuspecting patients. (*Id.*).

Despite this warning, eSutures's response to Ethicon's subpoenas was grossly fraudulent, knowingly concealing all evidence of its involvement in the counterfeiting. eSutures would have gotten away with it completely if Ethicon had not subsequently executed a seizure in India and collected eSutures's communications from its co-conspirator, Medserve.

### 1.  eSutures Conceals All Documents Concerning Its Counterfeiting and Falsely Portrays Defendant Shah as an Outside Vendor

Ethicon's August 12, 2019 subpoena to eSutures sought "all documents and communications from January 1, 2016 to the present concerning Mudassar Shah." (Potter Decl. ¶ 26 & Ex. 7). At the time, Ethicon knew that Mr. Shah was involved in the counterfeiting and

16

that he had some business relationship with eSutures. (*Id.* ¶¶ 25-26). Ethicon directly told eSutures that it had identified Mr. Shah as a counterfeiter. (*Id.*).

Ethicon now knows that Mr. Shah – a defendant in this action – is a full-time, salaried employee of eSutures. (*Id.* ¶ 32 & Ex. 10). Defendant Shah receives monthly wire payments from eSutures labeled "salary." (*Id.*). He has an eSutures.com business email address. (*See* Potter Decl. Ex. 37). And Defendant Shah holds himself out as a salaried eSutures employee in his counterfeit transactions. For example, in October 2019 he wrote to a potential Illinois-based customer: "i m employee of Esutures.com," explaining "i m working for them since 2 years" and "they pay me monthly sallery to my bank account in pakistan." (Potter Decl. Ex. 17). Defendant Shah explained that he does "purchasing from all over the world" for eSutures. (*Id.*). When asked by the gray-market distributor if Shah would provide the same services for him, Shah responded "no bro ..[.] since i m a permanent employee …i dont need to look around," and "[Defendant] Anthony [Iaderosa Jr.] is my best friend and my boss also." (*Id.*).

In fact, Defendant Shah was the employee who primarily managed eSutures's relationship with Medserve. (*See, e.g.*, Potter Decl. Exs. 19-22, 24-30). He was personally involved in all or nearly all of eSutures's purchases of counterfeit SURGICEL® from Medserve. (*Id.*). Unsurprisingly, Defendant Shah had extensive written communications about the counterfeits, both with other eSutures employees and with Medserve. (*Id.*).

In its subpoena response, eSutures concealed **all** of those documents. It produced a total of 68 pages of documents in response to Ethicon's two subpoenas, including only 28 pages of documents concerning Mr. Shah. (*See id.* ¶¶ 28-29 & Exs. 8, 9). **None** of those documents had anything to do with the counterfeiting or Medserve. (*Id.* ¶ 30). Not only that, but eSutures was careful not to produce any documents indicating that Mr. Shah was an eSutures employee. For

17

example, eSutures produced no documents to, from, or mentioning Mr. Shah's eSutures.com email address. (*Id.*). Instead, eSutures produced only a small set of documents carefully hand-selected to give the appearance that Mr. Shah was an outside vendor to eSutures, not an employee.

### 2. eSutures Conceals the Counterfeits It Has in Stock, and Instead Produces a Handful of Authentic Boxes

In connection with the subpoena, eSutures agreed to send Ethicon SURGICEL® products it had in stock so that Ethicon could assess whether they were counterfeit. (Potter Decl. ¶ 31). eSutures sent Ethicon four ten-count boxes of SURGICEL® devices and a few loose packets, all of which were authentic. (*Id.*). Ethicon later discovered that at the time it sent these selected authentic packets to be tested by Ethicon, eSutures was in possession of several hundred units of counterfeit SURGICEL® devices from Medserve that eSutures knew to be counterfeit.

Documents that Ethicon subsequently seized from Medserve in India show that on August 12, 2019 – the same day that Ethicon served the subpoena – eSutures received from Medserve a shipment of 300 units of counterfeit SURGICEL® devices. (Potter Decl. Ex. 13). Defendant Shah made this purchase from Medserve on behalf of eSutures. (Potter Decl. Ex. 30). But it turned out that unlike prior batches, the counterfeit packaging of this batch was so poorly done that it was immediately obvious that it was not genuine product. Shortly after responding to the subpoena, eSutures complained to Medserve about the quality of these counterfeit SURGICEL® devices. For example, Defendant Shah forwarded to Medserve the following complaint from Defendant Einhorn: "The packaging is very suspicious. really bad print job . . . . Plastic is not original. No ethicon seal." (Potter Decl. Ex. 30).

Despite knowing that it was in possession of hundreds of counterfeit SURGICEL® devices, eSutures sent only authentic product to Ethicon to be tested for authenticity. There can

18

be no serious question that eSutures deliberately selected the authentic product and withheld the counterfeit product as part of a conscious effort to deceive Ethicon and avoid liability for its counterfeiting.

In sum, in responding to Rule 45 subpoenas, eSutures deliberately concealed all of its counterfeits and all documents concerning its counterfeiting. Instead, eSutures produced extremely limited, hand-picked documents and products intended to make it appear as an innocent distributor. One could hardly ask for more powerful evidence that eSutures cannot be trusted to voluntarily comply with federal discovery.

### 3. After Concealing the Obvious Counterfeits from Ethicon, eSutures Attempts to Sell Them Overseas

After fraudulently responding to Ethicon's subpoena, eSutures still had the problem of what to do with the hundreds of obviously fake counterfeits. Its solution: try to sell them into abroad. eSutures sent a series of WhatsApp messages to Medserve, attempting to arrange a sale of the obvious counterfeits to one of Medserve's distributor customers in Dubai. (Potter Decl. Ex. 30). From the documents from the Medserve seizure, it appears that eSutures was likely unsuccessful, and that the obvious counterfeits remain in eSutures's possession.

### C. eSutures's Manufacture and Sale of Counterfeit SURGICEL® FIBRILLAR™ Devices

In addition to counterfeiting SURGICEL® Absorbable Hemostats, eSutures partnered with Medserve to create and sell counterfeits of Ethicon's SURGICEL® FIBRILLAR™ hemostats. This venture involved obtaining expired SURGICEL® FIBRILLAR™ devices and repackaging them into counterfeit packaging with falsified expiration dates. eSutures acquired and shipped the expired devices to Medserve; Medserve repackaged the expired devices into the counterfeit packaging; and eSutures was given some of the counterfeit repackaged devices to sell at a profit.

19

Not only is it unsafe and illegal to sell expired surgical devices for use in humans, but the counterfeit repackaging process rendered the product nonsterile and bacterially contaminated. Like the other counterfeits sold by eSutures, these repackaged counterfeits pose a serious threat to the health and lives of patients.

### 1. Ethicon Instructs eSutures to Stop Selling Expired Ethicon Surgical Devices

Ethicon previously learned that eSutures was selling expired Ethicon devices, and took action to stop it. In April 2015, the undersigned counsel sent on Ethicon's behalf a formal cease-and-desist letter to Defendant Iaderosa Jr., the owner and President of eSutures. (Potter Decl. Ex. 38). The letter demanded that eSutures stop selling expired Ethicon products. (*Id.*). The letter told eSutures that "ETHICON has serious concerns that expired product is being sold for use with human patients, which could present a significant health and safety concern"; that selling "expired product … constitutes a violation of the federal Lanham Act"; and that "offering expired product … as though it were unexpired and approved for human use is a fraud on the customer." (*Id.*).

But as Ethicon now knows, eSutures did not stop its illegal trafficking of expired Ethicon surgical devices. It simply pivoted from openly selling expired devices to engaging in criminal counterfeiting.

### 2. Ethicon's Acquisition and Testing of eSutures's Expired Devices in Counterfeit Packaging

Ethicon has on two occasions received SURGICEL® FIBRILLAR™ devices sold by eSutures, and confirmed them to be expired product in counterfeit packaging.

First, a U.S. company, Davol Inc., had purchased SURGICEL® FIBRILLAR™ from eSutures for competitive research purposes. In response to a subpoena, Davol produced the SURGICEL® FIBRILLAR™ devices to Ethicon along with the paperwork proving that it had

20

purchased them from eSutures. (Potter Decl. Ex. 39). Ethicon received the device five months after Davol purchased it. (*Id.*). According to the packaging, the device was well within its expiration date when Ethicon received and tested it. (Burkley Decl. ¶ 47). Ethicon's testing confirmed that the packaging of the SURGICEL® FIBRILLAR™ was counterfeit based on several anomalies, as set forth in the accompanying declaration of product scientist Daniel Burkley. (*Id.* ¶ 50). The device inside the counterfeit packaging was yellowed with age, but despite the discoloring, testing showed it to be authentic – the expiration date on the counterfeit packaging was clearly fake. (*Id.* ¶¶ 49-50).

Second, Ethicon's investigators made a test buy directly from eSutures, and again received authentic SURGICEL® FIBRILLAR™ in counterfeit packaging. This test purchase was made in Pakistan through Defendant Shah, the Pakistan-based employee who managed eSutures's relationship with Medserve. (Decl. of Rao Zaman, dated June 9, 2020 ("Zaman Decl.") ¶¶ 4, 7). Ethicon's investigators contacted Defendant Shah, who arranged to have the purchase occur at a billiards hall he owns, "Shah Snooker Club" in Pakistan. (*Id.* ¶ 5). Defendant Shah has posted on Facebook pictures of himself at his snooker hall wearing his eSutures.com uniform:

21



(*Id.* ¶ 8). Per Defendant Shah's instructions, Ethicon's investigators met his cousin at the snooker hall, who telephoned Defendant Shah to confirm the sale, and then sold SURGICEL® devices to the investigators for cash. (*Id.* ¶¶ 6-7). Once again, Ethicon tested and confirmed that the packaging of the SURGICEL® FIBRILLAR™ was counterfeit, while the device itself was authentic. (Burkley Decl. ¶ 37).

### 3. The Counterfeit Repackaged SURGICEL® FIBRILLAR™ Is Dangerous and Contaminated

The sale of expired surgical devices for use in humans is illegal for a reason: expired devices pose an unwarranted risk to patients. (Fitz Decl. ¶ 15). eSutures's counterfeit SURGICEL® FIBRILLAR™ is not just expired, but is also removed from its original sterile packaging. Authentic SURGICEL® devices are manufactured in a sterile environment, and then undergo an additional sterilization process after they are sealed inside packets. (*Id.* ¶ 12). That sterility is, of course, lost if the packets are opened in a non-sterile environment. Unsurprisingly, given the unsanitary way in which the counterfeits were assembled, an outside lab has confirmed

22

that the counterfeit repackaged SURGICEL® FIBRILLAR™ sold by Medserve is bacterially contaminated. (Potter Decl. Ex. 16).

