IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNSON & JOHNSON, ETHICON, INC., ETHICON US, LLC, and JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 20-cv-3471 |
| v. | ) ) ) | Judge Robert M. Dow, Jr. |
| ADVANCED INVENTORY MANAGEMENT, INC. d/b/a eSUTURES.COM, ANTHONY IADEROSA, JR., JASON EINHORN, MIKE PHIPPS, and MUDASSAR SHAH, | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendants' Renewed Emergency Motion to Lift Asset Freeze Order [90] and Plaintiff's Emergency Cross-Motion to Compel Response to Interrogatory No. 1 Concerning Defendants' Unfrozen Assets [109]. For the reasons set forth below, Defendants' Renewed Motion [90] is denied without prejudice, and Plaintiff's Cross-Motion [109] is denied in part without prejudice as moot (insofar as it relates to the Motion to Lift Asset Freeze Order) and referred to Magistrate Judge Cummings for exploration with counsel and resolution (insofar as it relates to any other issues of significance leading up to the preliminary injunction hearing).

## STATEMENT

By way of background, on June 15, 2020, Plaintiffs filed this action under seal. The following day, they presented *ex parte* motions seeking immediate relief in the form of, *inter alia*, a temporary restraining order, a seizure order, an asset freeze order. The Court granted the requested relief, relying principally on the well-supported allegations that at least some percentage of the medical products sold by Defendants were counterfeit; the public interest demanded immediate measures to ensure that counterfeit (and perhaps unsafe and unsanitary) products not be implanted in human beings during surgery; and Defendants have irregular business practices that may make the collection of an accounting of profits difficult. Although Plaintiffs only submitted evidence that four product lines had been counterfeited (the "in-scope" products), the Court granted a seizure order on any product bearing the "Ethicon" trademark, including those for which there was not yet evidence of counterfeiting or lack thereof (the "out-of-scope" products). See [31 at 2, 11.][1] The Asset Freeze froze three bank accounts owned by Defendant AIM that collectively held roughly $2.3 million.

---

[1] The Court adopts Defendants' terminology for simplicity's sake. All products bearing the Ethicon marks are technically within the "scope" of the Seizure Order.

On June 19, 2020, Defendants Advanced Inventory Management ("AIM") and Anthony Iaderosa, Jr. (collectively, "Defendants") moved to lift the asset freeze order. Relying principally on an affidavit from Anne Tuzik ("Tuzik"), the company's Chief Financial Officer, Defendants argued that (a) the Asset Freeze was overbroad given the scope of alleged counterfeiting and (b) regardless, such an extensive Asset Freeze was unnecessary given that Defendants run an otherwise respectable business and would suffer prejudice if the freeze was not lifted. Plaintiffs countered that Tuzik's declaration was too conclusory to determine the amount at stake; there is evidence that Defendants have offshore bank-accounts and other associated illegal businesses; and the Tuzik declaration was word-smithed to avoid actually saying that Defendants cannot pay their upcoming bills.

During a two-hour hearing on June 24, the Court heard arguments on both sides. The Court explained that the Tuzik affidavit, standing alone "may not be the strongest way to put forward your evidence." [62 at 62.] The Court provided a roadmap for Defendants:

> [T]he strongest presentation * * * probably would be one affidavit from my CFO, that has some documents attached to it that I can take to the bank, a tax return, something that was audited, something that at least looks good and legit, supplemented with an affidavit from my founder and principal that says, to the extent you need to know something about me, you're getting it from me.

[*Id.* at 62–63.] The Court kept the Asset Freeze intact, although it freed $250,000 from AIM's account to pay its employees, and freed two of Iaderosa's retirement accounts, collectively worth about $1.7 million. [64]; [68].

Defendants have since renewed their motion to lift the asset freeze order. [90.] While Defendants did not include an affidavit from Iaderosa or independently verified records, they did include a new affidavit from Tuzik that differed from the original Tuzik declaration in several respects. First, it included more fine-grain information about Defendants' sales across all product and brand lines, though that data was presented in summary form and prepared for this motion. Second, it included revised estimates of the total sales of various Ethicon products; as is relevant here, the new declaration estimates sales of "in-scope" Ethicon products to be twice as high as originally reported in the first Tuzik declaration. Third, the new declaration includes several attachments prepared for the purpose of this motion, including a list of Defendants' weekly expenses, a summary of Defendants' revenue from different product lines, and a list of all the merchandise seized from Defendants' warehouse. Defendants argue that, notwithstanding the change in numbers, these more precise estimates establish that the Asset Freeze is overbroad and continues to unnecessarily harm Defendants even after the June 25th disbursement.