### 4. eSutures Partnered with Medserve to Manufacture the Counterfeits and to Falsify Documents to Evade Detection

Records obtained from the Medserve seizure show that eSutures was a knowing partner in the manufacture of the counterfeit repackaged SURGICEL® FIBRILLAR™. eSutures also worked closely with Medserve to falsify documents and evade detection.

### a. eSutures Attempts to Use Decade-Expired Product, Which Medserve Warns Would Kill Patients

For example, in April 2019, Medserve wrote to Defendant Shah, the eSutures employee, that "there are huge warehouses in USA where there are large stocks which are of short expiry or are expired. I am interested in getting those products. . . . In such products a lot of money can be saved." (Potter Decl. Ex. 24). In a voice message later that night, Medserve stated, "Keep searching for more such stock which is available also, and let me know by morning how much has been collected. Keep collecting more and more stocks. All stock will work." (Potter Decl. Ex. 25).

Through a WhatsApp message, Defendant Shah then sent a photograph of the below handwritten order to Medserve, copying Defendant Einhorn, entitled "Expired Stok":



23

(Potter Decl. Ex. 22). The numbers 2082 and 2083 are product codes for SURGICEL SNoW®; 1963 is the product code for SURGICEL® FIBRILLAR™.

At Medserve's request, Defendant Einhorn, eSutures's Director of Operations, provided the expiration dates for the SURGICEL® hemostats being offered. Several dozen of the surgical devices had been expired for over a decade. (*Id.*). Even Medserve was horrified at the idea of repackaging such ancient surgical devices and selling them as "new," and was forced to spell it out for Defendant Einhorn in a voice message:

> Boss, we are friends, and we cooperate with each other, and **we all have a common sense**, so we must all be having an idea what will work or not. Yesterday night, I was a little drunk and I said I would buy all the expired goods. **But we cannot kill anyone**, we can never accept goods of 2007, 2008 – it is impossible.

(*Id.*) (emphasis added). Defendant Einhorn responded "ok np." (*Id.*).

### b. eSutures Knew the Expired Products Would Be Used to Manufacture Counterfeits, and Received the Counterfeits Back as Payment

eSutures shipped large quantities of expired SURGICEL® FIBRILLAR™ to Medserve in May 2019. (Potter Decl. Ex. 37). Although eSutures invoiced Medserve over $10,000 for those expired products, there is no record of Medserve paying that invoice. Instead, the records show that in August 2019, Medserve shipped back to eSutures a somewhat smaller quantity of supposedly non-expired SURGICEL® FIBRILLAR™ – doubtlessly the expired SURGICEL® FIBRILLAR™ now repacked into the counterfeit packaging. (Potter Decl. Ex. 13). In short, eSutures's payment for supplying the expired surgical devices was to receive a cut of the finished counterfeits to sell in the United States.

24

### c. eSutures and Medserve Work Together to Falsify Records to Conceal their Counterfeiting

The documents from the Indian seizure show that eSutures and Medserve worked

together to falsify paperwork and take other steps with the express purpose of concealing their

illegal trade.

On January 5, 2019, Medserve sent a voice message to Defendant Shah providing

instructions on how to ship the expired products:

> There is no need to mention the expiry or lot. Just need to mention that it's a cotton foam, no need to mention its use or anything. Just need to write cotton foam samples and send it via Aramex. . . . No need to mention reference code or item name on the invoice. Only mention the size and name it as cotton foam samples and that's it.

(Potter Decl. Ex. 26). Defendant Shah stated in a return voice message:

> I have given [Defendant Einhorn] an option that as the products are expired, he can show that he is sending the same as a free gift or donation and send it.

(*Id.*). But Medserve objected:

> We'll be f[*]cked if we mention 'expire' there . . . we'll all expire. It is not allowed.

(Potter Decl. Ex. 27). Defendant Shah acknowledged by voice memo back:

> I will make sure that the word expired will not be mentioned anywhere. Just mention cotton foam only. That's fine.

(*Id.*).

Defendant Einhorn nevertheless generated an invoice that included the expiration date for

each product, explaining that "I will remove the expiration.. just for my reference and will also

remove outer boxes." (Potter Decl. Ex. 28). Medserve again emphasized in a voice note to

Defendant Shah: "Details of every code and the number of pieces need not be mentioned on the

invoice. There will only be 3 lines on the invoice which is 2082, 2083, 1963 and their total

number of pieces. Otherwise, it will not work." (*Id.*). Defendant Einhorn complied, generating

25

an eSutures invoice just three lines long, listing only the products and their product codes. The expiration date on the invoice is listed as "--". (*Id.*). The original and falsified invoices are shown below:

eSutures.com

Invoice

Thank you for your order at eSutures.com!

BILLING
**P.D Arora**
Medserve
6/5 A. Prasanna APT, Bahamashah Rd.
Near Kirpal Bagh, Dehi
New Delhi 110009
India
P: 0091-9899999911
E: pd@medsevindia.com
Purchase Order

SHIPPING ADDRESS
**Yu Tsz Him**
MCI Logistics Guangdong LTD
Unit 217, Phase 1, Domestic Freight Village
Airport, Baoan District, Guangdong Province
Shenzhen City 518128
China
P: 85295018955
E: m.shah@esutures.com

Order Number: **292090**
Order Date: 5/2/2019 12:18 pm

| Item # | Size | Description | Expiration | Qty | Unit | Price | Ext Price |
|---|---|---|---|---|---|---|---|
| 2082 | - | Surgicel SNoW Absorbable Hemostat: 2" x 4" | 01-2016 | 268 | eaches | $12.00 | $3,216.00 |
| 2082 | - | Surgicel SNoW Absorbable Hemostat: 2" x 4" | 01-2016 | 1 | box of 10 | $120.00 | $120.00 |
| 2082 | - | Surgicel SNoW Absorbable Hemostat: 2" x 4" | 01-2017 | 54 | eaches | $12.00 | $648.00 |
| 2082 | - | Surgicel SNoW Absorbable Hemostat: 2" x 4" | 01-2018 | 20 | eaches | $12.00 | $240.00 |
| 2082 | - | Surgicel SNoW Absorbable Hemostat: 2" x 4" | 01-2019 | 5 | eaches | $12.00 | $60.00 |
| 2082 | - | Surgicel SNoW Absorbable Hemostat: 2" x 4" | 01-2018 | 11 | box of 10 | $120.00 | $1,320.00 |
| 2083 | - | Surgicel SNoW Absorbable Hemostat: 4" x 4" | 01-2018 | 13 | eaches | $24.00 | $312.00 |
| 2083 | - | Surgicel SNoW Absorbable Hemostat: 4" x 4" | 01-2019 | 5 | eaches | $24.00 | $120.00 |
| 2083 | - | Surgicel SNoW Absorbable Hemostat: 4" x 4" | 01-2018 | 5 | box of 10 | $240.00 | $1,200.00 |
| 1963 | - | Surgicel Fibrillar Absorbable Hemostat: 4" x 4" | 01-2016 | 2 | eaches | $15.00 | $30.00 |
| 1963 | - | Surgicel Fibrillar Absorbable Hemostat: 4" x 4" | 01-2017 | 53 | eaches | $15.00 | $795.00 |
| 1963 | - | Surgicel Fibrillar Absorbable Hemostat: 4" x 4" | 01-2018 | 100 | eaches | $15.00 | $1,500.00 |
| 1963 | - | Surgicel Fibrillar Absorbable Hemostat: 4" x 4" | 01-2019 | 7 | eaches | $15.00 | $105.00 |
| 1963 | - | Surgicel Fibrillar Absorbable Hemostat: 4" x 4" | 01-2016 | 3 | box of 10 | $150.00 | $450.00 |
| | | | | | | **Sub Total:** | **$10,116.00** |
| | | | | | | **Shipping & Handling:** | **$0.00** |
| | | | | | | **Order Total:** | **$10,116.00** |

Total due: $10,116.00 Net 30 days. Please make checks payable to **eSutures.com**

Thank you for your business! Please visit us again at eSutures.com

**eSutures.com** • 9645 Willow Ln • Mokena IL 60448 • P: (888) 416-2409 • F: (708) 478-3519 • info@esutures.com

If you feel we've provided great value or would like to leave us feedback, please do so on the eSutures.com Google My Business page: https://goo.gl/mbrKQw We appreciate your input!



(Potter Decl. Ex. 37).

At Medserve's instruction, Defendant Shah also prepared a separate shipping invoice for

the products, listing 379 pieces of "cotton foam" at $0.75 per piece. (Potter Decl. Ex. 41).

Medserve explained how to keep the numbers on the shipping invoice fraudulently low to avoid

attention:

> Value wont be more than 300usd. For example if its 1000pieces then value will
> be 0.3usd each, total 300usd.

(Potter Decl. Ex. 19). Medserve further explained how to ship the product to avoid scrutiny:

> Please dont hesitate to dispatch shipment on low value by Aramex as its sample
> shipment by courier mode not in cargo. Courier shipment never comes in
> scrutiny. Data exists for cargo shipment not for cargo [*sic*].

(Potter Decl. Ex. 20).

Notably, eSutures shipped the expired Ethicon devices to Medserve through a logistics

company in China, rather than directly to India. (Potter Decl. Ex. 37). The purpose of this

27

expensive circumnavigation was to conceal the relationship between the two counterfeiters by using a third-party middleman. But despite their best efforts, the illegal shipment was held up in Chinese customs, and ultimately returned to eSutures. eSutures then tried again: it shipped the expired devices to Medserve to the logistics company's Hong Kong branch. (Potter Decl. Ex. 37). When re-shipping the expired medical devices, Defendant Einhorn asked "how do you want me to describe goods…. ABSORBABLE HEMOSTAT or COTTON FOAM," and Medserve responded, "Cotton foam." (Potter Decl. Ex. 21). Defendant Einhorn complied. (*Id.*). With this falsification of the paperwork, eSutures was successful: after the expired products made it through Hong Kong customs, they were forwarded on to Medserve in Delhi.