"[T]he Court unquestionably has authority to freeze assets to preserve an equitable accounting of profits, a remedy provided to counterfeiting victims by 15 U.S.C. § 1117(a)." *Klipsch Group, Inc. v. Big Box Store Ltd.*, 2012 WL 5265727, at *4 (S.D.N.Y. Oct. 24, 2012) ("*Klipsch II*") (citing *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 71–72 (2d Cir.1998)). To exempt assets from an asset freeze, "[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of

2

counterfeiting activities." *E.g.*, *Monster Energy Company v. Wensheng*, 136 F.Supp.3d 897, 910 (N.D. Ill. 2015). Likewise, the Court must balance the equities in considering whether an Asset Freeze continues to be warranted. *Klipsch II*, 2012 WL 5265727, at *11 ("balancing the hardships" in determining whether the asset restraint was equitable); see also *Malletier v. Sadia*, 2015 WL 7351465, at *4 (N.D. Cal. Nov. 20, 2015) (discussing *Reebok International v. Marnatech Enterprises, Inc.*, 970 F.2d 552 (9th Cir. 1992)).

First, Defendants have not met their burden of providing "documentary proof" that the profits from counterfeiting are less than $2 million (the amount remaining in their frozen accounts). Here, the second Tuzik declaration explains that the total sales of "in-scope" products was almost exactly $2 million over the past two-and-a-half years, and sales on all Ethicon products over that time period totaled roughly $31 million.[2] Tuzik explains that the average profit margin is roughly 30%. Even based on Tuzik's numbers, then, the maximum possible profits derived from the sale of counterfeit Ethicon goods is millions of dollars *more* than are currently frozen. (30% profit margins on $31 million in sales). While it may be the case that counterfeiting profits amount to less than $2 million, this is hardly documentary proof of that.[3]

Indeed, courts in this District and elsewhere regularly decline to modify asset freeze orders in the face of ambiguous or unpersuasive evidence. *Entertainment One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 954 (N.D. Ill. 2019) (disregarding as incredible defendant's statement that the counterfeit product purchased by an investigator just happened to be the only one they ever sold); *H-D U.S.A., LLC v. Guangzhou Tomas Crafts Co., Ltd.*, 2017 WL 6733685, at *6 (N.D. Ill. Dec. 18, 2017) (disregarding conclusory statement that "none of the [funds] currently on deposit * * * is derived from" counterfeit sales); *Monster Energy*, 136 F. Supp. 3d at 910 (refusing to modify asset freeze where defendants did not submit "any evidence regarding their PayPal account

---

[2] Defendants claim that the "out of scope" Ethicon products should not be considered counterfeit, given that there is not yet evidence that any of these products were ever counterfeited. But *Defendants* bear the burden of providing documentary evidence that these products were never counterfeited; just because some products are more suspect does not mean that others are not suspect at all. See *Monster Energy*, 136 F. Supp. 3d at 910; cf. *Klipsch II*, 2012 WL 5265727, at *3 (analyzing brands, not product lines). The Court is not unsympathetic to Defendants' predicament in this regard—Plaintiffs have possession of all of Defendants' Ethicon inventory, the testing protocol is still being worked out with the assistance of Magistrate Judge Cummings, and Plaintiffs may not be testing their products with an eye toward producing evidence that helps Defendants. But there are other ways around this problem, discussed below, including providing more specific transactional sales or purchasing data. The Court understands that some of this data may be of poor quality, see generally [137], but perhaps Defendants can cobble together enough information about its suppliers, sales, and the results of Plaintiffs' testing to narrow the scope of the Asset Freeze or erode Plaintiffs' arguments that such a broad freeze is equitable.

[3] Defendants also imply that the Court should reduce the Asset Freeze to an amount proportional to the sales of Ethicon-branded product. So, if Ethicon products make up 37% of Defendants' sales, then only 37% of its bank account should be frozen. The one case they cite for this approach, however, did no such thing. See *Monster Energy*, 136 F.Supp.3d at 910 (refusing to even "modify the injunction to limit the seizure to an amount corresponding to the products alleged to have been offered for sale, rather than the seizure of their entire PayPal account"). Indeed, the scope of the asset freeze is determined by the equitable relief that may be available if Plaintiffs prevail, *i.e.*, Defendants' profits off counterfeits, not the proportion of Defendants' sales comprised of counterfeits.

transactions to show that these funds are not the proceeds of counterfeiting activities"); *Luxottica USA LLC v. The Partnerships and Unincorporated Associations Identified On Schedule "A"*, 2015 WL 3818622, at *4–5 (N.D. Ill. June 18, 2015) (declining to lift freezes on five of seven accounts based on defendants' spreadsheets that were unsupported by a declaration); *North Face Apparel Corp. v. TC Fashions, Inc.*, 2006 WL 838993, at *3–4 (S.D.N.Y. Mar. 30, 2006) (keeping order in place when the parties disputed the aggregate sales numbers and profit margins).