### D. eSutures's Sale of Counterfeit Ethicon LIGACLIP® Devices

When Ethicon was in the middle of executing the Indian seizure at Mr. Arora's apartment, there was a knock at the door. As fate would have it, Medserve received that day a special delivery: thousands of counterfeit Ethicon LIGACLIP® Extra Ligating Clips packed loosely in large, non-sterile plastic bags, delivered in full view of Ethicon's counsel and Indian law enforcement:



(Potter Decl. ¶ 16).

28

Ethicon has tested samples of the LIGACLIP® devices recovered from Medserve and conclusively determined them to be counterfeit. The details of that testing are set forth in the accompanying affidavit of Cameron McLain. Among the deficiencies are visible differences in the surfaces of the clips themselves:

 

(Decl. of Cameron McLain, dated June 9, 2020 ("McLain Decl.") ¶ 8). There are also several differences between the counterfeit and authentic clip cartridges, including the following:



(*Id.* ¶ 9).

A series of tests also confirmed the counterfeits to perform more poorly than authentic LIGACLIP® Extra Ligating Clips on several measures. (*Id.* ¶ 20). For example, the counterfeit

29

clips pull off more easily than the authentic device, and create significantly larger "clip gaps" –
the gap between a vessel and the clip when applied. (*Id.* ¶¶ 13-14, 15-16). These are crucial
measures for the effectiveness of surgical clips, and these deficiencies create a significant risk of
harm to a patient receiving the counterfeit clips. (*Id.* ¶ 20).

The counterfeit LIGACLIP® Extra Ligating Clips were not delivered with their
counterfeit packaging, and so Ethicon did not recover the counterfeit packaging at the seizure.
But Ethicon did recover a WhatsApp communication in which Medserve directly informed
eSutures that he sells the "duplicate" – *i.e.*, counterfeit – LIGACLIP® devices in counterfeit
Ethicon packaging:

> [T]here is one [duplicate] product which is available in the market and its report is
> perfectly fine. . . . There is a Chinese version of Ligaclip but nicely packed in
> Johnson & Johnson's packaging. It sells a lot in Pakistan and Dubai. . . . If you
> ever need duplicate Ligaclip, I can arrange for you as I know the guy who makes
> it and it is being sold in all Indian hospitals and it's a successful product also.

(Potter Decl. Ex. 29).

Finally, because the counterfeit LIGACLIP® devices were collected at the Indian seizure,
Ethicon has not had them tested by a laboratory for bacterial contamination. However, given
that the counterfeit LIGACLIP® devices were delivered to Medserve in a non-sterile plastic bag,
and given the generally unsanitary nature of Mr. Arora's apartment and Medserve's
counterfeiting operation, it is extremely likely that the counterfeit LIGACLIP® products are
bacterially contaminated as well.

Shipping records show that eSutures purchased nearly one thousand of these counterfeit
LIGACLIP® devices from Medserve and imported them into the United States. (Potter Decl. Ex.
13).

30

### E.    eSutures's Sale of Counterfeit ETHICON SECURESTRAP® Devices

The Food and Drug Administration's Office of Criminal Investigation ("FDA OCI") has been conducting a criminal investigation of eSutures, and at the government's request Ethicon has been cooperating with that investigation. In December 2019, FDA OCI asked Ethicon to confirm that ETHICON SECURESTRAP® devices found in eSutures's warehouse were counterfeit. (Rauso Decl. ¶ 19-20). Ethicon was easily able to do so based on the fake lot numbers that appeared on the counterfeit boxes and documentation that was missing from inside the boxes. (*Id.*). FDA OCI informed Ethicon that eSutures had purchased several dozens of these supposed ETHICON SECURESTRAP® devices from a gray-market distributor in Turkey. (*Id.*). FDA OCI also informed Ethicon that eSutures had sold at least some of those ETHICON SECURESTRAP® products in the United States. (*Id.*).

Before the FDA OCI found them at eSutures, Ethicon was unaware that there were counterfeit ETHICON SECURESTRAP® devices circulating in the marketplace. These counterfeit ETHICON SECURESTRAP® products are the **fourth** counterfeit Ethicon product that eSutures has trafficked in the past two years – that Ethicon knows of. Moreover, the counterfeit ETHICON SECURESTRAP® has no connection to Medserve, proving that eSutures's counterfeiting goes beyond its partnership with Medserve and Mr. Arora. eSutures's trafficking of never-before-seen counterfeit Ethicon devices from a new overseas supplier strongly suggests that there are additional counterfeit Ethicon devices in eSutures's inventory that Ethicon has not yet discovered.

### III. ADDITIONAL EVIDENCE OF ESUTURES'S WILLFULNESS AND UNLAWFUL ACTIVITY

#### A. Medserve is a Known Counterfeiter of American Surgical Devices

A quick Google search exposes Medserve for what it is: a recidivist purveyor of contaminated, counterfeit surgical devices. In December 2011, a medical device distributor named RAM Medical, Inc. pled guilty to selling hundreds of boxes of counterfeit surgical mesh falsely bearing the marks of a U.S. medical manufacturer. In its press release concerning the prosecution, the U.S. Department of Justice specifically identifies "M/S Medserve in Delhi, India" as the origin of the counterfeits. (Potter Decl. Ex. 40). The press release, which is readily available online, also notes that the "adulterated mesh . . . contained numerous microorganisms." (*Id.*).

#### B. eSutures Shipped the Counterfeits to Employees' Homes to Evade Detection

eSutures purchased counterfeit Ethicon devices from Medserve beginning at least in October 2018, and had the first few shipments of counterfeits delivered to its sizable company warehouse. (Potter Decl. Ex. 13). However, in April 2019, eSutures suddenly changed that practice. It continued buying counterfeits from Medserve in bulk, but it had the deliveries sent to the personal homes of eSutures employees. (*Id.*). Moreover, for these deliveries, eSutures instructed Medserve to scrub its invoices of all references to eSutures, including removing the employees' company email addresses. (*See id.*). The obvious explanation, and the only plausible one, is that eSutures knew it was purchasing counterfeits and was actively attempting to avoid detection by Ethicon and the government.

For example, on April 11, 2019, Defendant Shah placed an order with Medserve on eSutures's behalf, and instructed that the shipment be shipped directly to Defendant Einhorn's home to avoid FDA scrutiny. (Potter Decl. Ex. 24). When Medserve prepared an invoice

32

including eSutures's corporate phone number and the email address "Jason@esutures.com,"
Defendant Shah instructed Medserve in a voice memo to "Just strike off the email address and
telephone number and instead write the [home] address and phone number of Jason." (*Id.*).
Medserve then in fact shipped counterfeit SURGICEL® and LIGACLIP® products to Defendant
Einhorn at his apartment in Chicago on April 12 and April 18, 2019. (Potter Decl. Ex. 13).
Similarly, on June 8 and August 8, 2019, eSutures purchased counterfeit SURGICEL® products
from Medserve and had them shipped to another eSutures employee, Defendant Phipps, at his
house in Beecher, Illinois. (*Id.*; *see* Potter Decl. Ex. 30).

### C. Upon Learning that Ethicon Sued Another Member of the Counterfeiting Network, eSutures Begs Its Co-Conspirator to Delete the Evidence

On October 4, 2019, Ethicon filed its second amended complaint in the Florida Action,
adding Medserve and several additional members of the counterfeiting network as defendants.
After receiving Ethicon's initial discovery requests, one of the new defendants reached out to
eSutures. (Potter Decl. Ex. 18). It told eSutures it had been sued, and provided eSutures a copy
of Ethicon's document discovery demands. (*Id.*). eSutures's reaction was to beg the other
counterfeiter, in a panic, to delete the relevant electronic records that Ethicon was requesting.
Defendant Shah wrote: "**plzz dont tell them [Ethicon] my details ... plz delete all**." (*Id.*)
(emphasis added). He continued: "**delete my texts and my number ... from ur cell**." (*Id.*)
(emphasis added).

### D. eSutures Supplements Its Counterfeiting with Other Unlawful Schemes to Obtain Ethicon Devices

eSutures is a criminal enterprise: in addition to running an illegal online casino and its
massive counterfeiting operation, it runs other schemes to unlawfully obtain authentic Ethicon
surgical devices on the cheap.

33

For example, eSutures's purchase of stolen medical supplies in bulk is a matter of public record. In 2013, Michael Gwinn, a former surgical assistant confessed and pled guilty to stealing nearly $1 million in medical supplies from his employer and fencing them through eSutures.[4]

eSutures also employs as its inventory manager Mr. Anthony Iaderosa Sr., the father of Defendant Iaderosa Jr. Mr. Iaderosa Sr. was previously a purchasing manager for Unilever, a manufacturer of surgical and other products, but was fired for his role in a large-scale invoicing fraud scheme involving collusion with local suppliers for payment of false invoices.[5] Iaderosa Sr. joined eSutures immediately after he was fired from Unilever.[6]

Finally, and most recently, eSutures has corrupted clerks and other low-level employees of multiple U.S. surgery centers, bribing them to fraudulently obtain heavily discounted product under their employers' names but secretly ship that product to eSutures. These surgery centers are granted a heavy discount when they purchase Ethicon surgical devices representing that the devices will only be used on the center's patients, and will not be resold. eSutures corrupts these clerks into making large purchases of discounted Ethicon devices using their employer's credentials, and then personally pays the employees to deliver the discounted devices to eSutures, all while keeping their employers in the dark. The facts of this scheme are alleged in paragraphs 136-181 of Ethicon's Complaint.

The FDA OCI's ongoing criminal investigation of eSutures covers this fraudulent scheme as well as the counterfeiting. Ethicon has cooperated with the government's criminal

---

[4] http://archive.knoxnews.com/news/crime-courts/former-fort-sanders-surgical-assistant-admits-role-in-nearly-1-million-theft-case-ep-510595044-355608641.html/.

[5] https://www.nwitimes.com/news/local/unilever-fraud-allegations-lead-to-firings/article_6e58241e-f27c-56eb-ac76-17de8979ae73.html.

[6] *See* https://www.esutures.com/about-us/staff.

investigation, and has conducted a separate investigation of its own. Ethicon has gathered evidence of multiple low-level surgery-center employees placing large orders of Ethicon devices, logging in with their employers' credentials but paying using their personal credit cards and home addresses. In fact, Ethicon has obtained a copy of a $68,000 check that eSutures wrote personally to a surgery-center clerk – and *not* her employer:



(Potter Decl. Ex. 34). Given the extensive nature of eSutures's schemes to illegally acquire Ethicon devices, Ethicon has no reason to believe that any of the Ethicon products in eSutures's inventory were legitimately and lawfully obtained.