Defendant's attempt to analogize this case to *Klipsch II*, 2012 WL 5265727 (S.D.N.Y. Oct. 24, 2012), is unpersuasive—and even undercuts their case. *Klipsch II* does suggest that an unsupported and conclusory affidavit meets a defendant's evidentiary burden. 2012 WL 5265727, at *3 ("The Court credited [the CEO's] Declarations regarding the volume of [] sales."). But *Klipsch II* merely supplemented the legal analysis from *Klipsch I*, 2012 WL 4901407 (S.D.N.Y. Oct. 11, 2014). It turns out that not only had the defendant corporation submitted an affidavit from its CEO—it also submitted a list of every sale of allegedly counterfeit product over the relevant time horizon and information about the provenance of all of the product at issue and prices paid. *Klipsch I*, 2012 WL 4901407, at *3. The documentary evidence showed that defendant sold a total of $6,000 of plaintiff's products and amassed $1,000 in profit therefrom. *Id.* The court reduced the freeze to $20,000, still several times more than could even theoretically be needed based on the defendant's affidavit. *Id.* Here, however, there is no affidavit from the CEO, no transaction-level data, no accounting of profit margins beyond a guesstimate, no explanation of the provenance of the goods. And even if the documentary evidence submitted here was up to the level of that in *Klipsch*, it is not even clear that *Klipsch* would require reducing the asset freeze; indeed, in that case, assets an order of magnitude greater than necessary were restrained.

The Court understands that this litigation is very fast moving. It's not uncommon for litigants to update their numbers as more information becomes available or accounting errors are uncovered. *North Face*, 2006 WL 838993, at *3 nn.4&5; see also [115 (noting that ECF did not generate notices of a docket entry)]; [131 (acknowledging that the wrong exhibit had been attached to a previous motion)]. The Court, accordingly, does not assume that Tuzik's original declaration purposefully deflated the numbers for the sales of Ethicon products or that her current analysis is inherently incredible. But, as explained above, it is Defendants' burden to present documentary evidence that the frozen assets are not counterfeiting profits. Where there is ambiguity, broad summary statistics cannot meet that burden, especially in cases such as this where those statistics show that Defendants sold tens of millions of dollars of Ethicon-branded merchandise.

Accordingly, the Court need not broach the issue of how to calculate profits on Ethicon-branded goods. It seems unlikely that any topline number can be applied to all products. Even assuming everything is above board, Defendants purchase medical supplies from various sources and sell them in a just-in-time model. See generally, *e.g.*, [78]. It may very well be that Defendants' guesstimate of 30% is accurate (or at least accurate enough). But Defendants might also want to consider that *Klipsch*, a case they requested this Court follow, credited detailed information about the provenance and cost of various products, individual-level sale prices, and defendant's forthcoming responses. *Klipsch I*, 2012 WL 4901407, at *3.

In addition, after balancing the equities, the Court concludes that the assets in question must remain frozen. The original Asset Freeze Order explained that "the Plaintiffs are likely to

4

succeed in showing that the Asset Restrained Defendants have knowingly sold counterfeit medical devices in violation of the Lanham Act and * * * that each of the Asset Restrained Defendants is likely to attempt to conceal or remove its or his illegal profits if its or his assets are not frozen." [30 at 2.] Defendants ask the Court to revisit this analysis based on two main arguments—that they are an upstanding business and therefore can be trusted to pay up if they lose this suit, and they will suffer irreparable harm if the money is not freed up. Neither of these arguments, however, is well supported by the record currently before the Court.

The Court concludes that it is still likely that the funds will dissipate if released. Here, notwithstanding counsel's assertions that AIM is an upstanding business, there are other allegations of shady if not illegal business practices including dealing in stolen goods and running a criminal online casino. Compare [13]; [78], with *Sealed v. Sealed*, 2016 WL 9226442, at *3 n.4 (refusing to restrain assets where the only evidence that defendant was an illegitimate business was that it sometimes did not collect sales tax on cash sales). Defendants' executives' repeated invocations of their Fifth Amendment rights against self-incrimination (presumably when asked about these allegations) do not advance Defendants' cause. See *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) (permitting adverse inferences to be drawn from Fifth Amendment silence, but silence cannot be the sole bases for summary judgment). And if Tuzik's calculations are correct, then Defendants' profits from Ethicon products substantially dwarf their cash on hand; if the Court were to err in any back-of-the-envelope calculation of counterfeiting profits, then Defendants are unlikely to have sufficient cash to cover the difference. See *Klipsch II*, 2012 WL 5265727, at *11 (finding a large asset freeze inequitable because even if $20,000 undershot the counterfeiting profits, defendants had $14 million of monthly revenue, suggesting they could easily pay any difference).