## ARGUMENT

Ethicon respectfully submits that the extraordinary facts of this case and the egregiousness of eSutures's conduct make it clear that Ethicon is entitled to the relief it seeks in this motion.

## I.    ETHICON IS ENTITLED TO AN *EX PARTE* SEIZURE ORDER

Ethicon seeks an *ex parte* seizure order pursuant to the Trademark Counterfeiting Act of 1984, 15 U.S.C. § 1116(d)(1). Passed in response to "an 'epidemic' of commercial counterfeiting," *see* S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in 1984

35

U.S.C.C.A.N. 3627, 3631 (citing *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984)), the Counterfeiting Act permits a court to grant an *ex parte* order of seizure in "[c]ivil actions arising out of [the] use of counterfeit marks," including seizure of counterfeit goods and "records documenting the manufacture, sale, or receipt" of the counterfeit goods. 15 U.S.C. § 1116(d)(1)(A). As Congress explained in the Senate Report accompanying this bill, "[t]he reason for this provision is that many counterfeiters, once given notice that their fraudulent operations have been discovered, will immediately dispose of the counterfeit goods and make it impossible for the trademark owner ever to bring them to justice." 1984 U.S.C.C.A.N. at 3629.

In the Florida Action, Ethicon requested and received, and successfully executed, two *ex parte* seizure orders from the U.S. District Court for the Middle District of Florida. (Potter Decl. ¶¶ 4-7 & Exs. 1, 2). The seizures not only led to the recovery of crucial evidence about the counterfeiting, but also allowed Ethicon to seize hundreds of dangerous counterfeits before they were sold to medical facilities. The outcome of those seizures has been invaluable in Ethicon's efforts to identify the members of this international counterfeiting network, shut down its members, and chase down counterfeit product that has already been distributed. The *ex parte* seizure against Medserve occurred pursuant to Indian law, but the District Court in the Florida action issued a formal Letter of Request to the Indian court in support of such a seizure. (Potter Decl. ¶¶ 11-13 & Exs. 4, 5). As described above, those prior *ex parte* seizures allowed Ethicon to identify and gather evidence against eSutures, which is by far the largest and most important American member of the counterfeiting network. Without those seizures, Ethicon would have been stuck with eSutures's fraudulent response to Ethicon's subpoenas, and would almost certainly lack the evidence required to bring this motion.

36

A.    **Ethicon Satisfies All the Requirements for an *Ex Parte* Seizure Under the Counterfeiting Act.**

The Counterfeiting Act enumerates several prerequisites for obtaining an *ex parte* seizure order. *See* 15 U.S.C. § 1116(d)(4)(B).[7] Ethicon has satisfied all of them. Ethicon therefore respectfully requests that the Court issue an *ex parte* seizure order. A proposed order is being filed simultaneously with this motion.

1.    **An order other than an *ex parte* seizure order is not adequate to achieve the purposes of the Lanham Act (15 U.S.C. § 1116(d)(4)(B)(i)).**

As set forth above, the Lanham Act's goals are to protect manufacturer's marks and goodwill, to allow manufacturers to control the quality of their products, and to protect the American consumer from confusion. *See supra* pp. 35-36. Here, eSutures is engaged in wholesale distribution of thousands of counterfeit, dangerous, and ineffective surgical devices. eSutures has also participated in the manufacture of counterfeit goods by selling expired product to be repackaged into counterfeit packaging, which it then sold in the United States. The only feasible means of stopping eSutures, collecting the evidence of its counterfeiting, and tracing the distribution of these counterfeits is through an *ex parte* seizure.

As recognized by Congress in enacting the Counterfeiting Act, counterfeiters are more likely than not to dispose of or conceal the counterfeit goods when confronted with a trademark action. 130 Cong. Rec. H 12076, 12080 ("[M]any of those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon."). Here, eSutures took unmistakable and illegal steps to conceal its counterfeiting from

---

[7] The Counterfeiting Act separately requires plaintiffs to notify the local U.S. Attorney before seeking an *ex parte* seizure. 15 U.S.C. § 1116(d)(2). Ethicon has done so. (Potter Decl. ¶ 37 & Ex. 11). In its proposed seizure order, Ethicon has also included a provision requiring a seizure bond pursuant to 15 U.S.C. § 1116(d)(4)(A).

Ethicon and the government, such as falsifying shipping documents and having counterfeits delivered to employees' homes. (*See* pp. 16-19, 32-35, *supra*). And as described in detail below, eSutures has an established history of both flouting federal discovery and attempting to conceal, destroy, or remove evidence when it learns it has been caught. The Counterfeiting Act's provision for *ex parte* seizures was enacted for precisely this type of scenario.

## 2. Ethicon has not publicized the requested seizure (15 U.S.C. § 1116(d)(4)(B)(ii)).

Ethicon has not publicized the requested seizure. (Potter Decl. ¶ 36). Ethicon has moved for the papers in support of Ethicon's application for *ex parte* relief to be kept under seal by the Clerk of this Court pending the effectuation of the seizure order.

## 3. Ethicon is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services (15 U.S.C. § 1116(d)(4)(B)(iii)).

As demonstrated above, the indisputable evidence shows that eSutures is distributing, selling, and offering for sale a variety of counterfeit Ethicon devices in counterfeit packaging that falsely bears Ethicon's registered trademarks. (*See* pp. 19-32, *supra*). Ethicon is more than likely to succeed on its counterfeiting claims, and that is more than sufficient to satisfy this statutory criterion. (*See* pp. 47-50, *infra*).

## 4. An immediate and irreparable injury will occur if such seizure is not ordered (15 U.S.C. § 1116(d)(4)(B)(iv)).

As discussed below, Ethicon (and others) are being irreparably harmed as eSutures's dangerous and contaminated counterfeits are currently being distributed to, and used by, medical facilities in the United States. (*See infra* pp. 50-52). Seizing the counterfeit product and the documentation concerning its sale and distribution is a necessary first step to prevent eSutures from continuing to sell the counterfeits, to identify others who may be involved, and to warn

38

customers who may have purchased counterfeit product. Until that happens, Ethicon and the public will be irreparably injured.

### 5. The matter to be seized will be located at the place identified in the application (15 U.S.C. § 1116(d)(4)(B)(v)).

The requested seizure will take place at three locations: eSutures's corporate offices (including its warehouse) and the two residences, belonging to Defendants Einhorn and Phipps, to which eSutures had several hundred counterfeits shipped. Ethicon has documentary evidence that the counterfeits at issue were delivered to all three of these addresses. (Potter Decl. Ex. 13).

As to the corporation, the address of the proposed seizure address matches public documentation of its location, including eSutures's website, and was confirmed by an on-site visit to eSutures's offices and warehouse by an Ethicon investigator.[8] (Potter Decl. Ex. 37; Decl. of Michael Houston, dated June 10, 2020 ("Houston Decl.") ¶¶ 2-3). The residential addresses match those on Medserve's shipping paperwork, and their ownership by Defendants Einhorn and Phipps were confirmed through public record searches. (Potter Decl. Ex. 13). An investigator also personally visited and confirmed the current occupancy of those residences by Defendants Einhorn and Phipps, respectively. (Decl. of James Meredith, dated June 10, 2020 ("Meredith Decl.") ¶¶ 5, 6).

### 6. The harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application (15 U.S.C. § 1116(d)(4)(B)(vi)).

eSutures has no legitimate interest in selling counterfeit Ethicon surgical devices, and therefore cannot suffer any harm from the seizure of such goods. The individual Defendants likewise have no legitimate interest in storing counterfeits or documents concerning the

---

[8] *See* https://www.esutures.com/contact/.

counterfeits at their personal residences. Ethicon, on the other hand, has a very strong interest in protecting the public's health and safety, as well as its own trademarks and goodwill, from the counterfeits that Defendants are selling. (*See* pp. 47-52, *infra*).

> 7. **Defendants would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person (15 U.S.C. § 1116(d)(4)(B)(vii)).**

As noted above, Congress determined in passing the Counterfeiting Act that counterfeiters "have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon." 130 Cong. Rec. H12076, at 12080. While that is true of counterfeiters in general, here the evidence against eSutures leaves no doubt. The record shows when eSutures has been given normal service of process and asked to participate in discovery, it has concealed all evidence of its counterfeiting and attempted to move or destroy that evidence.

Ethicon details above eSutures's fraudulent response to Ethicon's Rule 45 subpoenas concerning the counterfeits. (*See* pp. 16-19, *supra*). Briefly summarized, eSutures withheld all documents concerning the counterfeiting, all documents showing that Defendant Shah is an eSutures employee, and all of the several hundred counterfeit SURGICEL® devices it had in stock. Instead, eSutures hand-picked a tiny group of documents and a handful of authentic SURGICEL® devices, and produced only those non-incriminating items to Ethicon. eSutures's production was calculated to conceal all evidence of its counterfeiting while selling the false narrative that it was merely a legitimate supplier complying with the subpoena. And after concealing its counterfeits from Ethicon, eSutures attempted to sell them – the ones that were too obviously fake to sell in the United States – in Dubai. (Potter Decl. Ex. 30).

Notably, eSutures was represented by outside litigation counsel in its response to the subpoena. (Potter Decl. ¶ 27). Ethicon has no reason to believe that eSutures's outside counsel

40

was aware that the production was fraudulent; rather, Ethicon assumes that eSutures failed to disclose evidence of counterfeiting to its outside counsel. The point remains that even when guided by outside litigation counsel in response to a federal subpoena, eSutures committed vast discovery fraud in order to conceal its counterfeiting. There is no reason to believe eSutures would act differently if given notice of this lawsuit.

In fact, as also described above, eSutures recently attempted to convince one of its co-conspirators to destroy evidence in order to subvert federal discovery. (*See* p. 33, *supra*). In October 2019, eSutures learned that Ethicon had sued another member of the counterfeiting network and served discovery demands on it. eSutures's immediate and frantic reaction was to beg its co-conspirator by WhatsApp to destroy all evidence concerning eSutures before responding to Ethicon's discovery request: "plzz dont tell them [Ethicon] my details ... plz delete all . . . delete my texts and my number ... from ur cell." (Potter Decl. Ex. 18).