Defendants' citation to *Malletier v. Sadia*, 2015 WL 7351465 (N.D. Cal. Nov. 20, 2015), is unpersuasive. In *Malletier*, the primary evidence that funds would dissipate was the fact that the CEO attempted to sell her home and took out a home equity loan (though she took no efforts to hide the sale listing). *Id.* at *6–7. The CEO submitted an affidavit explaining and contextualizing these decisions and other potentially shady business practices; based on this evidence, the court did not believe it likely that the funds would dissipate. *Id.* Here, however, nobody, let alone the CEO, has provided any explanation for any of the various allegations or evidence of perfidy, offshore accounts, and criminal conduct.

In regard to the second point, Defendants do have a business to run. But it is still not clear the extent to which the Asset Freeze order is actually prejudicing them. Even after Plaintiffs pointed out the evasive wording of the original Tuzik declaration, her second declaration contains some circular and ambiguous lines that could be read to suggest that Defendants have other bank accounts or could cover their bills. See [90-1, ¶ 18 ("I have reviewed the list of bank accounts that AIM has that have been frozen.")]; see also [109-2 at 5 (asserting that it would be "unduly burdensome" to provide a list of all of AIM's offshore accounts)]. Defendants are also mum about Plaintiffs' reports that they have access to a multi-million-dollar line of credit, which should be more than enough to float them for the time being. See [108 at 13 (citing 108-2)]; cf. [92, ¶ 17]. Likewise, although the exact corporate structure of AIM is unclear, there is at least some suggestion that AIM is a sole proprietorship, see [62 at 32, 34–35], in which case Iaderosa may be able to find some way to use his unfrozen assets for the benefit of his company.

In sum, as the Court explained several weeks ago, and Defendants' own cases confirm, the ball is in Defendants' court—they know from whom they purchased merchandise; what they paid for it; what they sold it for; how many bank accounts they have; whether Iaderosa is apt to flee to Dubai; and so on. It is their burden to come up with something that shows the Court that the universe of potential counterfeiting profits is less than what is currently frozen. Likewise, after balancing the equities the Court again concludes that they weigh in favor of an Asset Freeze—Defendants have not pointed to any new and persuasive evidence demonstrating that they are likely to pay up if the freeze is lifted or suffer irreparable harm if the freeze continues.

Because Defendant's emergency motion to lift the Asset Freeze is denied, Plaintiffs' emergency motion to compel [109] is denied in part as moot, at least insofar as it relates to the asset freeze issue. That said, based on the arguments before the Court, Defendants' position is quite brazen. On the one hand, they barrage the Court with emergency motions, pleading poverty, to lift the Asset Freeze, but on the other hand, they argue that the existence of additional offshore accounts is irrelevant. Moreover, they claim that it would be unduly burdensome to track down all of their international accounts, while claiming to the Court that the stakes of lifting the Asset Freeze could not be higher. If Defendants choose to bring yet another motion to lift or modify the Asset Freeze that pleads poverty, they should be prepared to identify under oath all of their accounts, lest they run into the same brick wall again.

There appears to be, however, more to the dispute over access to information about Defendants' bank accounts beyond the relationship of those accounts to Defendants' ability to pay their bills—which is one of the reasons advanced for lifting or modifying the Asset Freeze. For, Plaintiffs note that "[i]dentifying counterfeiters' bank accounts is also an important tool for tracking the spread of counterfeits: tracing payments is one of the primary ways to identify the purchase and sale of counterfeits." [109, at 4.] That observation places the information sought squarely within the scope of "matters to be decided in the pending motion for preliminary injunction and to confirm seizure." [See 121, at 3.] Interrogatory No. 1 thus is not simply a "fishing expedition" and cannot be dismissed as such. Nevertheless, Defendants raise objections that the request may sweep in "financial accounts held by Moving Defendants, their families, and other businesses without demonstrable connection to the case." [125, at 2.] To the extent that Defendant Iaderosa owns most or all of AIM, this objection might not carry much weight as to accounts controlled by him. But he or any other Defendant may have a plausible argument that the scope of the interrogatory reaches too far, so the Court will refer this limited matter to Magistrate Judge Cummings for further exploration and disposition, along with the other issues on which he currently is assisting the parties.

Dated: July 20, 2020

_____
Robert M. Dow, Jr.
United States District Judge

6