Moreover, eSutures used the mobile-phone application WhatsApp for the vast majority of its communications about the counterfeits. WhatsApp is similar to text messaging, including in that it must be linked to a specific mobile phone number.[9] But what makes WhatsApp popular among counterfeiters is that, unlike text messaging and most other forms of electronic communications, WhatsApp is designed so that the messages are protected by end-to-end encryption, and are therefore recoverable *only* on the sender and receiver's mobile phones, and not from a server or other remote location.[10] And it takes only seconds for a user to delete

---

[9] https://faq.whatsapp.com/general/account-and-profile/changing-phone-numbers-and-or-phones/.

[10] https://www.whatsapp.com/security/.

41

WhatsApp messages from his or her phone.[11]  Providing eSutures notice of this lawsuit before an *ex parte* seizure would allow them to immediately and irretrievably delete their incriminating WhatsApp messages.

Finally, by knowingly selling and helping manufacture counterfeit Ethicon surgical devices, eSutures engaged in criminal counterfeiting.  *See* 18 U.S.C. § 2320.  eSutures also committed the crime of selling misbranded medical devices, which is one of very few federal strict-liability crimes, and which carries substantial jail time when done knowingly.  21 U.S.C. § 331.  And, of course, both the corporate and individual Defendants are all subject to extensive civil liability for their actions.  The incentives for eSutures to cover up its criminal behavior are clear, as is its history of flouting federal discovery and attempting to conceal or destroy evidence.  eSutures is precisely the type of defendant that Congress had in mind when it authorized *ex parte* seizure orders in the Counterfeiting Act.

## B.    The Proposed Seizure Order Provides for Additional Protections to Protect eSutures's Attorney-Client Privilege

Any seizure carries some risk of capturing attorney-client communications, which the parties typically address after the seizure is executed.  But here, because eSutures utilized outside counsel in connection with Ethicon's subpoenas – putting aside eSutures's fraudulent response – Ethicon believes additional steps should be taken during the seizure to protect any attorney-client privileged documents.[12]

---

[11] https://faq.whatsapp.com/en/android/26000068/.

[12] Ethicon notes, however, eSutures's use of its counsel to make the fraudulent production means that communications with that counsel about that production fall under the crime-fraud exception to the attorney-client privilege. *See, e.g.*, *United States v. Boender*, 719 F. Supp. 2d 951, 953-957 (N.D. Ill. 2010), *aff'd*, 649 F.3d 650 (7th Cir. 2011); *Abbott Labs. v. H&H Wholesale Servs., Inc.*, No. 17 CV 3095 (CBA)(LB), 2018 WL 2459271, at *4-6 (E.D.N.Y. Mar. 9, 2018). Again, Ethicon assumes for purposes of this motion that eSutures's counsel had no knowledge of its

42

As is commonly done during *ex parte* seizures, the proposed seizure order provides that an outside and independent data vendor will copy and maintain the electronically stored information located on the premises: *i.e.*, the data and documents from computers, phones, servers, and other electronic devices. In order to protect eSutures's privilege, the proposed seizure order goes further, and provides that Ethicon's counsel shall not be provided access to the seized electronic documents. Instead, all documents will be reviewed in the first instance by the third-party data vendor, who will give eSutures an opportunity to object before the documents are released to Ethicon.

Specifically, Ethicon's counsel would work with UnitedLex to decide what search terms to run and what categories of documents to look for. UnitedLex would then run the searches and conduct the review, using in-house employees experienced in such reviews. The documents selected by UnitedLex would first be provided to eSutures's counsel, who would have 24 hours to assert privilege over any documents before they are provided to Ethicon. Any documents over which privilege is claimed would be set aside and entered by eSutures on a privilege log; the remaining documents would be produced to Ethicon. The order provides, and Ethicon will stipulate, that the collection of documents at the seizure and/or their review by UnitedLex shall not on its own constitute a waiver of any privilege or immunity.

UnitedLex is a global technology and legal services company with over three thousand employees. (Decl. of Ryan Frye, dated June 9, 2020 ("Frye Decl.") ¶ 3). It is more than capable

---

client's fraud. But the crime-fraud exception applies where the *client* knowingly uses counsel to make a fraudulent production: the lawyer's knowledge is irrelevant. *Abbott*, 2018 WL 2459271, at *5-6; *see also Boender*, 719 F. Supp. at 956 (applying crime-fraud exception based on the client's "lie to the lawyer"). Ethicon nevertheless believes the prudent course of action is to allow eSutures to claim privilege over seized documents as it sees appropriate, and then the parties can address the crime-fraud exception before the Court.

43

of collecting and maintaining the data and conducting this type of review. (*Id.* ¶ 9). In fact, UnitedLex has recently performed this service in connection with an *ex parte* seizure ordered by the U.S. District Court for the Eastern District of New York, where there were similar concerns about privilege because of ongoing litigation between the parties. (*Id.* ¶ 10).

This privilege-review procedure will allow for the relatively rapid production of documents while ensuring Ethicon never sees an eSutures document that has not been first reviewed by eSutures's counsel. The biggest downside is that this procedure has the potential to delay Ethicon's access to the documents and information it needs most urgently: *e.g.*, the identities of eSutures's suppliers of Ethicon devices and the identities of the customers who purchased the counterfeits. That information will allow Ethicon to immediately begin tracking down the already-sold counterfeits and any additional counterfeiters. The proposed seizure order therefore requires eSutures to produce that information itself, and to do so as soon as practicable after the seizure is commenced. Knowing that Ethicon has already seized its documents will incentivize eSutures to be truthful in self-disclosing that information.

## C. The Seizure Must Include Copying Mobile Devices to Capture WhatsApp Messages

eSutures primarily communicated with Medserve via WhatsApp. (*See, e.g.*, Potter Decl. Exs. 17-22, 24-30). Because WhatsApp communications can only be downloaded directly from the sender or recipient's mobile phone, it is essential that the seizure order provide that Ethicon may copy any mobile devices found on the premises, including those being carried by persons present at the time of the seizure. WhatsApp messages can quickly and easily be permanently deleted either remotely or on the phone itself, making it crucial that phones be quickly copied at the time of the seizure, before word spreads and the Defendants have the opportunity to destroy evidence. The process of copying the data on mobile phones can be done quickly on the spot,

44

and Ethicon's data vendor will make the copy without otherwise affecting the phone or its data. The importance of an order allowing the copying of mobile devices has been confirmed in Ethicon's experience with the *ex parte* seizures in Florida as well as the *ex parte* seizure in India against Medserve. For example, Ethicon would never have recovered eSutures's WhatsApp communications with Medserve if the Indian seizure order had not provided for the copying of mobile phones. (*See, e.g.*, Potter Decl. Exs. 19-22, 24-33.) The proposed seizure order filed with this motion includes such a provision.

### D. The Seizure Should Include the Two Residences that eSutures Used to Receive and Conceal the Counterfeits

Because Defendants Einhorn and Phipps had large quantities of counterfeits shipped to their personal homes, those homes should be sites of the seizures as well. The manifest purpose of having the counterfeits shipped to employee homes is to conceal the fact that the counterfeits were purchased by eSutures – as is confirmed by the fact that the shipping paperwork was stripped of all mention of the company. (*See* pp. 32-33, *supra*). It is therefore very likely that the counterfeits are not only received at the employees' homes, but stored there as well. In fact, the defective batch of counterfeit SURGICEL® – the one that was too obviously fake to sell in the United States – was delivered to Defendant Phipps's home. (*See* Potter Decl. Exs. 13, 30). Since it appears eSutures's attempts to sell those defective counterfeits abroad were unsuccessful, to the best of Ethicon's knowledge those counterfeits remain in Defendant Phipps's residence.

By choosing to use their homes to effect eSutures's trade in counterfeits, Defendants Einhorn and Phipps brought their personal residences squarely within the ambit of this litigation. It is not uncommon for counterfeiters to use personal residences in connection with their trafficking in counterfeit goods, and in such cases, courts will order seizures at both home and

45

office. (*See, e.g.*, Potter Decl. ¶¶ 13-16; Potter Decl. Exs. 13, 30). In fact, if the Indian court had not included both Medserve's office and its principal's apartment in its seizure order, Ethicon would not have uncovered Medserve's counterfeit manufacturing operation. (Potter Decl. ¶¶ 13-16.)

### E.    The Seizure Order Should Include All Ethicon Products

The proposed seizure order provides for the seizure of all Ethicon products located on the premises. Ethicon currently knows of four counterfeit Ethicon devices being trafficked by eSutures: SURGICEL® Absorbable Hemostats, SURGICEL® FIBRILLAR™, LIGACLIP® Extra Ligating Clips, and ETHICON SECURESTRAP® devices. eSutures also sent hundreds of expired units of a fifth Ethicon product, SURGICEL SNoW®, to Medserve – strongly suggesting that eSutures collaborated with Medserve to create counterfeit repackaged SURGICEL SNoW® as well. The breadth of this counterfeiting alone suggests that Ethicon does not know the full extent of the Ethicon product lines being counterfeited.

Indeed, before the FDA OCI found counterfeit ETHICON SECURESTRAP® devices sitting on eSutures's shelves, Ethicon had no idea counterfeit ETHICON SECURESTRAP® existed – let alone was being distributed in the United States. And because the counterfeit ETHICON SECURESTRAP® came from a different supplier than Medserve – a previously unknown counterfeiter based in Turkey – it is clear that eSutures's counterfeiting goes beyond the counterfeiting network that has been the focus of Ethicon's investigation to date. Ethicon should be given the opportunity to test and uncover what other Ethicon devices are being counterfeited by eSutures.

The risk to eSutures is minimal. The proposed seizure order provides that Ethicon will test the seized Ethicon products to determine whether they are authentic, and that Ethicon will return any authentic product to eSutures. To the degree that eSutures has any authentic product,

46

it will suffer only the inconvenience of having to wait for those products to be tested. Given the evidence of eSutures's widespread, willful counterfeiting, that potential inconvenience is far from unreasonable, and is strongly outweighed by Ethicon's and the public's interest in shutting down all of eSutures's counterfeiting of Ethicon products.

## II.    ETHICON IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

The Seventh Circuit Court of Appeals has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001). Here, Ethicon seeks a temporary restraining order, to be followed by a preliminary injunction, to immediately stop eSutures's trafficking of counterfeit Ethicon surgical devices and help ensure that evidence is preserved. To obtain such relief, Ethicon must demonstrate "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 20 (2008). Ethicon easily meets all of those elements.

### A.    Ethicon Has a Strong Likelihood of Success on the Merits

Among other claims, Ethicon has alleged various causes of action against eSutures for violating Ethicon's trademark rights under the Lanham Act and state law. Ethicon can prevail on its trademark claims by showing: "(1) its mark is distinctive enough to be worthy of protection"; "(2) defendant is not authorized to use its mark"; and "(3) defendant's use of its mark causes a likelihood of confusion." *Allied Van Lines, Inc. v. iMove, Inc.*, No. 1:17-CV-08021, 2018 WL 572510, at *3 (N.D. Ill. Jan. 25, 2018); *see Neopost Indus. B.V. v. PFE Int'l, Inc.*, 403 F. Supp.

47

2d 669, 684 (N.D. Ill. 2005) (citing *Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 496-97 (7th Cir. 2001)).

None of these elements is remotely in question here. Ethicon owns multiple distinct, valid registered trademarks for the products at issue. (Russo Decl. ¶¶ 6-17; Bally Decl. ¶¶ 11-21; Rauso Decl. ¶¶ 8-15; Potter Decl. Ex. 12.) Defendants are "using" those marks in interstate commerce by selling counterfeit Ethicon surgical devices – specifically, SURGICEL® Absorbable Hemostats, SURGICEL® FIBRILLAR™, LIGACLIP® Extra Ligating Clips, and ETHICON SECURESTRAP® – in counterfeit packages that are nearly identical to genuine Ethicon packaging, including in their replication of Ethicon's trademarks.[13] (*See, e.g.*, Dacey Decl. ¶¶ 8, 15, 19, 26). There also can be no dispute that eSutures is not authorized to use Ethicon's marks. (Russo Decl. ¶ 21).

Because eSutures sold counterfeit SURGICEL® product and packaging intended to look exactly like the genuine article, likelihood of consumer confusion is presumed. *Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 949 (N.D. Ill. 2019) ("[A] court presumes likelihood of confusion when a defendant has produced counterfeit goods in an attempt to capitalize on the popularity of another's product."); *H-D U.S.A., LLC v. Guangzhou Tomas Crafts Co., Ltd.*, No.

---

[13] Defendant Advanced Inventory Management, Inc. d/b/a eSutures.com is liable as the corporate entity that bought and sold the counterfeit products. The individual Defendants are jointly and severally liable with the corporation as officers who participated in and/or supervised the counterfeiting. *See, e.g.*, *4SEMO.com Inc. v. S. Illinois Storm Shelters, Inc.*, 939 F.3d 905, 912-13 (7th Cir. 2019) (officers or employees liable when they "personally participate[d] in the manufacture or sale of the infringing article . . . , use[d] the corporation as an instrument to carry out his own willful and deliberate infringements, or . . . knowingly use[d] an irresponsible corporation with the purpose of avoiding personal liability." (quoting *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926)); *Tony Jones Apparel, Inc. v. Indigo USA LLC*, No. 03-cv-0280, 2005 WL 1667789, at *6 (N.D. Ill. July 11, 2005) (officer also liable when he had "right and ability to supervise the infringing activit[ies], and also has a direct financial interest in such activities.").

48

16-CV-10096, 2017 WL 6733685, at *3 (N.D. Ill. Dec. 18, 2017) ("The Seventh Circuit held in an unpublished opinion that producing 'counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product' creates a 'presumption of a likelihood of confusion.'" (quoting *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007))); *Monster Energy Co. v. Jing*, No. 15-cv-277, 2015 WL 4081288, at *2 (N.D. Ill. July 6, 2015) (same). In any event, these counterfeits closely resemble legitimate product, but are defective and contaminated, and pose an extreme risk to patient health. It is inconceivable that American hospitals purchased these counterfeits by the thousands believing them to be anything other than legitimate Ethicon surgical devices.

Moreover, because Ethicon has no ability to supervise the quality or safety of the counterfeits sold by eSutures, consumers are likely to be both confused and deterred by the circulation of these inferior and dangerous counterfeit products. *See Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 872, 881 (N.D. Ill. 2013) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986))).

Finally, "[b]ecause sellers bear strict liability for violations of the Lanham Act, even innocent dealers who sell goods bearing an infringing mark are liable for trademark infringement." *Lorillard Tobacco Co. v. Div. & Noble Amoco Corp.*, 390 F. Supp. 2d 678, 682 (N.D. Ill. 2005). "[C]laims of ignorance as to the status of the [counterfeits] are, therefore, irrelevant to the issue of liability." *Id.*; *see Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992) ("Sellers bear strict liability for violations of

49

the Lanham Act."); *see also Top Tobacco, L.P. v. Midwestern Cash & Carry, LLC*, No. 11-cv-4460, 2014 WL 243431, at *5 (N.D. Ill. Jan. 22, 2014). Thus, although the evidence is overwhelming that eSutures was a knowing and willful participant in the counterfeiting network, the mere fact that they bought and sold the counterfeits conclusively establishes their liability. Ethicon's Lanham Act claims are not merely likely, but virtually certain, to succeed.

### B.    Ethicon Is Suffering Irreparable Harm as a Result of Defendants' Activities

With regard to irreparable harm, "[a]ny inquiry must start with the well-established, and in this case unchallenged, presumption that Lanham Act injuries are irreparable." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 18 (7th Cir. 1992); *see also Life After Hate, Inc. v. Free Radicals Project, Inc.*, 410 F. Supp. 3d 891, 909 (N.D. Ill. 2019) ("The Seventh Circuit traditionally has applied a presumption of irreparable harm in false advertising and trademark infringement suits." (quoting *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 952 (N.D. Ill. 2018))).

The "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 437 (N.D. Ill. 2019) (quoting *Re/Max N. Cent.*, 272 F.3d at 432). Furthermore, "[i]rreparable injury 'almost inevitably follows' when there is a high probability of confusion because such injury 'may not be fully compensable in damages.'" *Bulgari, S.p.A. v. Partnerships & Unincorporated Ass'ns Identified On Schedule "A,"*, No. 14-CV-4819, 2014 WL 3749132, at *6 (N.D. Ill. July 18, 2014) (quoting *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1332 (7th Cir. 1977)), *report and recommendation adopted*, 2014 WL 3765854 (N.D. Ill. July 29, 2014); *see also W. Capra Consulting Grp., Inc. v. Snyder*, No. 1:19-cv-4188, 2019 WL 3935045, at *11 (N.D. Ill. Aug. 20, 2019) ("A remedy at law is inadequate if damages would 'be seriously

50

deficient as a remedy for the harm suffered.' Such a deficiency may be present if, among other reasons, '[t]he nature of the plaintiff's loss . . . make[s] damages very difficult to calculate, as in the loss of future business profits." (alterations in original) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984))).

There is no question that eSutures's sale of dangerous counterfeit Ethicon devices is causing great harm to Ethicon's goodwill, and that its continued sale will irreparably harm Ethicon. Not only is Ethicon unable to control the quality of the counterfeit devices, but the counterfeit devices have in fact proven to be both ineffective and bacterially contaminated. (*See* pp. 13-15, *supra*). Immediate injunctive relief is, therefore, necessary to prevent further damage to Ethicon's reputation and goodwill – and, of course, to patient health and safety, none of which can be undone. (Russo Decl. ¶ 23; Bally Decl. ¶ 24; Rauso Decl. ¶ 21.)

## C. The Balance of Equities Tips Decisively in Ethicon's Favor

Seventh Circuit precedent "establishes a 'sliding scale' approach to motions for temporary or preliminary injunctive relief: 'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Weifang Tengyi Jewelry Trading Co. v. Intuii LLC*, No. 18-cv-4651, 2019 WL 1200776, at *4 (N.D. Ill. Mar. 14, 2019) (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)). Counterfeiting "scores high" on the sliding scale, as it "indisputably violates the Lanham Act." *Id.* at *5.

Here, the equities emphatically support the issuance of a temporary restraining order. First and foremost, the counterfeit products are defective and contaminated, and pose a serious threat to patient health and safety. (*See* pp. 13-15, *supra*). Quite apart from the harm to Ethicon's goodwill, this threat to public health justifies immediate injunctive relief. *See, e.g.*,

51

*Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995) (court must include "public interest" in balancing the equities).

Moreover, because the law recognizes no excuse for selling counterfeit goods, the harm to patients and to Ethicon absent the injunction would far outweigh the harm to Defendants if their conduct is preliminarily enjoined. Each and every sale of counterfeit SURGICEL® devices diminishes the value of Ethicon's trademarks, causes harm to Ethicon's reputation, and threatens the public health. *See Bulgari, S.p.A.*, 2014 WL 3749132, at *6 ("'When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner.' This is because '[o]ne who adopts the mark of another for similar goods acts at his own peril since he has no claim to the profits or advantages thereby derived.'" (citation omitted) (quoting *Krause Int'l, Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994), and *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992))).

### D.    An Injunction Is in the Public Interest

The public interest in an injunction is self-evident in this case. It is in the public interest to prevent the sale of defective, contaminated surgical devices being used on unsuspecting patients. It is also in the public interest to prevent confusion and protect informed choice when patients' health is at stake. *See, e.g.*, *Luxottica Grp. S.p.A. v. Li Chen*, No. 16-cv-6850, 2017 WL 836228, at *3 (N.D. Ill. Mar. 2, 2017) ("[T]he public interest favors Plaintiffs because 'enforcement of the trademark laws prevents consumer confusion.'" (quoting *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000))); *Deckers Outdoor Corp. v. Partnerships & Unincorporated Ass'ns*, No. 13-cv-2167, 2013 WL 1337616, at *9 (N.D. Ill. Mar. 27, 2013) ("In trademark infringement cases, 'the relevant consideration in determining whether the public interest will be disserved by the grant of an injunction is the consumer's

interest in not being deceived about the products they purchased.'" (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988))).

### E. Ethicon Has Moved Expeditiously to Investigate the Counterfeiting and Bring This Action

Ethicon's investigation leading to this lawsuit has been diligent and expeditious. By happenstance, eSutures did not supply the counterfeit SURGICEL® products that Ethicon first discovered in a University of Kentucky Medical Center operating room. To discover eSutures's pivotal role in the international counterfeiting network, Ethicon had to conduct an expansive and expensive investigation that was impeded in no small part by eSutures's own fraudulent response to Ethicon's subpoenas. Ethicon finally discovered eSutures's central role in the counterfeiting only by hunting down Medserve, filing an action in India, executing an *ex parte* seizure in Delhi, and decrypting the WhatsApp chats on Mr. Arora's cell phone.

As noted above, preliminary information from the Florida Action suggested a connection between Defendant Shah and eSutures, but Ethicon had no definitive proof of eSutures's counterfeiting. (Potter Decl. ¶ 25). Ethicon therefore issued subpoenas to eSutures in August 2019. As set forth in detail at pages 16-19, *supra*, eSutures's response to those subpoenas was fraudulent, and carefully designed to lull Ethicon into believing eSutures was a legitimate supplier. Ethicon learned how central eSutures was to the counterfeiting network only by executing a seizure of Medserve in India and reviewing the eSutures WhatsApp communications stored on Mr. Arora's mobile phone. (*See* Potter Decl. Exs. 19-22, 24-30). This process was slow and laborious. By order dated November 21, 2019, the Indian court held that all seized documents had to be subjected to an initial review by representatives of both Ethicon and Medserve – simultaneously, in person – with any disputes as to relevance to be brought to the court's attention. (*Id.* ¶ 18). As a result, the Medserve data was not fully released and processed

53

until January 22, 2020, at which point Ethicon's counsel began searching through millions of pages of documents, much of which had to be translated from Hindi. (*Id.* ¶ 19; *see* Potter Decl. Ex. 23). By the time Ethicon discovered the extent of eSutures's counterfeiting, the COVID-19 pandemic had begun, leading to the shutdown of most domestic travel and in-person business activities across the United States. (*Id.* ¶¶ 20-21).

Meanwhile, throughout its investigation, Ethicon was cooperating (and continues to cooperate with) the FDA OCI's criminal investigation. The FDA OCI initially requested that Ethicon not bring a civil action because it might impede their investigation. (*Id.* ¶ 22). Only recently, on June 10, 2020, did the Assistant U.S. Attorney in charge of the eSutures criminal investigation gave Ethicon clearance to file this action. (*Id.*).

Given this history, Ethicon's request for a temporary restraining order and preliminary injunction is plainly timely. The time Ethicon spent prior to filing this action is fully justified by Ethicon's "good faith efforts to investigate the alleged infringement," *Life After Hate*, 410 F. Supp. 3d at 910 (quoting *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)) – efforts that were substantially hampered by eSutures's discovery fraud. Separately, Ethicon's decision to comply with the FDA OCI's request makes this motion timely. Courts have recognized that cooperation with federal criminal investigations justifies a delay in bringing related civil litigations. *See, e.g. Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826, 2015 WL 10906060, at \*12 (E.D.N.Y. Nov. 6, 2015) (issuing preliminary injunction despite delay in bringing suit, and concluding "at no time was Abbott sleeping on its rights and delaying without reason" where, among other things, Abbott "coordinated with FDA OCI" and "FDA OCI explicitly asked Abbott to delay pursuing actions against" a defendant), *aff'd*, 670 F. App'x 6 (2d. Cir 2016).

54

**F.      The Temporary Restraining Order Should Encompass All Ethicon Products**

As with the *ex parte* seizure order (*see* pp. 46-47, *supra*), the temporary restraining order should prohibit eSutures from selling all Ethicon products, at least for the first fourteen days following the seizure. The evidence set forth above clearly shows eSutures is a knowing counterfeiter who sells as many different counterfeit Ethicon products as it can get its hand on. Even if eSutures were to contend (contrary to the facts) that its sale of counterfeits was an innocent mistake, that would only mean that eSutures lacks the ability to differentiate authentic Ethicon devices from counterfeits, and thus cannot be trusted to sell what it claims is "authentic" product. Under either scenario, it is more than reasonable to hold that for two weeks eSutures should put a hold on its Ethicon sales. If eSutures believes it is able to prove that it sells authentic, legitimately obtained Ethicon surgical devices, and that its misdeeds are limited to the four known devices it is counterfeiting, it can make that argument at the preliminary injunction stage.

**III.     ETHICON IS ENTITLED TO EXPEDITED DISCOVERY**

Ethicon also respectfully seeks a limited expedited discovery order so that it may quickly investigate the distribution of counterfeit Ethicon products in an effort to permanently banish them from the market.

Federal courts have broad discretion to expedite the normal pace of discovery in cases seeking temporary or preliminary injunctive relief. 28 U.S.C. § 1657 directs that "the court shall expedite the consideration of . . . any action for temporary or preliminary injunctive relief." Rule 26(d) of the Federal Rules of Civil Procedure expressly allows for expedited discovery, with the Advisory Committee comments noting that expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction." Advisory Comm. Note to Fed. R. Civ. P. 26(d). Similarly, Rule 30(a)(2)(A)(iii) provides that the Court may grant leave to

take depositions "before the time specified" in the discovery rules, and Rule 34(b)(2)(A) provides that "[a] shorter or longer time may be . . . ordered by the court" for the production of documents than the rules would otherwise allow. Moreover, Congress recognized that there is a special need for expedited discovery in counterfeiting cases, specifying in the Trademark Counterfeiting Act that a court may modify the time limits for discovery "to prevent the frustration of the purposes of [a seizure order] hearing." 15 U.S.C. § 1116(d)(10)(B).

In trademark cases in this Court and elsewhere, requests for expedited discovery are regularly granted – usually in cases involving conduct far less extreme than the sale of counterfeit and adulterated medical devices. *See, e.g.*, *Deckers Outdoor Corp.*, 2013 WL 1337616, at \*10 (granting *ex parte* expedited discovery order in case concerning counterfeit footwear); *Tory Burch LLC v. Partnerships & Unincorporated Ass'ns Identified on Schedule A*, No. 13-cv-2059, 2013 WL 1283824, at \*10 (N.D. Ill. Mar. 27, 2013) (granting *ex parte* expedited discovery order in case concerning counterfeit fashion accessories); *see also* (Potter Decl. Ex. 35 (expedited discovery order from the Florida Action)).

"To determine whether to authorize expedited discovery in a particular case, courts generally apply a 'good cause' standard." *Deckers Outdoor Corp.*, 2013 WL 1337616, at \*10. "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Hard Drive Prods., Inc. v. Doe*, 283 F.R.D. 409, 410 (N.D. Ill. 2012). Courts consider the following factors in determining whether good cause for expedited discovery exists: "(1) whether a preliminary injunction is pending; (2) the breadth of the requested discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the opposing party to comply with the requests; and (5) how far in advance of the typical discovery process the request was made."

*Restoration Hardware, Inc. v. Haynes Furniture Co.*, No. 16-cv-10665, 2017 WL 3597518, at \*2
(N.D. Ill. Mar. 13, 2017) (citing *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 554 (N.D. Ill.
2011)).

Here, Ethicon has shown good cause for expedited discovery. First, Ethicon is seeking a
temporary restraining order and preliminary injunction. Second, the scope of the requested
expedited discovery is narrow, and limited to the counterfeits at issue. *See Federal Express
Corp. v. Federal Espresso, Inc.*, No. 97 CV 1219, 1997 WL 736530, at \*2 (N.D.N.Y. Nov. 24,
1997) ("[T]he scope of permissible expedited discovery is limited to requests that are more
narrowly 'tailored to the time constraints under which both parties must proceed [and] to the
specific issues that will have to be determined at the preliminary injunction hearing.'"). Third,
Ethicon seeks expedited discovery because, as outlined above, it is attempting to track down
dangerous counterfeits that have already been distributed, as well as to locate and shut down
other members of the counterfeiting network that is distributing them. Fourth, expedited
discovery will allow Ethicon to move quickly in its efforts to address the counterfeit distribution
chain, which is important because after suit is filed, word tends to travel quickly and
counterfeiters tend to move underground.

## IV.     ETHICON IS ENTITLED TO AN *EX PARTE* ORDER FREEZING
            CERTAIN DEFENDANTS' ASSETS

Ethicon seek an *ex parte* order freezing the assets of Defendants Advanced Inventory
Management, Inc. d/b/a eSutures.com, Anthony Iaderosa Jr., and Mudassar Shah.

Where, as here, a plaintiff seeks lost profits or other equitable remedies under the
Lanham Act, 15 U.S.C. § 1117, a federal court has the "inherent equitable powers to order
preliminary relief, including an asset freeze, in order to assure the availability of permanent
relief." *Deckers Outdoor Corp.*, 2013 WL 1337616, at \*9 (quoting *Levi Strauss & Co. v. Sunrise*

57

*Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995)). Moreover, because "the Lanham Act authorizes the district court to grant [the plaintiff] an accounting of [the defendants'] profits as a form of final equitable relief, the district court ha[s] the inherent power to freeze [the defendants'] assets in order to ensure the availability of that final relief." *Id.* (quoting *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992)); *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("Since the assets in question . . . were profits of the [defendants] made by unlawfully stealing [the plaintiffs'] services, the freeze is appropriate and may remain in place pending final disposition of this case."). The purpose of such an order is "to preserve the possibility of an effective accounting of [the counterfeiter's] profits and the return of the profits fraudulently obtained." *Reebok*, 970 F.2d at 560. Courts recognize that counterfeiters make their living by secrets and subterfuge, and therefore are likely to "hide their allegedly ill-gotten funds if their assets are not frozen." *Lorillard Tobacco Co. v. Montrose Wholesale Candies*, No. 03-cv-4844, 2005 WL 3115892, at *17 (N.D. Ill. Nov. 8, 2005) (quoting *Reebok*, 970 F.2d at 563); *see also Deckers Outdoor Corp.*, 2013 WL 1337616, at *9 ("The freezing of financial assets is also appropriate in this case because Defendants may otherwise transfer their financial assets to overseas accounts, thereby depriving the Plaintiff of final relief.").

Motions for an asset freeze under the Lanham Act are evaluated under the familiar standard for a preliminary injunction. *See Lorillard Tobacco Co.*, 2005 WL 3115892, at *13-14. The overwhelming evidence of eSutures's willful counterfeiting and subterfuge easily satisfies this standard.

As set forth above, Ethicon has demonstrated a likelihood of success on the merits of its trademark claims. (*See* pp. 47-50, *supra*). Furthermore, Ethicon has demonstrated it will have

58

inadequate remedies at law in the absence of an asset freeze. The facts strongly support the conclusion that eSutures will conceal or dissipate its illegal profits when given the chance. eSutures uses its surgical-supply business as a front for an illegal online casino, accused of collecting bets without distributing winnings. (*See* p. 8, *supra*). Moreover, eSutures also has a long track record of taking steps to actively conceal its counterfeiting, including falsifying paperwork and having deliveries sent to employee homes. (*See* pp. 25-28, 32-33, *supra*). eSutures has also urged its co-conspirators to destroy evidence after being sued in federal court, and has fraudulently responded to Rule 45 subpoenas issued by Ethicon. (*See* p. 33, *supra*). And eSutures is the primary American member of an international counterfeiting network, which it runs with the help of at least one full-time employee, Shah, living abroad in Pakistan. (*See* pp. 16-18, 21-22, *supra*). All of this evidence strongly indicates that the Defendants "may hide their allegedly ill-gotten funds if their assets are not frozen." *Lorillard Tobacco Co.*, 2005 WL 3115892, at *17 (quoting *Reebok Int'l, Ltd.*, 970 F.2d at 563); *see id.* at *16 ("In this case, the Lanham Act provides [Plaintiffs] with the equitable remedy of recovering [Defendants'] profits. In such cases, courts have generally concluded that an asset freeze is appropriate to ensure that permanent equitable relief will be possible." (quoting *Levi Strauss & Co.*, 51 F.3d at 987; *Reebok Int'l, Ltd.*, 970 F.2d at 559)).

  The balance of harms also weighs in favor of an asset freeze. The evidence shows that the Defendants knowingly sold counterfeit medical devices in violation of the Lanham Act. (Burkley Decl. ¶¶ 13, 23, 31, 37, 50; Dacey Decl. ¶¶ 10, 22, 24, 29, 32; *see* pp.16-34, *supra*). Any harm an asset freeze may cause to Defendants was "brought upon themselves with their tactics of deception and underhandedness." *Lorillard Tobacco Co.*, 2005 WL 3115892, at

*17. The harm to Ethicon's trademarks and goodwill, as well as the harm to unsuspecting patients, caused by eSutures's actions are detailed above. (*See* pp. 47-53, *supra*).

The Court's authority to freeze assets is not limited to assets within this District, nor even to assets within the United States. *See, e.g.*, *Iron Maiden Holdings Ltd. v. Partnerships & Unincorporated Ass'ns Identified on Schedule "A"*, No. 1:18-cv-1098, 2018 WL 2077732, at *4 (N.D. Ill. Mar. 6, 2018) (issuing asset restraining order on "[a]ny banks, savings and loan associations, payment processors, or other financial institutions, for any Defendant"); *Michael Kors, L.L.C. v. Wang*, No. 15-CV-124, 2015 WL 12683830, at *4 (N.D. Ill. Feb. 18, 2015) (same); *Oakley, Inc. v. The Partnerships*, No. 14-CV-7714, 2014 WL 12573678, at *3 (N.D. Ill. Oct. 30, 2014) (same); *Deckers Outdoor Corp.* 2013 WL 12314399, at *5 (same); *see also United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, [a district court] has authority to order it to 'freeze' property under its control, whether the property be within or without the United States.").

Similarly, this Court is armed with further authority under the All Writs Act, 28 U.S.C. § 1651, to issue such orders requiring the cooperation of banks and other non-parties that may have physical custody of Defendants' assets. *See Thorogood v. Sears, Roebuck & Co.*, 678 F.3d 546, 548 (7th Cir. 2012) (The All Writs Act "has been interpreted to empower a federal court 'to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.' This power 'extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.'" (alteration in original) (quoting *United States v.*

60

*New York Tel. Co.*, 434 U.S. 159, 172, 174 (1977)); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1259 (7th Cir. 1979) ("We also find support for the district court's authority to enter these [asset freeze] injunctions in the All Writs Act.").

Accordingly, to ensure that the accounting and lost profits sought by Ethicon are available at the conclusion of this action, and to limit the risk to consumers, the Court should freeze the Defendants' assets, wherever they may be, and issue such subsequent and additional injunctive orders against non-parties to this action as may be necessary to enable Ethicon fully to enforce the asset freeze order.

## V. THE COURT SHOULD ORDER ALTERNATIVE EMAIL SERVICE FOR THE PAKISTAN-BASED DEFENDANT SHAH

The proposed *ex parte* seizure order contains a standard provision that provides that service shall be effected by delivery of all the papers at the commencement of the seizure to an adult on the premises. But while the other Defendants work and live in Illinois, Defendant Shah is based in Pakistan. Ethicon therefore moves for an order permitting alternative service upon Mr. Shah by email.

Pakistan is a signatory to the Hague Convention, but service in Pakistan through the Hague Convention is dilatory at best, and for the reasons stated above – most importantly, to protect American patients – service of this action cannot wait. (*See* pp. 47-53, *supra*). Under Rule 4(f)(3) of Federal Rules of Civil Procedure, this Court may authorize service of process by any "means not prohibited by international agreement, as the court orders." Pakistan has not objected to service by email, and therefore this Court may authorize email service pursuant to Rule 4(f)(3). *See, e.g.*, *McLean-Fogg Co. v. Ningbo Fastlink Equip. Co.*, No. 08-cv-2593, 2008

WL 5100414, at *2 (N.D. Ill. Dec. 1, 2008) (authorizing service by email on Chinese defendants accused of selling counterfeits).[14]

"Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2)," and the district court has "sound discretion . . . [to] determin[e] when the particularities and necessities of a given case require alternate service of process under Rule 4(f)(3)." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015-16 (9th Cir. 2002); *see Santiago v. Anderson*, 496 F. App'x 630, 635 (7th Cir. 2012) (citing with approval *Brockmeyer v. May*, 383 F.3d 798, 805-06 (9th Cir. 2004) (explaining that "that Rule 4(f)(3), which permits service in foreign country 'as the court orders' so long as chosen method comports with international agreements, imparts broad discretion and would allow for service by regular mail and e-mail"). There is no requirement to show that other means of service would be unavailable or unsuccessful. *Commodity Futures Trading Comm'n v. Caniff*, No. 19-cv-2935, 2020 WL 956302, at *5 (N.D. Ill. Feb. 27, 2020) (collecting cases and stating that the "plain language of the rule does not require a plaintiff to attempt service under Rule 4(f)(1) before seeking authorization to use an alternative means of service under Rule 4(f)(3)"); *Monco v. Zoltek Corp.*, No. 17-cv-6882, 2018 WL 3190817, at *4 (N.D. Ill. Apr. 24, 2018) (A plaintiff "is not required to first attempt service through the Hague Convention under Rule 4(f)(1) before asking this Court to allow alternate means.").

---

[14] Email did not exist when the Hague Convention was signed in 1965. Most federal courts have held that email service is therefore not prohibited by the Hague Convention for purposes of the Rule 4(f)(3) analysis. *See, e.g.*, *MacLean-Fogg*, 2008 WL 5100414, at *2. Other federal courts have held that if a Hague Convention signatory objected to service by regular mail, that implies an objection to email service as well. *E.g.*, *Luxottica Grp. S.p.A. v. Partnerships & Unincorporated Ass'ns,* 391 F. Supp. 3d 816, 826 (N.D. Ill. 2019). Here, Pakistan has *not* objected to service by regular mail, and so there is no question that email service is permissible. *See* Declarations, Articles 8, 15, 16, *Hague Conference on Private Int'l Law*, https:// www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=436&disp=resdn.

Email service upon Mr. Shah will ensure that he receives immediate and timely notice of this action, and is eminently reasonable under the circumstances. As set forth above at pp. 16-18 and 21-22, Mr. Shah is a salaried employee of eSutures residing in Pakistan. (*See* Potter Decl. Ex. 10). Mr. Shah regularly communicated via electronic means, including by email and WhatsApp messaging, to eSutures, Medserve, and other gray-market distributors. (*See* Potter Decl. Exs. 19-22, 24-30, 37). Mr. Shah is also likely to attempt to evade service. He was intimately involved in eSutures's falsification of paperwork, having counterfeits sent to residential homes, and other methods of concealing their illegal trade. (*See* pp. 23-28, *supra*). And Mr. Shah recently attempted to have a co-conspirator destroy evidence when alerted to U.S. litigation. (*See* p. 33, *supra*).

In circumstances such as these, courts have readily granted alternative methods of service of the summons and complaint, including by email. *See, e.g.*, (Potter Decl. Ex. 36 (order in the Florida Litigation authorizing service by email upon foreign defendants Medserve and Pure Care Traders, and their proprietors Arora and Hussain, respectively)); *Caniff*, 2020 WL 956302, at \*4-7 (authorizing service by email of Dutch defendant involved in U.S. options fraud); *MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co.*, No. 08-cv-2593, 2008 WL 5100414, at \*2 (N.D. Ill. Dec. 1, 2008) (authorizing service by email on Chinese defendants accused of selling counterfeits); *FTC v. PCCare247 Inc.*, 2013 WL 841037, at \*4 (S.D.N.Y. Mar. 7, 2013) (authorizing service by email and Facebook upon individuals in India responsible for fraud on American citizens).

The record in this action shows Mr. Shah has used two email addresses in connection with his sale of purported Ethicon products: his eSutures business email, m.shah@esutures.com, and his personal email address, Mudassarshah79@yahoo.com. (Potter Decl. Exs. 41, 42).

63

Ethicon respectfully requests that the Court order pursuant to Rule 4(f)(3) that email service upon both of those addresses shall constitute good and sufficient service.

## CONCLUSION

For the reasons stated above, the Court should grant Ethicon's Order to Show Cause for a temporary restraining order, an *ex parte* seizure order, expedited discovery, an asset freeze order, alternative service for Defendant Shah, and a preliminary injunction, and should award any other and further relief that the Court may deem just and proper. Proposed orders for the requested relief are being filed simultaneous herewith.

64

Dated: June 15, 2020

Respectfully submitted,

BRADLEY J. ANDREOZZI (ARDC No. 6286557)
MATTHEW M. MORRISSEY (ARDC No.
 6302575)
FAEGRE DRINKER BIDDLE & REATH LLP
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698
Tel:   (312) 569-1000
Fax:   (312) 569-3000
bradley.andreozzi@faegredrinker.com
matthew.morrissey@faegredrinker.com

and

GEOFFREY POTTER
ARON FISCHER (*admission application to be
 submitted*)
TIMOTHY A. WATERS (*admission application to
 be submitted*)
JOSHUA R. STEIN (*admission application to be
 submitted*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Tel:   (212) 336-2000
Fax:   (212) 336-2222
gpotter@pbwt.com
afischer@pbwt.com
twaters@pbwt.com
jstein@pbwt.com

*Attorneys for Plaintiffs Johnson & Johnson,
Ethicon, Inc., Ethicon US, LLC, and Johnson &
Johnson Health Care Systems Inc.*

65