UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNSON & JOHNSON, ETHICON, INC., | : | |
| ETHICON US, LLC, and JOHNSON & | : | |
| JOHNSON HEALTH CARE SYSTEMS, INC., | : | Case No. 20-cv-3471 |
| | : | |
| Plaintiffs, | : | Judge Robert M. Dow, Jr. |
| | : | |
| v. | : | Magistrate Judge Jeffrey I. Cummings |
| | : | |
| ADVANCED INVENTORY MANAGEMENT, | : | **JURY TRIAL DEMANDED** |
| INC. d/b/a ESUTURES.COM, ANTHONY | : | |
| IADEROSA JR., JASON EINHORN, MIKE | : | |
| PHIPPS, and MUDASSAR SHAH, | : | |
| | : | |
| Defendants. | : | |
| ------------------------------------------------------------- | | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Johnson & Johnson, Ethicon, Inc., Ethicon US, LLC, and Johnson & Johnson

Health Care Systems, Inc. (collectively, "Ethicon" or "Plaintiffs") by and through their attorneys,

Faegre Drinker Biddle & Reath LLP and Patterson Belknap Webb & Tyler LLP, for their First

Amended Complaint against Defendants Advanced Inventory Management, Inc. d/b/a

eSutures.com, Anthony Iaderosa Jr., Jason Einhorn, Mike Phipps, and Mudassar Shah

(collectively, "eSutures" or "Defendants") allege as follows:

## <u>SUMMARY OF THE ACTION</u>

1.      In this action, Ethicon seeks to put an immediate and permanent stop to

eSutures's sale and distribution of counterfeit surgical devices, as well as diverted, altered,

stolen, and misbranded surgical devices.

2.      eSutures sold dangerous counterfeits of Ethicon products, including

hemostats, surgical clips, and fixation devices that are designed to be left in the body after

surgery. Testing shows that the counterfeit versions of these devices are bacterially contaminated and critically defective. The counterfeits being trafficked by eSutures pose a serious risk to the health and lives of unsuspecting patients.

3. eSutures sold these dangerous counterfeits to hospitals and surgery centers throughout the United States knowing that they were counterfeit and, in some instances, having actively participated in the counterfeiting. One of eSutures's counterfeit suppliers explicitly informed eSutures that it sold counterfeit Ethicon medical devices, and eSutures worked with the supplier to import the counterfeits without attracting scrutiny. Other vendors directly warned eSutures, in writing, that they had sold eSutures contaminated counterfeit devices. eSutures simply ignored the warnings – because it already knew it was selling counterfeits – and continued selling those contaminated counterfeits to customers.

4. eSutures obtained most of the currently known counterfeit Ethicon devices from a well-known and notorious counterfeiter called M/S Medserve ("Medserve"), located in Delhi, India. On October 11, 2019, Ethicon obtained from the Indian courts, with the support of a Letter of Request issued by the U.S. District Court for the Middle District of Florida, an order for a seizure at Medserve's offices and the apartment of its owner, Pritamdas Arora. At the seizure, Ethicon found that Mr. Arora was creating counterfeit Ethicon SURGICEL® hemostats and Ethicon LIGACLIP® surgical clips on the floor of his non-sterile and unsanitary apartment, inserting the fake surgical devices into counterfeit Ethicon packaging with his bare hands. eSutures purchased, imported, and then sold to U.S. customers large quantities of these dangerous counterfeit surgical devices.

5. Ethicon had samples of Medserve's counterfeit SURGICEL® medical devices tested by a major international laboratory. The testing revealed that the devices –

2

designed and intended to be implanted in the bodies of patients – were contaminated with multiple species of bacteria.

6.      eSutures is Medserve's largest American customer, and the largest known distributor of its counterfeit Ethicon devices in the United States.  In the past two years, eSutures sold in the United States, at minimum, thousands of packets of bacterially contaminated counterfeit SURGICEL® medical devices, and nearly a thousand counterfeit LIGACLIP® medical devices.  eSutures also sold counterfeits of the ETHICON SECURESTRAP® Absorbable Strap Fixation Device, which is used to affix mesh inside the body during hernia surgery.

7.      In addition to selling critically defective fakes, eSutures conspired with Mr. Arora to distribute expired Ethicon surgical devices in counterfeit packaging.  eSutures procured expired Ethicon devices and, at Medserve's direction, sent them to Medserve to be repackaged and shipped back to eSutures for distribution in the United States.  Mr. Arora, the counterfeiter, rejected some of the oldest product offered by eSutures, imploring eSutures to use "common sense" so that their counterfeits would not "kill anyone."  Nevertheless, eSutures and Medserve proceeded to distribute expired Ethicon products, with the expired product being unsealed and repackaged by hand in Mr. Arora's Delhi apartment under unsanitary conditions. The resulting product was not only expired, but also non-sterile and contaminated.

8.      In instances when eSutures did sell genuine Ethicon medical devices, it obtained them through fraudulent and otherwise unlawful means.  For example, eSutures acts as a fence for vast quantities of stolen product, purchasing one or two surgical devices at a time from hospital technicians or administrative staff who simply pocketed the devices and walked them out of the hospital.  And on numerous occasions, eSutures conspired with employees of

surgery centers and other medical facilities to purchase Ethicon surgical devices under their employers' heavily discounted contracts with Ethicon and divert them to eSutures. Although the employees obtained the discounted products from Ethicon on behalf of their employers and represented (falsely) that the products were for the sole use of their employers, they sold them to eSutures. eSutures knew that the employees were acting *ultra vires* and that the transactions depended on lying to Ethicon or Ethicon's authorized distributors.

9. eSutures also bought and sold vast quantities of individual Ethicon surgical devices that were removed from their FDA-approved and FDA-required packaging and lacked required Instructions for Use. eSutures's warehouse has hundreds of plastic bins filled with loose, individually wrapped units of Ethicon surgical devices, which eSutures refers to as "eaches." eSutures commingled these "eaches" without regard to their lot numbers, the vendors they purchased them from, whether any of those lot numbers had been recalled, and without attention to specific expiration dates. eSutures then sold and shipped these "eaches" loosely in envelopes to hospitals and medical centers – as well as unauthorized, unlicensed purchasers – without the FDA-required packaging and Instructions for Use.

10. All genuine Ethicon surgical devices are shipped with printed Instructions for Use included in the carton, which may contain, for example, 12 or 36 individually wrapped devices. eSutures sells hundreds of thousands of "eaches" of Ethicon devices that have been stripped of their outer packaging and without those Instructions for Use. The Federal Food, Drug, and Cosmetic Act specifically provides that selling medical devices without their Instructions for Use renders them "misbranded devices," and trafficking in misbranded devices is a strict-liability federal crime. 21 U.S.C. §§ 331(a), 333(a), 352(f).

11.    Furthermore, as required by FDA regulations, all authentic products are shipped in outer packaging that has undergone rigorous testing to ensure that the surgical devices are not harmed or compromised in any way by the shipping process.  The integrity of surgical devices during the shipping process is very important: if, for example, a reload cartridge of surgical staples became misaligned during shipping, it could cause the surgical stapler to misfire, causing serious injury to the patient.  By discarding Ethicon's authentic outer packaging, and then shipping the Ethicon devices loose in plain shipping envelopes and boxes, eSutures violates FDA regulations and ensures that the Ethicon products are shipped and handled under substandard conditions.

12.    In this action, Ethicon has sought and continues to seek injunctive relief in order to put an immediate stop to the sale of these dangerous counterfeit and misbranded medical devices.  This relief includes an *ex parte* seizure order the Court entered on June 16, 2020, which Ethicon executed at eSutures's premises beginning on June 17, 2020.  Ethicon seeks other injunctive and monetary relief for eSutures's trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and 815 Ill. Comp. Stat. 510 *et seq.*; trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and 765 Ill. Comp. Stat. 1036/65; and common-law breach of contract, unjust enrichment, unfair competition, and tortious interference with contract.

## THE PARTIES

13.    Plaintiff Johnson & Johnson is a New Jersey corporation, with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. Johnson & Johnson is the owner of the SURGICEL® trademarks, the LIGACLIP® trademark, the ETHICON SECURESTRAP® trademark, and the Ethicon trademarks described below.

14. Plaintiff Ethicon, Inc. is a New Jersey corporation, with its principal place of business at Route 22 West, Somerville, New Jersey 08876. Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson and, among other products, manufactures, through its affiliates and partners, SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® products. Ethicon, Inc. is the owner of the SURGICEL® Trade Dress, the LIGACLIP® Trade Dress, and the ETHICON SECURESTRAP® Trade Dress, as described below.

15. Plaintiff Ethicon US, LLC is a Texas limited liability company, with its principal place of business at 4545 Creek Road, Cincinnati, Ohio 45242. Ethicon US, LLC is an indirect subsidiary of Ethicon, Inc. and Johnson & Johnson and distributes and sells, among other products, SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® products in the United States.

16. Plaintiff Johnson & Johnson Health Care Systems Inc. ("JJHCS") is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 425 Hoes Lane, Piscataway, New Jersey 08854. JJHCS is a wholly owned operating subsidiary of Johnson & Johnson. JJHCS provides account management, contracting, supply chain, and business services to health care customers, including hospital systems and group purchasing organizations, for products manufactured by Johnson & Johnson subsidiaries, including Ethicon.

17. Defendant Advanced Inventory Management, Inc. d/b/a eSutures.com is an Illinois corporation with its principal place of business at 9645 Willow Lane, Mokena, Illinois 60448.

18. Defendant Anthony Iaderosa Jr. ("Iaderosa Jr.") is a resident of Illinois and the founder, president, CEO, and owner of Advanced Inventory Management, Inc. d/b/a

eSutures.com. Iaderosa Jr. operates and controls Defendant Advanced Inventory Management, Inc. Iaderosa Jr. hired and supervised Defendant Shah, including with regard to the purchase and sale of counterfeits. Iaderosa Jr. also approved all wire transfers used to pay for counterfeit products. In this action Iaderosa Jr. has invoked his Fifth Amendment right against self-incrimination and refused to answer all questions at deposition other than his name.

19.     Defendant Jason Einhorn ("Einhorn") is a resident of Illinois and the Director of Operations of Advanced Inventory Management, Inc. d/b/a eSutures.com. Einhorn has personally purchased and imported counterfeit Ethicon medical devices on behalf of Advanced Inventory Management, Inc. In this action Einhorn has invoked his Fifth Amendment right against self-incrimination and refused to answer all questions at deposition other than his name.

20.     Defendant Mike Phipps ("Phipps") is a resident of Illinois and an employee of Advanced Inventory Management, Inc. d/b/a eSutures.com. Phipps has personally received counterfeit Ethicon products on behalf of Advanced Inventory Management, Inc. and delivered them to the company warehouse.

21.     Defendant Mudassar Shah ("Shah") is an employee of Advanced Inventory Management, Inc. d/b/a eSutures.com. Shah has personally purchased and sold counterfeit Ethicon medical devices on behalf of Advanced Inventory Management, Inc.

### JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and pendent jurisdiction.

23.     The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with Illinois and with this District so as

to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. All Defendants are affiliated with Advanced Inventory Management, Inc., an Illinois company, and actively participated in importing, distributing, and/or selling counterfeit medical devices in Illinois, as well as committing other torts in Illinois as alleged herein.

24.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because Advanced Inventory Management, Inc.'s offices are located in this District, because Advanced Inventory Management, Inc. has sold counterfeit Ethicon medical devices from this District, because Einhorn, Phipps, and Shah have shipped counterfeit Ethicon medical devices directly into this District, and because a substantial part of the events giving rise to Ethicon's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Ethicon's Surgical Devices

#### 1.     Ethicon's SURGICEL® Absorbable Hemostat Medical Devices

25.     Ethicon has been selling SURGICEL® medical devices for over 60 years. SURGICEL® devices are hemostats used during surgery to control bleeding. The SURGICEL® family of medical devices includes what is now branded as the SURGICEL® Original Absorbable Hemostat and SURGICEL® FIBRILLAR hemostats.

26.     SURGICEL® devices are made out of oxidized regenerated cellulose, a material that has several qualities that are useful for surgery. First, SURGICEL® devices are used to stop and control bleeding during surgery. Second, SURGICEL® devices are absorbable: the hemostat can be left inside the patient's body after surgery, where it will be absorbed harmlessly. Third, SURGICEL® devices act as an antimicrobial agent. Each of these three

features – the hemostatic properties, the absorbable properties, and the antimicrobial properties – are important in surgeries.

27.     Notably, all of these properties are attributable to the oxidized state of the regenerated cellulose material used to make SURGICEL® devices.  Regenerated cellulose fiber that is not oxidized does not have hemostatic or antimicrobial properties and is not absorbable in the body.

28.     When it launched in 1957, SURGICEL® was the first oxidized regenerated cellulose hemostat available on the market, setting a new standard of care for controlling bleeding in various procedures.  The SURGICEL® brand is the #1 trusted brand of adjunctive hemostats, and is widely trusted by surgeons for its consistent safety and performance. SURGICEL® medical devices are used in millions of procedures a year, and have been used more than 100 million times worldwide.

29.     All authentic SURGICEL® Original Absorbable Hemostat distributed in the United States is manufactured according to a specific and consistent formula at a factory located in Neuchatel, Switzerland.  This state-of-the-art facility has rigorous quality control, specialized equipment, and consistent processes to produce a medical device that surgeons can rely on to be the same material in each package.  Ethicon also uses a factory located in San Lorenzo, Puerto Rico, which manufactures to rigorous quality standards a number of SURGICEL® devices, including SURGICEL® Absorbable Hemostat, for distribution in certain regions outside of the United States.  In addition to direct sales, Ethicon distributes SURGICEL® devices in the United States through a specific set of authorized distributors, who then sell the devices to healthcare facilities such as hospitals for use in surgical procedures.

### 2. Ethicon's LIGACLIP® Extra Ligating Clip Medical Devices

30. LIGACLIP® medical devices are a family of clip appliers used in both endoscopic and open surgery. The family includes both the instruments used to apply the clips, as well as clip cartridges containing extra ligating clips. Ethicon's LIGACLIP® family of devices provides a complete portfolio of both multiple- and single-use clip devices for both open and endoscopic ligation.

31. Within the LIGACLIP® family, Ethicon offers multi-clip appliers with preloaded clips in different versions for endoscopic and open surgery. Ethicon also offers single-clip appliers, in both endoscopic and open surgery designs, that can be re-sterilized and reused for multiple patients.

32. For use with the LIGACLIP® appliers, Ethicon offers LIGACLIP® Extra Ligating Clips. These clip bases are loaded with extra clips, which can be used with the reusable single-clip appliers. Ethicon's LIGACLIP® clips are carefully designed and engineered for secure fixation on the structure and to minimize the chance of dislodgment.

33. Ethicon distributes the LIGACLIP® family of products all over the world. In the United States, LIGACLIP® is the market leader in open and endoscopic ligation.

34. All authentic LIGACLIP® Extra Ligating Clips are manufactured according to stringent specifications. Ethicon has invested significant time and money in developing clips that deliver superior retention, efficient ligation, and minimal blood vessel damage.

### 3. ETHICON SECURESTRAP® Absorbable Strap Fixation Products

35. The ETHICON SECURESTRAP® Absorbable Strap Fixation Device is a multi-use laparoscopic absorbable fixation device used by surgeons to affix mesh to repair

hernias inside the abdominal wall. The ETHICON SECURESTRAP® Absorbable Strap Fixation system uses temporary tacks to adhere the mesh, which then absorb into the body within 12 to 18 months, once the tissue has integrated the mesh into the abdominal wall.

36. The ETHICON SECURESTRAP® devices are preloaded with tacks, and are disposable – that is, used in a single surgical procedure and then discarded.

37. Ethicon launched the ETHICON SECURESTRAP® Absorbable Strap Fixation Device in April 2011. When Ethicon announced the ETHICON SECURETRAP® device, it was the first fixation device to feature an absorbable "strap" design for laparoscopic and open hernia repair procedures.

38. ETHICON SECURESTRAP® is the market-leading absorbable fixation device.

39. All authentic ETHICON SECURESTRAP® devices are manufactured in an Ethicon factory according to stringent specifications.

40. Because the ETHICON SECURESTRAP® devices are multi-fire products with preloaded tacks, each device has to be able to reliably function multiple times during a single operation. A lesser-quality counterfeit poses a high risk of malfunctioning during surgery.

**B. Trademarks Used on Ethicon's Surgical Devices**

41. Johnson & Johnson is the owner of a number of well-established famous and registered trademarks (the "Ethicon Trademarks") that appear on genuine Ethicon products:

- The "Ethicon" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on June 3, 1958, as U.S. Registration No. 662658.

- The **ETHICON** trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on December 14, 1954, as U.S. Registration No. 599432.

- The ETHICON ENDO-SURGERY trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on October 29, 1996, as U.S. Registration No. 2011413.

- The Ethicon Endo-Surgery trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on January 7, 2014, as U.S. Registration No. 4462925.

42.     Johnson & Johnson is the owner of a number of well-established famous and registered trademarks (the "SURGICEL Trademarks") that appear on genuine SURGICEL® devices:

- The "SURGICEL" trademark that appears on the packaging of genuine SURGICEL® devices, which was registered on the Principal Register of the United States Patent and Trademark Office on August 4, 1959, as U.S. Registration No. 682773.

- The "SURGICEL SNOW" trademark that appears on the packaging of genuine SURGICEL SNoW® devices, which was registered on the Principal Register of the United States Patent and Trademark Office on December 6, 2011, as U.S. Registration No. 4068018.

43.     Johnson & Johnson is the owner of the "LIGACLIP" trademark (the "LIGACLIP trademark"), a well-established famous and registered trademark that appears on the packaging of genuine LIGACLIP® Extra Ligating Clip devices, which was registered on the

Principal Register of the United States Patent and Trademark Office on August 13, 1974, as U.S. Registration No. 0990939.

44.     Johnson & Johnson is the owner of the "ETHICON SECURESTRAP" trademark (the "SECURESTRAP trademark"), a well-established famous and registered trademark that appears on the packaging of genuine ETHICON SECURESTRAP® Absorbable Strap Fixation devices, which was registered on the Principal Register of the United States Patent and Trademark Office on May 29, 2012, as U.S. Registration No. 4150544.

45.     Johnson & Johnson is also the owner of several other well-established and registered trademarks that appear on the packaging of genuine Ethicon products that eSutures buys and sells within the United States, or purports to buy and sell within the United States.  All Ethicon products that eSutures buys and sells, or purports to buy and sell, feature packaging that bears one or more well-established and registered trademarks belonging to Johnson & Johnson, and may also bear trademarks belonging to one of Johnson & Johnson's wholly owned subsidiaries.

46.     Ethicon uses distinctive packaging (the "SURGICEL Trade Dress") to distinguish its SURGICEL® medical devices in the marketplace.  Ethicon is the owner of the SURGICEL Trade Dress, which includes the exterior and interior packaging of SURGICEL® medical devices.

47.     Ethicon uses distinctive packaging (the "LIGACLIP Trade Dress") to distinguish its LIGACLIP® products in the marketplace.  Ethicon is the owner of the LIGACLIP Trade Dress, which includes the exterior and interior packaging of LIGACLIP® products.

48.     Ethicon uses distinctive packaging (the "SECURESTRAP Trade Dress") to distinguish its ETHICON SECURESTRAP® products in the marketplace.  Ethicon is the

13

owner of the SECURESTRAP Trade Dress, which includes the exterior and interior packaging of ETHICON SECURESTRAP® products.

49.     Ethicon has used and is currently using these trademarks and trade dress in commerce and in connection with its sale of SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® products and plans to continue such use in the future.  Ethicon prominently displays them in its advertising and promotional materials.

50.     Ethicon has engaged and continues to engage in activities designed to promote SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® products and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.  All of these trademarks (the Ethicon Trademarks, the SURGICEL Trademarks, the LIGACLIP trademark, and the ETHICON SECURESTRAP trademark) and trade dress (the SURGICEL Trade Dress, the LIGACLIP Trade Dress, and the ETHICON SECURESTRAP Trade Dress) symbolize business goodwill of Ethicon and are invaluable assets to Ethicon.

**C.     The Authorized Manufacture and Distribution of Ethicon Surgical Devices**

51.     All Ethicon surgical devices are produced and shipped according to stringent, consistent standards and specifications.  Ethicon distributes its devices directly, as well as through a closely vetted and scrutinized set of authorized distributors.  These products, standards, and distributors are subjected to rigorous, ongoing quality control measures.  This ensures that medical professionals can rely on Ethicon products to be safe and effective.

52.     Ethicon also devotes enormous effort and resources to ensure product quality and patient safety.  For all medical devices intended for use in the United States, Ethicon designs the products, and each product's packaging and Instructions for Use, to be in full

14

compliance with federal regulations. Ethicon's medical devices intended for sale in the United States have received all the necessary approvals and clearances from the FDA.

53. The FDA regulates a multitude of aspects of each Ethicon medical device intended to be sold in the United States, including regulating Ethicon's processes for determining how the device is packaged, labeled, and distributed. Ethicon therefore subjects each product and its packaging to extensive testing, which is part of the process by which Ethicon submits for clearance to the FDA pursuant to Section 510(k) of the Federal Food, Drug, and Cosmetic Act. This submission is made to demonstrate that the device is safe and effective, and is evaluated under the FDA's objective safety and performance criteria.

54. The FDA has cleared each Ethicon product at the "box level," with specific indications for use. The packaging and labeling are considered part of the device. That means the device must remain in its packaging during the duration of its chain of distribution. This ensures that the box and the device(s) within will remain safe, protected, and undamaged, and provide all required information to the end user.

55. The outer cartons of authentic Ethicon devices undergo strict testing to ensure that the packaging can withstand the shipping process while maintaining the safety and integrity of the devices inside. Most Ethicon devices are sold by the carton, with multiple individually sealed devices inside. The individually sealed devices inside such cartons are not designed for, and have not been tested for, individual shipping. Ensuring that the outer packaging appropriately protects the devices is an integral part of Ethicon's compliance with the regulatory process and a crucial component of Ethicon's quality control.

56. Each Ethicon medical device is designed with specific and unique FDA-mandated and FDA-approved Instructions for Use. Instructions for Use are set forth in detail on

a printed insert that is included with every package of Ethicon devices. Each of Ethicon's hundreds of devices has a unique set of Instructions for Use. Ethicon's requirements provide that all Ethicon medical devices intended for sale in the United States must be sold with printed, FDA-approved instructional inserts. For most devices, which are sold in outer cartons containing multiple individually sealed devices, Ethicon includes a single printed copy of the Instructions for Use inside the outer carton.

57.     Unauthorized changes to an Ethicon surgical device, its packaging, or its Instructions for Use result in the device being misbranded under FDA regulations. It is a strict-liability federal crime to traffic misbranded surgical devices. Ethicon devices cannot be sold without their approved packaging and instructional insert, in unapproved packaging, or with any modifications, mishandling, or tampering.

58.     Ethicon requires its authorized distributors to follow procedures that ensure that its quality-control policies and practices are met throughout the lifecycle of each Ethicon product. These authorized distributors and their agents must meet Ethicon's requirements for how Ethicon's products are purchased, stored, transported, and sold. This includes protocols concerning near-expired and expired product, returns, and recalls.

59.     Ethicon has a strict policy against the sale of expired medical devices. Ethicon does not sell any expired devices, and its authorized distributors are prohibited from selling expired devices. Expired devices are not considered valid. Ethicon also has a policy against distributing partial boxes or single unboxed units of Ethicon product. And in all instances, Ethicon requires that every sale of every Ethicon device include the FDA-required Instructions for Use.

16

60. Ethicon expects and demands that all authorized distributors and other members of the authorized distribution chain follow all field actions and recalls. All Ethicon devices are manufactured with a specific product code, lot number, and expiration date. Ethicon uses the product codes and lot numbers to track where its products are shipped and then monitor them if any safety or quality issues arise. When a recall is warranted, for example, Ethicon works with the regulatory agencies in the countries that were authorized to receive the affected lot number, informing them of the particular issue and seeking their guidance. For each affected country, Ethicon provides a direct notification to all consignees for the affected lot numbers, including distributors and health care customers, notifying them of the issue and what further action is necessary.

61. Through these controls and others, Ethicon seeks to safeguard the reputation that its products have developed over several decades. As a result of Ethicon's extensive branding, marketing, sales, and quality control efforts in the United States and around the world, patients and medical professionals expect a product of the highest safety, reliability, and quality.

**D.      eSutures's Knowing Sale of Counterfeit Ethicon Medical Devices**

62. eSutures holds itself out as a legitimate distributor of surgical supplies. It advertises itself as the "global online leader in providing discounted surgical supplies," and "a wholesale liquidator of surgical supplies & sutures from such top brands as Ethicon." eSutures's advertising also claims: "eSutures.com is a discount distributor. We purchase excess inventory, find a home for that product within the same marketplace, and we provide it on a just-in-time basis." On its website, eSutures advertises: "We have worked with facilities of every size, from entire hospital systems switching the brand of all their suture and endomechanicals down to veterinarians looking to sell a couple of boxes of expired sutures. . . . We have been in business

17

since 2000, and have yet to encounter a facility who has been dissatisfied with our service in any way."

63.     In a slick promotional video posted on its website, Defendant Iaderosa Jr. – the president, founder, CEO, and owner of eSutures – looks into the camera while cascading piano music plays in the background, and says of the surgical devices he sells: "Someone is having surgery tomorrow, and that product is going in them.  Every order gets treated with that type of care.  And we understand that these items are needed next day.  They are going into a person, and that person has a family."

64.     Despite these representations, eSutures knowingly distributes large quantities of defective counterfeit surgical supplies.  In the last two years alone, eSutures has knowingly sold in the United States thousands of counterfeit Ethicon surgical devices that do not work and are bacterially contaminated.  eSutures's dangerous counterfeits have indeed been inserted into innocent patients' bodies, putting their health and lives at risk.

65.     eSutures has purchased and sold, at minimum, the following counterfeit Ethicon medical devices: counterfeit SURGICEL® Absorbable Hemostat, counterfeit SURGICEL® FIBRILLAR, counterfeit LIGACLIP® Extra Ligating Clips, and counterfeit ETHICON SECURESTRAP® fixation devices.

### 1.     Medserve's Counterfeiting Operation

66.     The majority of the known counterfeit Ethicon devices sold by eSutures were obtained from Medserve, located in Delhi, India.

67.     Through legal actions brought in the U.S. District Court for the Middle District of Florida and the Hon'ble High Court of Delhi at New Delhi, India, Ethicon identified Medserve as the source of the counterfeit Ethicon medical devices distributed by eSutures and others.  In the course of these actions, Ethicon executed court-ordered seizures at several

locations, including Medserve's offices and the apartment of its principal, Mr. Arora, both in Delhi, India.

68.     The seizure uncovered incontrovertible evidence that Medserve was counterfeiting large numbers of Ethicon medical devices. For example, in Mr. Arora's home, Ethicon uncovered large quantities of never-used and never-sealed counterfeit SURGICEL® pouches, depicted below. These pouches were empty, waiting to be filled with counterfeit products.



69.     Ethicon also found in Mr. Arora's home large quantities of ordinary, non-sterile fabric gauze made by a third-party manufacturer, depicted below. The gauze was pre-cut and pre-folded in a similar manner to the counterfeit SURGICEL® that Ethicon's investigators had received in prior test buys from Medserve. Scientific testing has shown that this non-sterile, untreated fabric was in fact placed in the counterfeit SURGICEL® packaging and sold as though it were SURGICEL®.



70.     Mr. Arora inserted the non-sterile gauze into counterfeit SURGICEL®
packaging from the floor of his Delhi apartment, which was visibly unclean and certainly not a
sterile environment.  As a result, the counterfeit SURGICEL® products sold by Medserve are
non-sterile and contaminated.

71.     In a WhatsApp communication obtained at the seizure, Medserve noted
that a hospital who had received its counterfeit SURGICEL® "told us it cause[d] infection,"
which prompted Medserve to note that "[w]hen we pack material, we use our hands to pack, may
be it created problem."

72.     In addition to counterfeit SURGICEL® medical devices, Ethicon also
found counterfeit LIGACLIP® medical devices at Mr. Arora's apartment during the court-
ordered seizure.  In fact, a large delivery of counterfeit LIGACLIP® medical devices was made
to Mr. Arora's home while the seizure was being executed.

**2.      The Counterfeit SURGICEL® Medical Devices**

73.     Since at least 2018, eSutures purchased from Medserve thousands of units
of defective and contaminated counterfeit SURGICEL® medical devices, which eSutures
imported into the United States and then sold to U.S. hospitals and surgery centers.

74. Ethicon has examined boxes of SURGICEL® medical devices made by Medserve and identical to those sold by eSutures. Ethicon conclusively determined that the products were counterfeit. Ethicon's testing also revealed that the counterfeit SURGICEL® devices are critically defective and dangerous, and pose a serious risk to patient health and safety.

75. Authentic SURGICEL® medical devices are made out of oxidized regenerated cellulose. The oxidation of the regenerated cellulose is critical to its use in surgery: it provides SURGICEL® devices' hemostatic, antimicrobial, and absorbable properties. Regenerated cellulose fiber that is not oxidized is essentially just an untreated fabric, such as rayon. Non-oxidized regenerated cellulose is not absorbable in the body and does not have hemostatic or antimicrobial properties.

76. Ethicon performed analytical tests of the counterfeit SURGICEL® product manufactured by Medserve, using a technique called infrared spectroscopy. The testing showed that the counterfeits have much lower levels of oxidation than genuine SURGICEL® devices. This means that the counterfeits do not have the antimicrobial, hemostatic, and absorption properties that make SURGICEL® surgical devices safe and effective. The oxidation levels of the counterfeit product are well below the minimum levels required for genuine SURGICEL® medical devices and would be considered a critical manufacturing defect if measured at an Ethicon factory.

77. A particular critical danger of the counterfeit product is that it lacks sufficient oxidation to be absorbed if left in the body after surgery. Instead of being absorbed, the counterfeits are liable to remain in the body as foreign objects. This presents serious and potentially life-threatening risks to patients. For example, the counterfeits could cause foreign

body granuloma, a granular tumor or growth caused by the presence of a foreign body. The non-absorbed foreign matter could also act as a nidus for infection, or could result in surgical adhesions: the formation of internal scar tissue that connects parts of the body that are not normally connected.

78.     In addition to analyzing the oxidation levels of the counterfeit SURGICEL® products, Ethicon had them tested for contamination at an independent laboratory. This testing revealed that the counterfeit SURGICEL® products made by Medserve are not sterile and are bacterially contaminated. The bacteria found in the counterfeit products included *bacillus licheniformis, bacillus aerius, bacillus sonorensis, bacillus siamensis, bacillus amyloliquefaciens, bacillus atrophaeus, bacillus cereus, bacillus thuringiensis, bacillus subtilis, bacillus mojavensis,s. bacillus circulans, staphylococcus aureus, enterococcus hirae, enterococcus faecium, lysinibacillus pakistanensis, lysinibacillus fusiformis, lysinibacillus sphaericus,* and *bacillus toyonensis.*

79.     Bacterial contamination creates a serious risk of infection for patients. Sterility is extremely important for surgical devices. If a contaminated product is implanted in a patient, it could lead to an infection and significant complications.

80.     Authentic SURGICEL® medical devices are, of course, sterile, and are subject to a rigorous manufacturing and packaging process that ensures their sterility. After the hemostats are hermetically sealed into their individual pouches, the pouches undergo sterilization via radiation, which ensures that no microbial contaminants – such as bacteria, fungi, and viruses – are living within the devices.

### 3.     The Counterfeit LIGACLIP® Medical Devices

81.     Since at least 2018, eSutures purchased from Medserve, at minimum, nearly one thousand units of defective counterfeit LIGACLIP® products, which eSutures

22

imported into the United States and then sold to U.S. hospitals and surgery centers. eSutures also recently purchased a large quantity of counterfeit LIGACLIP® products from another U.S.-based gray-market distributor, who had in turn obtained the counterfeits from Medserve.

82.     Ethicon's testing has conclusively determined the purported LIGACLIP® products to be counterfeit. Moreover, Ethicon's testing establishes that the counterfeit LIGACLIP® products are critically defective and dangerous, and pose a serious risk to patient health and safety.

83.     For example, as compared to genuine products, the counterfeit LIGACLIP® clips have significant clip gaps, and can be pulled off easily after being applied. These deficiencies mean that the counterfeits have a higher risk of allowing patient bleeding to occur after the clip is placed. This is a serious risk to patients who receive a counterfeit LIGACLIP® product.

84.     The counterfeit LIGACLIP® samples were obtained during a seizure carried out under the authority of the Indian courts, and restrictions imposed by the court have prevented Ethicon from testing these products for contamination. However, the counterfeit LIGACLIP® products were not in sterile packaging, and were recovered from the same unsanitary and non-sterile location and conditions as the counterfeit SURGICEL® products. Therefore, the counterfeit LIGACLIP® products are contaminated as well.

**4.      The Counterfeit ETHICON SECURESTRAP® Products**

85.     eSutures also sold counterfeit ETHICON SECURESTRAP® products.

86.     On or about October 26, 2018, eSutures purchased at least several dozen counterfeit ETHICON SECURESTRAP® products from gray-market distributor Medifelix, which is located in Turkey. eSutures then sold at least some of those counterfeit ETHICON SECURESTRAP® products in the United States.

87.     The federal Food and Drug Administration's Office of Criminal Investigation ("FDA OCI"), which is investigating eSutures, provided Ethicon with photographic images of the suspected counterfeits.  Based on these photographs, Ethicon confirmed that the ETHICON SECURESTRAP® products sold by eSutures were counterfeit.

88.     The lot numbers on the counterfeit ETHICON SECURESTRAP® products that eSutures purchased from Medifelix are fake: they are not legitimate lot numbers for the products they purport to be.  In addition, the counterfeit boxes were missing patient tracking labels, used by hospitals to chart the use of the product during surgery, that are contained with the authentic device.

89.     As of the date of this filing, Ethicon has not received a physical sample of the counterfeit ETHICON SECURESTRAP® products sold by eSutures, and therefore has not been able to test their properties.  However, given the complexity of the product and the properties of the other counterfeits sold by eSutures, it is extremely unlikely that the counterfeit ETHICON SECURESTRAP® products are sterile and functional, and it is therefore extremely likely that they pose a risk to patient health and safety.

## 5.     Expired SURGICEL® Products in Counterfeit Packaging

90.     In addition to selling fake Ethicon medical devices, eSutures also sold authentic but expired SURGICEL® devices in counterfeit packaging.  This counterfeit packaging bears, among other things, false expiration dates that purport to show the product is unexpired, when in reality the product is well beyond its genuine expiration date.  The counterfeit repackaged medical devices are contaminated due to the unsanitary and non-sterile counterfeit repackaging process.

91.     eSutures provided expired SURGICEL® medical devices to Medserve knowing and intending that they would be inserted into counterfeit packaging with falsified

24

expiration dates.  In return, eSutures received a portion of the finished counterfeits after Medserve had repackaged the expired medical devices into the counterfeit packaging.  eSutures sold those counterfeits to U.S. customers.

92.     It is dangerous and illegal to sell expired surgical devices such as SURGICEL®.  Moreover, the manufacture of these counterfeits necessarily requires the opening of the authentic, sterile-packaged medical devices and resealing them into the counterfeit packaging.  Unsurprisingly, given Medserve's near-total disregard for such risks in manufacturing the other counterfeit SURGICEL®, the counterfeit repackaged expired medical devices are bacterially contaminated, as confirmed by an independent laboratory.

93.     Ethicon has received, through a third-party subpoena in a separate action, samples of SURGICEL® FIBRILLAR that a U.S. customer had purchased from eSutures and had remaining in stock.

94.     Ethicon scientists tested the samples and compared them to genuine product.  They concluded that although the product itself had discolored with age, consistent with being past its expiration date, it appeared to be genuine product.  However, Ethicon concluded that the packaging was counterfeit, based on multiple indicators, including: non-matching production numbers, differences in the positioning and font of the barcode, and infrared-spectrometry results showing the packaging used a non-genuine heat-seal material.

95.     The subpoenaed customer also provided Ethicon with its purchase order for these counterfeit devices it received from eSutures.  The purchase order showed that the customer had purchased the counterfeits from eSutures in April 2019.  Medserve had shipped eSutures the same SURGICEL® product codes, addressed to Defendant Einhorn at eSutures's corporate address, in late 2018.

96.     Ethicon also purchased expired medical devices in counterfeit packaging directly from Medserve in test buys made by Ethicon's investigators.  Testing showed that those counterfeit-repackaged products were bacterially contaminated.

97.     eSutures knowingly conspired with Medserve to falsify paperwork to avoid detection of its illegal trade in expired Ethicon products in counterfeit packaging.

98.     For example, in April 2019, Medserve explained to Defendant Shah, an eSutures employee, that "there are huge warehouses in USA where there are large stocks which are of short expiry or are expired.  I am interested in getting those products. . . .  In such products a lot of money can be saved."  In a voice message later that night, Medserve stated, "Keep searching for more such stock which is available also and let me know by morning how much has been collected.  Keep collecting more and more stocks.  All stock will work."

99.     Defendant Shah sent the following order to Defendant Einhorn and Medserve, stating "this order ,we ll proceed tomarow …"



The numbers 2082 and 2083 are product codes for SURGICEL SNoW®, and 1963 is a product code for SURGICEL® FIBRILLAR.  "Kabeer" is an alias for Mr. Arora, Medserve's principal.

100.     At Medserve's request, Defendant Einhorn, eSutures's Director of Operations, provided the expiration dates for the products being offered, with several dozen products having been expired for over a decade.

101.     The idea of repackaging these long-expired surgical medical devices and selling them as "new" was too much even for Medserve, who responded to Defendant Einhorn with a voice message stating: "Boss, we are friends, and we cooperate with each other, and we all have a common sense, so we must all be having an idea what will work or not. Yesterday night, I was a little drunk and I said I would buy all the expired goods. But, we cannot kill anyone, we can never accept goods of 2007, 2008 – it is impossible. But, we can buy, I'm just mentioning. You need to give them back the material. We cannot accept all the material."

102.     Medserve then repeated its objection in a written message, and Defendant Einhorn responded "ok np."

103.     Medserve sent a voice message to Defendant Shah providing instructions on how to ship the expired products: "There is no need to mention the expiry or lot. Just need to mention that it's a cotton foam, no need to mention its use or anything. Just need to write cotton foam samples and send it via Aramex. . . .  No need to mention reference code or item name on the invoice. Only mention the size and name it as cotton foam samples and that's it."

104.     Defendant Shah stated in a return voice message that "I have given [Defendant Einhorn] an option that as the products are expired, he can show that he is sending the same as a free gift or donation and send it."

105.     Medserve objected: "we'll be f[*]cked if we mention 'expire' there… we'll all expire. It is not allowed." Defendant Shah acknowledged by voice memo back: "I will

make sure that the word Expired will not be mentioned anywhere.  Just mention cotton foam only.  That's fine."

106.    Defendant Einhorn generated an invoice that included the expiration date for each product, explaining that "I will remove the expiration.. just for my reference and will also remove outer boxes."



107.    Mr. Arora again emphasized in a voice note to Shah: "Details of every code and the number of pieces need not be mentioned on the invoice.  There will only be 3 lines

on the invoice which is 2082, 2083, 1963 and their total number of pieces. Otherwise, it will not work."

108.    eSutures complied with Mr. Arora's instructions. The eSutures invoice, dated May 2, 2019, is just three lines long, listing only the products and their product codes. The expiration date on the invoice is listed as "--". Per Medserve's instructions, the product was shipped to a logistics company in China.



**Invoice**

Thank you for your order at eSutures.com!

| BILLING: | SHIPPING ADDRESS: |
|---|---|
| **P.D Arora** | **Yu Tsz Him** |
| Medserve | MCI Logistics Guangdong LTD |
| 6/5 A. Prasanna APT, Bahamashah Rd. | Unit 217, Phase 1, Domestic Freight Village |
| Near Kirpal Bagh, Dehi | Airport, Baoan District, Guangdong Province |
| New Delhi 110009 | Shenzhen City 518128 |
| India | China |
| P: 0091-9899999911 | P: 85295018955 |
| E: pd@medsevindia.com | E: m.shah@esutures.com |
| Purchase Order | |

Order Number: **292104**
Order Date: 5/2/2019 12:54 pm

| Item # | Size | Description | Expiration | Qty | Unit | Price | Ext Price |
|---|---|---|---|---|---|---|---|
| 1963 | - | Surgicel Fibrillar Absorbable Hemostat: 4" x 4" | -- | 192 | eaches | $15.00 | $2,880.00 |
| 2083 | - | Surgicel SNoW Absorbable Hemostat: 4" x 4" | -- | 68 | eaches | $24.00 | $1,632.00 |
| 2082 | - | Surgicel SNoW Absorbable Hemostat: 2" x 4" | -- | 467 | eaches | $12.00 | $5,604.00 |
| | | | | | **Sub Total:** | | **$10,116.00** |
| | | | | | **Shipping & Handling:** | | **$0.00** |
| | | | | | **Order Total:** | | **$10,116.00** |

Total due: $10,116.00 Net 30 days. Please make checks payable to **eSutures.com**

Thank you for your business! Please visit us again at eSutures.com

eSutures.com • 9645 Willow Ln • Mokena IL 60448 • P. (888) 416-2409 • F. (708) 478-3519 • info@esutures.com

If you feel we've provided great value or would like to leave us feedback, please do so on the eSutures.com Google My Business page: https://goo.gl/mbrKQw. We appreciate your input!

109.    At Mr. Arora's instructions, Shah prepared a separate shipping invoice for the products, listing 379 pieces of "cotton foam" at $0.75 per piece. Mr. Arora explained, "value wont be more than 300usd. For example if its 1000pieces then value will be 0.3usd each,total 300usd."

110.     Medserve further instructed, "Please dont hesitate to dispatch shipment on low value by Aramex as its sample shipment by courier mode not in cargo.  Courier shipment never comes in scrutiny.  Data exists for cargo shipment not for cargo."

111.     Medserve further explained: "Don't mention use etc.  You can write it's free samples …value declare for custom purposes.  I'm 100percent sure that there wont be any problem."

112.     Despite these instructions, the shipment faced customs issues: it was held in China, and ultimately returned to eSutures.  On Medserve's instructions, Defendant Einhorn prepared to ship the expired medical devices to a logistics company in Hong Kong.

113.     When re-shipping the expired medical devices, Defendant Einhorn asked "how do you want me to describe goods…. ABSORBABLE HEMOSTAT or COTTON FOAM."  Medserve responded, "Cotton foam."  When Defendant Einhorn confirmed that he changed it to cotton foam, Medserve responded, "Ok better."

E.     **Ethicon Obtains Counterfeit SURGICEL® Products Directly from eSutures**

114.     On or about October 8, 2019, investigators working on behalf of Ethicon met and engaged directly with Defendant Shah in Pakistan, where the investigators posed as buyers of surgical supplies.

115.     Ethicon's investigators placed an order with Defendant Shah and his cousin for sample products, which at Defendant Shah's instructions the investigators obtained from Shah's cousin at Shah's "Shah Snooker Club" – a billiards hall he owns – in Rawalpindi, Pakistan.  Shah has posed on social media in his snooker hall wearing his eSutures.com uniform.



116.    On or about October 15, 2019, Ethicon's investigators completed their test purchase of SURGICEL® products from Defendant Shah and his cousin.

117.    An Ethicon packaging engineer examined the SURGICEL® Absorbable Hemostat products obtained from Defendant Shah and his cousin, and determined that the outer packaging was counterfeit.  For example, the packaging exhibited differences in construction, design, font styles, and spacing from authentic product.

**F.      eSutures Attempts to Evade Detection by Withholding Documents Subpoenaed by Ethicon**

118.    In an anti-counterfeiting action brought in the United States District Court for the Middle District of Florida (the "Florida Action"), Ethicon obtained discovery indicating that eSutures had done significant business with an overseas distributor of counterfeit Ethicon products.  Accordingly, in August 2019, Ethicon served two non-party document subpoenas on eSutures.  In connection with serving those subpoenas, Ethicon's counsel informed eSutures both in writing and in telephone conversations that eSutures likely purchased counterfeit SURGICEL® devices.

119.    Ethicon did not know at the time that eSutures was knowingly and willfully selling the counterfeits and helping Medserve manufacture them.

120.    Among other requests, the subpoenas demanded production of "all documents and communications from January 1, 2016 to the present concerning Mudassar Shah," and all products purchased from Defendant Shah.  Ethicon made this request because discovery in the Florida Action had also revealed that eSutures had significant connections with Shah, and that Shah was also involved in the trafficking of counterfeits.

121.    Ethicon did not know at the time that Defendant Shah was an eSutures employee.  Ethicon learned only later that Shah was a full-time eSutures employee who received a regular salary from eSutures, negotiated deals and placed orders on behalf of eSutures, and held himself out expressly as an eSutures employee when negotiating purchases and sales of the counterfeit Ethicon products.

122.    In response to these subpoenas, eSutures provided a total of 68 pages of documents, 28 of which concerned Defendant Shah.  Ethicon now knows, based on the data it subsequently seized from Medserve in Delhi, India, that eSutures withheld large numbers of highly incriminating, responsive documents that should have been produced in response to Ethicon's subpoena.

123.    eSutures intentionally withheld these incriminating responsive, non-privileged documents concerning, for example, (1) Shah's status as a full-time employee of eSutures, (2) Shah's sale of eSutures's expired SURGICEL® products to Medserve, and (3) Shah's purchase of SURGICEL® products for eSutures from Medserve.

124.    Moreover, as part of its subpoena response, eSutures produced to Ethicon a total of four boxes and three loose pouches of SURGICEL® products.  Ethicon tested those

products and determined they were authentic – most likely because they were stolen or wrongfully diverted from surgery centers, as described below.

125. eSutures withheld its stock of counterfeit SURGICEL® products, giving Ethicon only the handful of products that it knew were authentic. At the time of Ethicon's subpoena, eSutures had in stock several hundred pouches of counterfeit SURGICEL® medical devices that Defendant Shah had purchased from Medserve. Defendant Shah purchased, and eSutures received, those counterfeits from Medserve shortly before Ethicon served the subpoena on eSutures.

126. eSutures knew that the products it had received from Medserve were counterfeits. Shortly after eSutures responded to the subpoenas, Defendants Einhorn and Shah complained to Medserve about that latest shipment of SURGICEL® products. For example, Defendant Einhorn wrote, "The packaging is very suspicious. Really bad print job . . . . Plastic is not original. No ethicon seal."

127. eSutures withheld those counterfeit SURGICEL® products from Ethicon when responding to the subpoena. eSutures likewise withheld all other documents and communications concerning those recently purchased counterfeits.

128. Upon executing this Court's Seizure Order, Ethicon located these hundreds of obvious counterfeits from Medserve, which eSutures still had in its possession. Ethicon's testing confirmed they were counterfeit.

### G. eSutures Attempts to Ship the Obvious Counterfeits to a Customer in Dubai

129. After being warned by Ethicon that eSutures was trafficking in counterfeit SURGICEL® products, and after noticing the obviously counterfeit nature of the latest batch from Medserve, eSutures did not send the counterfeits to Ethicon or notify the FDA. eSutures

did not contact its customers to warn them they had been buying counterfeits. Instead, with reckless disregard for patients, eSutures attempted to move the counterfeits out of its warehouse by selling them to a distributor in Dubai.

130.    Communications seized from Medserve indicate that after complaining about the quality of Medserve's latest counterfeits, eSutures pressed Medserve to identify a customer who would re-purchase the counterfeits. Medserve eventually suggested one of its distributor customers in Dubai, but from the communications, it appears the sale never ultimately took place. That distributor in Dubai is a known seller of the counterfeits into the United States, and so even if the sale had been successful, the counterfeits would have simply re-entered United States commerce through a different channel.

131.    Even after Medserve directly revealed that it sold counterfeit LIGACLIP® products, eSutures took no steps to warn its customers or notify the authorities or Ethicon.

**H.    eSutures Asks a Distributor to Destroy Incriminating Evidence**

132.    In October 2019, Defendant Shah made contact by WhatsApp with a gray-market medical distributor based in Illinois. Defendant Shah told the distributor in October 2019 that "i m employee of Esutures.com," and explained "i m working for them since 2 years" and "they pay me monthly sallery to my bank account in pakistan." Defendant Shah explained that he does "purchasing from all over the world" for eSutures. When asked by the gray-market distributor if Shah would provide the same services for him, Shah responded "no bro ..[.] since i m a permanent employee …i dont need to look around," and "Anthony [Iaderosa Jr.] is my best friend and my boss also."

133.    Ethicon subsequently filed an amended complaint in the Florida Action, naming that same Illinois-based gray-market distributor as a defendant for its sale of counterfeit SURGICEL® that it purchased from Medserve and distributed into the United States. The

Illinois-based distributor informed eSutures that it had been sued, and shared with eSutures document requests that Ethicon had served upon it.

134.    Defendant Shah responded: "**plzz dont tell them [Ethicon] my details … plz delete all**." He continued: "delete my texts and my number … from ur cell."

I.    **In the Initial Weeks of This Litigation, Ethicon Recovers Additional Counterfeits from eSutures's Customers – Despite eSutures's Desperate Attempts to Stop Ethicon From Warning Customers**

135.    After executing this Court's Seizure Order, Ethicon sent warning letters to eSutures's customers who had purchased SURGICEL®, LIGACLIP®, and/or ETHICON SECURESTRAP® devices from eSutures.

136.    eSutures did everything it could to stop or delay Ethicon from warning eSutures's customers about the counterfeits. This Court's Seizure Order required eSutures to "immediately" produce a list of its purchases and sales of SURGICEL®, LIGACLIP®, and/or ETHICON SECURESTRAP® devices, including the customers to whom it sold those devices. For days, eSutures represented to Ethicon that it had not yet produced that information because it was taking a long time to compile, only to reveal that it had unilaterally decided not to comply with the Court's order. When Ethicon immediately moved for contempt, eSutures responded by vehemently objecting to Ethicon warning its customers, and unsuccessfully moved to have a gag order imposed to prevent Ethicon from doing so. And when it was finally forced to produce the information to avoid contempt, eSutures falsely claimed that its internal records proved that it never sold any counterfeits sourced from Medserve to customers. On that false basis, eSutures threatened that Ethicon would be acting in bad faith and contrary to this Court's orders if Ethicon proceeded to warn eSutures's customers. In reality, as set forth below, eSutures's records showed no purchases or sales of products from Medserve because eSutures had falsified those records to conceal its purchases from Medserve under an alias.

137. It quickly became clear why eSutures had resorted to fraudulent misrepresentations and intentional violations of Court orders to stop Ethicon from warning its customers. As a result of those warning letters, Ethicon was able to recover unused counterfeit SURGICEL® devices and counterfeit LIGACLIP® devices from multiple eSutures customers in the United States, preventing those dangerous counterfeits from being used on patients.

138. Specifically, Ethicon retrieved counterfeit SURGICEL® devices sold by eSutures from medical facilities in Colorado and Montana. Ethicon's scientists tested these recovered SURGICEL® devices and confirmed both the package and the product were counterfeit, and were consistent with previously tested counterfeits manufactured by Medserve.

139. Ethicon also retrieved counterfeit LIGACLIP® devices sold by eSutures that had been partially used by a urology practice located in Illinois. Urologists often use LIGACLIP® devices in serious surgeries such as nephrectomies – the removal of a kidney – where the LIGACLIP device would remain inside the patient's body. Ethicon's scientists confirmed both the packaging and the product to be counterfeit. While the counterfeit packaging of the LIGACLIP® devices closely resembled Ethicon's authentic packaging, the counterfeit packaging had several small differences in font, spacing, and alignment, as well as differences in the construction of the carton, that proved the packaging to be fake. The counterfeit LIGACLIP® clips themselves had visibly different textures from authentic clips, and the counterfeit cartridges holding the clips differed from authentic cartridges in several respects, including with regard to the printing and markings on the cartridges.

140. Tragically, in many cases the dangerous counterfeits sold by eSutures had already been used on patients.

**J.    Ethicon Seizes Hundreds of Additional Counterfeits from eSutures's Inventory**

141.    To date, Ethicon has identified hundreds of counterfeit Ethicon products that were seized from eSutures's premises during the execution of the seizure order.

142.    Ethicon seized hundreds of counterfeit SURGICEL® devices that eSutures had purchased from Medserve, along with paperwork showing those products had been shipped to eSutures directly from Medserve.  Testing confirmed the devices and their packaging to be counterfeit and consistent with other counterfeit SURGICEL® devices manufactured by Medserve.

143.    Ethicon also seized hundreds of counterfeit LIGACLIP® devices from the inventory in eSutures's warehouse.  These counterfeit LIGACLIP® devices had the same lot number as the counterfeits recovered from the urology practice in Illinois.  Testing confirmed the devices and their packaging to be counterfeit and consistent with the counterfeits recovered from the urology practice.

**K.    Additional Evidence that eSutures's Counterfeiting Was Intentional and Willful**

144.    As described above, eSutures knew it was selling counterfeit Ethicon medical devices, and engaged in its counterfeiting knowingly and willfully.  In addition to the facts alleged above, the following facts demonstrate that eSutures was aware the products it obtained from Medserve and other suppliers were fake.

**1.    Medserve Is a Known Counterfeiter of American Surgical Devices**

145.    Medserve, eSutures's Delhi-based supplier, has previously been caught selling counterfeit implantable surgical devices into the United States.

37

146.     In December 2011, a medical device distributor named RAM Medical, Inc. pled guilty to selling hundreds of boxes of counterfeit surgical mesh.  In its press release concerning its prosecution of RAM Medical, the U.S. Department of Justice specifically identifies "M/S Medserve in Delhi, India" as the original seller of the counterfeits.  That press release is publicly available online – *see* https://www.justice.gov/archive/usao/nj/Press/files/RAM%20Medical%20Plea%20News%20Release.html – and is easily found on Internet search engines.

147.     Defendant Iaderosa Jr. and others at eSutures personally reviewed the press release concerning RAM Medical and Medserve's counterfeiting scheme, and discussed that press release with eSutures's lawyers.

148.     Medserve also told eSutures that RAM Medical was one of its former clients.  In discussing large orders for medical supplies in the past, Medserve wrote to eSutures that "there are many big players," and that "Ram Medical" was "a client from NJ [who] used to take [SURGICEL] Fibrillar 200 boxes."

### 2.     Medserve Told eSutures that It Sold Counterfeit Ethicon Products

149.     In August 2019, Medserve expressly admitted to eSutures that it sells "duplicate" – that is, counterfeit – products.  In a voice message, Medserve stated to Defendant Shah that "there is one [duplicate] product which is available in the market and its report is perfectly fine. . . .  There is a Chinese version of Ligaclip but nicely packed in Johnson & Johnson's packaging.  It sells a lot in Pakistan and Dubai."  Medserve continued, "If you ever need duplicate Ligaclip, I can arrange for you as I know the guy who makes it and it is being sold in all Indian hospitals and it's a successful product also."

150.     eSutures continued to purchase counterfeit Ethicon medical devices after receiving this direct admission from Medserve of its trafficking in counterfeit Ethicon medical devices.

### 3.     eSutures Took No Action When Its Vendors Directly Warned that They Had Sold Counterfeits to eSutures

151.     On multiple occasions, different vendors warned eSutures that they had sold contaminated counterfeit Ethicon products to eSutures.  eSutures did absolutely nothing in response to those warnings, because it already knew it was trafficking in dangerous counterfeits. In fact, on at least two occasions eSutures continued to sell the counterfeits to customers after its vendor warned eSutures about the counterfeits.

152.     For example, in October 2019, eSutures purchased ten 36-count boxes of supposed LIGACLIP® devices from a vendor called ███████████████████████ ██████.  Those supposed LIGACLIP® devices were in fact dangerous counterfeits.

153.     On March 16, 2020, █████ sent eSutures an email advising that the LIGACLIP® it sold to eSutures was contaminated and/or counterfeit.  █████ directed eSutures to put any remaining inventory aside and to warn any customers who had already received the product.  In response to that express warning from its vendor, eSutures did absolutely nothing: it did not quarantine the product on its shelves, contact customers, warn Ethicon or the FDA, or take any other action.  Instead, eSutures continued to sell the dangerous counterfeit LIGACLIP® devices from █████ to customers *after* █████ explicitly warned that those devices were contaminated fakes.

154.     As another example, in early November 2018, a supplier named Medifelix warned eSutures that it had shipped to eSutures counterfeit ETHICON SECURESTRAP® devices.  Once again, eSutures did nothing when a vendor directly warned that it furnished

eSutures with counterfeits. In fact, eSutures once again continued to sell the counterfeit ETHICON SECURESTRAP® devices *after* Medifelix explicitly told them the product was counterfeit. eSutures sold two of the counterfeit ETHICON SECURESTRAP® devices to a customer in late December 2018.

155. eSutures took action only when that customer complained that the counterfeits lacked patient-tracking stickers included with the authentic product. Only after realizing that customers would reject the counterfeits – thus affecting eSutures's ability to profit from its counterfeiting – did eSutures reach out to Medifelix and ask for a refund.

156. There is no doubt that eSutures in fact knew the ETHICON SECURESTRAP® devices from Medifelix were counterfeit: eSutures explicitly referred to them as "counterfeit" devices in its internal emails. And yet eSutures never warned its customers who received the counterfeit ETHICON SECURESTRAP® devices, contacted Ethicon or the FDA, or took other meaningful action. eSutures just wanted its money back. In fact, eSutures continued doing substantial business with the counterfeiter Medifelix after it got its refund.

### 4. Shipments of Counterfeits to eSutures Employees' Personal Residences

157. At least as early as October 2018, Medserve began regular shipments of counterfeits to eSutures. The first few shipments were delivered to eSutures's corporate address in Mokena, Illinois. However, beginning in April 2019, eSutures instructed Medserve to ship the counterfeits to eSutures's employees' personal homes, rather than to the corporate warehouse.

158. On April 11, 2019, Defendant Shah placed an order with Medserve on eSutures's behalf, and instructed that the shipment be shipped directly to Defendant Einhorn's home, in order to evade FDA scrutiny. When Medserve prepared an invoice including eSutures's corporate phone number and the email address "Jason@esutures.com," Defendant

40

Shah instructed Medserve in a voice memo to "Just strike off the email address and telephone number and instead write the [home] address and phone number of Jason."

159.    On April 12 and April 18, 2019, Medserve shipped counterfeit SURGICEL® and LIGACLIP® products to Einhorn at his apartment in Chicago.

160.    Similarly, on June 8 and August 8, 2019, eSutures purchased counterfeit SURGICEL® products from Medserve and had them shipped to another eSutures employee, Defendant Mike Phipps, at his house in Beecher, Illinois.

161.    eSutures has its own sizable company warehouse.  It had the counterfeit medical devices shipped to its employees' homes, rather than its warehouse or other corporate address, because eSutures knew it was buying counterfeits and wanted to evade detection by Ethicon and/or government authorities.  There is no legitimate reason for a medical supply company who believes it is buying genuine medical devices to have the devices shipped to employees' homes rather than the company itself.

162.    eSutures's warehouse receiving manager, Mike Phipps, testified that he received Ethicon products at his personal residence at the request of Defendant Einhorn, and then drove those products from his home to eSutures's warehouse.  Mr. Phipps testified that product delivered to eSutures in this manner would not be properly entered into eSutures's inventory-management system.

### 5.    eSutures Doctors Its Internal Records to Conceal Its Partnership with Medserve

163.    eSutures's internal records of its vendors and purchases nowhere mentions the name "Medserve" or its principal, Pritamdas Arora.  Neither Medserve's nor Mr. Arora's mailing address, telephone, or email address appears anywhere in eSutures's system.  That is because eSutures falsified its records to conceal all transactions with Medserve under the alias of

a company called "Little India Trading Co." with an address in Hong Kong. And although eSutures lists individual contacts, phone numbers, and email addresses for its other vendors, for "Little India Trading" (i.e., Medserve) eSutures listed no phone number, listed Defendant Einhorn where the individual contact at the vendor should have been listed, and listed Defendant Einhorn's @eSutures.com email address where the vendor's email address should have been listed.

164. This falsification of eSutures's own internal records of its dealings with Medserve was fraudulent and intended to conceal its partnership with Medserve from the government and Ethicon. Indeed, as described above, during the course of this litigation eSutures pointed to its own falsified records to argue that those records proved it had never sold any counterfeits from Medserve to customers. eSutures made that fraudulent misrepresentation as one of its many attempts to prevent Ethicon from warning eSutures's customers about the counterfeits and to prevent Ethicon from recovering any remaining counterfeits before they were used on patients.

### 6. Medserve Disclosed to eSutures that Its Business Was Illegal

165. In May 2019, when Medserve and eSutures were discussing the best way to send eSutures's expired SURGICEL® products to India, Mr. Arora raised the concern that "if he sends the shipment with proper details like medical/SURGICEL/surgical or any thing related to surgical goods this shipment will be held."

166. And in June 2019, in connection with eSutures discussing a large potential purchase from Medserve, Medserve questioned how payment would be made, noting in a voice message: "But tell me, if I need cash, till date I haven't taken or given you cash. If Jason has to pay, how will he pay? All my cash payments are illegal . . . I ask people to send the cash to Dubai and I get my payment from there."

167.    eSutures knew or should have known that Medserve was breaking Indian law by selling surgical supplies using illicit methods and was operating an illegal cash-only business.

**7.    eSutures's Owner and Top Executives Invoke Their Fifth Amendment Right Against Self-Incrimination and Refuse to Answer Questions About Their Counterfeiting**

168.    At their depositions, Defendants Iaderosa Jr. (eSutures's owner, President, and CEO) and Einhorn (eSutures's Director of Operation) invoked their Fifth Amendment rights against self-incrimination, and refused to answer any questions concerning eSutures's counterfeiting, its fraudulent purchases, or any other topic relating to eSutures's unlawful activities.

**8.    eSutures's Other Wrongful Activities**

169.    Prior to its known trafficking in counterfeit Ethicon medical devices, eSutures was involved in the purchase of stolen medical products.  For example, in 2013, Michael Gwinn, a former surgical assistant confessed and pled guilty to stealing nearly $1 million in medical supplies from his employer and selling them to eSutures.

170.    eSutures also employs as its inventory control manager Anthony Iaderosa Sr. ("Iaderosa Sr."), the father of Defendant Iaderosa Jr.  Iaderosa Sr. was previously a purchasing manager for Unilever, a manufacturer of surgical and other products, but was fired for his role in a large-scale invoicing fraud scheme involving collusion with local suppliers for payment of false invoices.  eSutures hired Iaderosa Sr. immediately after he was fired from Unilever.

171.    eSutures also operates an illegal corrupt casino.  To date, at least five separate lawsuits have been filed against eSutures, Defendant Iaderosa Jr., his wife Jennifer Iaderosa, his father Iaderosa Sr., and several other eSutures employees.  The lawsuits allege that

eSutures is being used to run an illegal online gambling organization that was not only illegal *per se*, but also collected bets while failing to pay out winnings. Defendant Iaderosa Jr. and others have asserted their Fifth Amendment right against self-incrimination in those lawsuits.

**L. eSutures Obtained and Distributed Misbranded, Materially Different Ethicon Medical Devices**

172. eSutures also knowingly distributes large quantities of unlawfully diverted surgical supplies that are materially different from those that Ethicon manufactures and intends for sale in the United States. These supplies have expired, been removed from their outer packaging, have been stripped of their required Instructions for Use, and/or have been exposed to substandard shipping and handling conditions. As a result, these devices do not comply with critical FDA regulations, are illegal to sell in the United States, cause confusion among consumers, and harm Ethicon's goodwill and trademarks.

**1. eSutures's Sale of "Eaches" Stripped of Their Outer Packaging and Instructions for Use**

173. The vast majority of the Ethicon devices eSutures buys and sells in U.S. commerce are "by the each" or "eaches." "Eaches" are individually sealed devices that were originally manufactured and shipped in an outer carton containing multiple devices, but which have been stripped of their outer packaging and sold and shipped as individual units. These "eaches" sold by eSutures are misbranded, out of compliance with FDA requirements and federal regulations, and are materially different from authentic Ethicon product as manufactured and sold by Ethicon in the United States. Their sale is a federal crime and a willful violation of Ethicon's trademarks.

174. As set forth above, each Ethicon medical device is designed with specific, unique Instructions for Use.

44

175.    Ethicon complies with FDA regulations and provides Instructions for Use to providers by providing printed instructional inserts with every Ethicon device.  Specifically, Ethicon includes a FDA-approved printed insert inside the outer carton of every Ethicon medical device intended for sale in the United States.  Ethicon does not permit its medical devices to be sold in the United States without their accompanying FDA-approved printed Instructions for Use.  "Eaches" that have been stripped from their outer packaging lack those important and FDA-mandated printed Instructions for Use.

176.    For many Ethicon devices, including SURGICEL® devices, the individual packets that eSutures sells as "eaches" state: "**CAUTION!  SEE INSTRUCTIONS FOR USE.**"  But eSutures sells those "eaches" in such a way that the medical provider has no Instructions for Use to reference.

177.    Moreover, as set forth above, the outer packaging in which Ethicon supplies and distributes its devices is designed to protect, and has been tested to protect, the device as required by FDA regulations.  eSutures received loose "eaches" that were shipped in plain packaging from vendors whom they did not vet, including (as described below) hospital employees who simply stole product off the shelves and mailed it to eSutures.  And when eSutures sold those loose "eaches," it also shipped those individual packets, which are not designed or tested for shipping, in plain mailing boxes or envelopes.  By trafficking in Ethicon devices removed from their FDA-approved and required packaging, eSutures violated FDA regulations and exposed the product to damage and mishandling.

178.    For instance, Ethicon sells cartridges of surgical devices, including surgical staples, that allow surgeons to quickly load surgical fixation devices.  If a reload

cartridge of surgical staples became misaligned during shipping, it could cause the surgical stapler to misfire, potentially causing serious injury to the patient.

179.    Ethicon devices that are sold as "eaches" are also missing critical information that appears only on the outer carton, which also makes them materially different from authentic, properly packaged products.

180.    Furthermore, eSutures fails to maintain the most basic inventory controls for its vast inventory of "eaches," which it stores loose and intermixed in plastic bins. eSutures makes no attempt to ensure that products with the same expiration dates or same lot numbers are kept together. In fact, for over 95% of the Ethicon devices located in eSutures's warehouse at the inception of this litigation, eSutures did not maintain even the most basic information that any legitimate surgical device distributor would retain, such as the lot numbers, expiration dates, and vendor for any particular Ethicon device. This interferes with and disrupts Ethicon's ability to effectively recall products.

181.    The offer for sale and sale of Ethicon devices in "eaches," without their requisite packaging, labeling, and Instructions for Use, results in the devices being materially different from the devices as they are manufactured, packaged, advertised, and sold by Ethicon. This is likely to cause confusion to customers and medical providers, harm to patients, and damage to Ethicon and Ethicon's goodwill and trademarks.

### 2.    eSutures's Sale of Expired Product

182.    eSutures routinely and knowingly purchased and sold expired Ethicon devices. As part of its regular business, eSutures solicited the purchase of expired and short-dated Ethicon products. A large portion of the Ethicon devices in eSutures's inventory, offered for sale within the United States, are expired devices. eSutures makes no discernable effort to ensure that expired product is not sold for use in human patients. In fact, as set forth above,

eSutures intentionally sold expired product that it had sent to India to be repackaged into counterfeit packaging.

183.     The use of expired medical devices presents significant risks to patient safety, including the risk that the device has degraded or will malfunction.  Ethicon strictly prohibits the sale of expired products or their use on patients.  eSutures's sale of expired products thus renders the Ethicon products it sells materially different from authentic, nonexpired product.

### 3.     eSutures's Sale of Recalled Product

184.     In addition to interfering with and interrupting Ethicon's ability to perform recalls and field actions, eSutures sells recalled Ethicon devices.  In fact, eSutures had in inventory a large number of recalled Ethicon devices, mixed in indiscriminately with other Ethicon devices for sale, when Ethicon executed the Seizure Order in this action.  This causes, or is likely to cause, consumer confusion, mistake, and deception.  Recalled product may pose significant risks to the health of patients.  The continued sale and use of recalled product would be detrimental to Ethicon and to the public.

185.     Ethicon recalls a medical device when it is found to be defective and/or could pose a risk to patient health.  Ethicon would never sell a product that has been recalled.

186.     Recalled Ethicon product is materially different than the authentic products Ethicon manufactures and distributes.  That a product has been recalled is unquestionably material to customers and patients.  eSutures's sale of recalled Ethicon product causes, or is likely to cause, harm to the public, as well as consumer confusion and harm to Ethicon's reputation and trademarks.

### 4.     eSutures's Sale of Ethicon Products to Non-Medical Facilities

187.     Ethicon devices are prescription-only medical products.  They are approved for sale only to healthcare professionals.  But eSutures lacks even the most basic

controls in place to ensure that it sells only to authorized medical distributors or healthcare professionals.

188.    For example, eSutures sells prescription-only Ethicon medical devices on eBay.  And when Ethicon's investigators made a test buy of Ethicon devices from eSutures using a front company, eSutures requested only a W-9 form for accounting purposes, and made no effort whatsoever to determine whether that front company was either a medical facility or a lawful distributor of surgical devices (it was neither).

189.    The sale of these prescription-only devices directly to consumers and without any controls raises potential health and safety concerns for its customers and their patients, causing damages to Ethicon's goodwill and its trademarks.

**M.    eSutures Wrongfully Obtained Discounted Ethicon Medical Devices**

190.    To the extent that eSutures has sold genuine Ethicon products, it has obtained them by bribing employees of medical facilities to use lies and deception to divert heavily discounted Ethicon products to eSutures.

191.    Over the course of years, eSutures corrupted the employees of multiple different medical facilities by bribing the employees to use their employers' credentials to make fraudulent purchases of Ethicon products.  At eSutures's direction, these employees falsely represented to Ethicon or its authorized distributors that they were purchasing on behalf of the medical facility that employed them, and that the Ethicon products would be used on the medical facility's patients – representations that allowed them to purchase Ethicon products at a steep discount.

192.    In fact, the corrupted employees were not purchasing the products on behalf of their employers.  Rather, they made those purchases using their personal checkbooks or credit cards and personal email addresses.  After receiving the discounted product, the corrupted

employees provided it directly to eSutures, who resold it at a large profit. eSutures shared that illicit profit with the corrupted employees by writing checks payable to the corrupted employees, while deliberately keeping the employer medical facility in the dark. Among others at eSutures, Defendant Iaderosa Jr. was personally involved in setting up and supervising these fraudulent transactions with corrupted surgical center employees.

193. These fraudulent transactions caused Ethicon to sell products at unwarranted discounts that it would never have provided except for the misrepresentations made by the employees at eSutures's behest. Moreover, these fraudulent transactions caused Ethicon to pay millions of dollars' worth of reimbursements to authorized distributors, also known as "chargebacks," for purchases that received an unwarranted discount. Ethicon would never have paid the chargebacks or allowed the discount to be provided if Ethicon had known the products were to be resold or provided to eSutures.

### 1. Fraud at North Shore Surgical Center

194. North Shore Surgical Center ("North Shore") is a healthcare institution located in Illinois. North Shore, through its Group Purchasing Organization ("GPO"), entered into contracts with Ethicon concerning, among other things, the pricing of Ethicon products (the "North Shore Contracts").

195. The North Shore Contracts specified that North Shore could only purchase discounted Ethicon products if it represented that the products would be used in-house – *i.e.*, on patients – and not for resale. The North Shore Contracts specifically prohibited the resale of any discounted Ethicon products.

196. Such resale prohibitions are widely practiced and known in the medical supplies industry. Gray-market suppliers such as eSutures are acutely aware of these provisions, because they are fundamental to the market in which gray-market suppliers operate.

197.     Ethicon recently learned that throughout 2014 and 2015, eSutures induced Rene Hluska, then a North Shore employee, to fraudulently purchase Ethicon medical devices at a discount through North Shore and provide them to eSutures.

198.     At eSutures's behest, Hluska made multiple purchases of Ethicon medical devices at a discount directly from Ethicon in her capacity as a North Shore employee.  During the process of each purchase, Hluska represented to Ethicon that she was purchasing on behalf of North Shore, and that the discounted medical devices would be used in-house at North Shore, even though she knew those representations were untrue.

199.     For example, the invoices for the purchases Hluska made specifically stated that the discounted medical devices could only be used for the purchaser's (*i.e.*, North Shore's) own use, and could not be resold.  In making the purchase, Hluska, at eSutures's inducement, fraudulently misrepresented that the purchase was for North Shore's own use.

200.     eSutures induced and conspired with Hluska to make those knowing misrepresentations.  eSutures was well aware that North Shore was contractually prohibited from reselling the medical devices it purchased from Ethicon.  If the discounts were generally available, eSutures would have been able to obtain them directly from Ethicon.

201.     Furthermore, if reselling were allowed, eSutures would have been able to openly transact business with North Shore, rather than with Hluska individually.  Hluska paid for the fraudulent purchases with personal checks from her personal bank account and, as shown below, eSutures made payments to Hluska, not to North Shore.

202.     Ethicon relied on Hluska's false representations in allowing her to purchase Ethicon products at North Shore's discounted prices.

203.    Ethicon would not have sold its medical devices to Hluska at discounted prices or at any price had it known that her representations were false, including that she was buying the products in her personal capacity, and that she was going to provide the products to eSutures rather than have them used in-house at North Shore.

204.    eSutures and Hluska knew and intended that Ethicon would rely on Hluska's misrepresentations, and in reliance upon them sell the medical devices to Hluska at an unwarranted discount.

205.    Per eSutures's instructions, Hluska sent the Ethicon medical devices to eSutures.  In exchange, eSutures paid Hluska personally by checks, like the one in the photo below, which Hluska deposited into her personal bank account:



## 2.    Fraud at Ingalls Memorial Hospital

206.    Ingalls Memorial Hospital ("Ingalls") is a healthcare institution located in Illinois and a part of the University of Chicago Medical Center hospital system.  Ingalls, through its GPO, entered into contracts with Ethicon concerning, among other things, the pricing of Ethicon products (the "Ingalls Contracts").

207.     The Ingalls Contracts specified that Ingalls could purchase discounted Ethicon products only if it represented that the products would be used in-house – *i.e.*, on patients – and not for resale.

208.     As with the North Shore Contracts, the resale prohibitions in the Ingalls Contracts are consistent with widespread practice in the medical supplies industry.  The existence of these provisions is common knowledge to all market participants, including eSutures.

209.     Between January 2016 and August 2018, eSutures induced John Joyce, then an Ingalls employee, to fraudulently purchase Ethicon products at a discount and provide them to eSutures.

210.     Joyce made multiple purchases of Ethicon products through Suture Express, one of Ethicon's authorized distributors.  At eSutures's behest, Joyce made those purchases by logging in to Suture Express's website using Ingalls's credentials.  In making the purchases, Joyce represented that he was making the purchases on behalf of Ingalls, and that the purchase was for use on Ingalls's patients, even though he knew that was untrue.

211.     For example, each time he made a purchase of Ethicon products from Suture Express, Joyce affirmatively represented that he would abide by certain enumerated conditions of the sale, including specifically that all purchases were for Ingalls's own use.  That representation was knowingly false, and was made at eSutures's inducement.

212.     By using Ingalls's credentials and misrepresenting that the products would be for Ingalls's own use, Joyce was able to purchase Ethicon product at the discounted rates provided in the Ingalls Contracts.

213.    Joyce paid for the fraudulent purchases with personal credit cards.  The billing addresses for each of those credit cards was Joyce's home residence.

214.    Although he logged on using Ingalls's credentials, Joyce used his personal email address and not his Ingalls business email address in connection with his fraudulent purchases.

215.    Per eSutures's instructions, Joyce sent the Ethicon products to eSutures. eSutures paid Joyce personally for the products.

216.    eSutures was well aware that the Ingalls Contracts prohibited resale and that in order to purchase discounted Ethicon product to resell to eSutures, Joyce had to make repeated misrepresentations.  If resale had been permitted, eSutures could have purchased product directly from Ingalls, rather than from Joyce.

217.    In reliance on Joyce's misrepresentations, Suture Express, Ethicon's authorized distributor, sold Ethicon products to Joyce at the discounted price set forth in the Ingalls Contracts.  Suture Express then passed on those misrepresentations (which Suture Express did not know to be false) to Ethicon, and requested a reimbursement or chargeback from Ethicon for the amount of the discount.

218.    Ethicon relied on Joyce's misrepresentations (as transmitted by Suture Express) that his purchases were on behalf of Ingalls, and that they were to be used on Ingalls's patients.  Based on that reliance, Ethicon issued chargebacks to Suture Express for the difference between the discounted prices and the list prices for the Ethicon products that Joyce purchased.

219.    Ethicon would not have issued chargebacks to Suture Express or allowed its products to be sold to Joyce at discounted prices had Ethicon known that Joyce was buying

the products in his personal capacity, or that he was going to provide the products to eSutures rather than use them in-house at Ingalls.

220.    It is widely known in the healthcare industry that Ethicon issues chargebacks to its authorized distributors for healthcare institutions' purchases of Ethicon products at discounted prices, based on the institutions' representations that they will follow the terms of their pricing contracts.

221.    eSutures and Joyce knew and intended that Joyce's misrepresentations to Suture Express would be passed on to Ethicon and that Ethicon would rely on them in issuing chargebacks to Suture Express.

**3.    Fraud at Audubon Surgery Center**

222.    Audubon Surgery Center ("Audubon") is a healthcare institution located in Colorado.  Audubon, through its GPO, entered into contracts with Ethicon concerning, among other things, the pricing of Ethicon products (the "Audubon Contracts").

223.    The Audubon Contracts specified that Audubon could purchase discounted Ethicon products only if it represented that the products would be used in-house – *i.e.*, on patients – and not for resale.

224.    As with the North Shore and Ingalls Contracts, the restrictions in the Audubon Contracts are consistent with widespread practice in the medical supplies industry. The existence of these provisions is common knowledge to all market participants, including eSutures.

225.    Nevertheless, eSutures induced Rochele Hovasse, an Audubon employee, to fraudulently purchase Ethicon products at a discount and provide them to eSutures.

226.    Hovasse made multiple purchases of Ethicon products through Suture Express, one of Ethicon's authorized distributors.  At eSutures's behest, Hovasse made those

purchases by emailing them to Suture Express using Audubon's account information.  In making

the purchases, Hovasse represented that she was making the purchases on behalf of Audubon,

and that the purchase was for use on Audubon's patients, even though she knew that was untrue.

227.    For example, each time she made a purchase of Ethicon products from

Suture Express, Hovasse affirmatively represented that she would abide by certain enumerated

conditions of the sale, including specifically that all purchases were for Audubon's own use.

That representation was knowingly and intentionally false, and was made at eSutures's

inducement.

228.    By using Audubon's credentials and misrepresenting that the products

were for Audubon's own use, Hovasse was able to purchase product at the discounted rates

provided in the Audubon Contracts.

229.    Hovasse used her personal email address, rather than her Audubon

business email, in connection with the fraudulent purchases.

230.    Per eSutures's instructions, Hovasse sent the Ethicon products to eSutures.

In exchange, eSutures paid Hovasse personally for the products.

231.    In reliance on Hovasse's misrepresentations, Suture Express sold to

Hovasse Ethicon products at the discounted price.  Suture Express then passed on those

misrepresentations (which Suture Express did not know to be false) to Ethicon, and requested a

reimbursement or chargeback from Ethicon for the amount of the discount.

232.    Ethicon relied on Hovasse's misrepresentations (as relayed by Suture

Express to Ethicon) that her purchases were on behalf of Audubon, and that they were to be used

on Audubon's patients.  Based on that reliance, Ethicon issued chargebacks to Suture Express for

the difference between the discounted prices and the list prices for the Ethicon products that Hovasse purchased.

233.    Ethicon would not have issued chargebacks to Suture Express or allowed its products to be sold to Hovasse at discounted prices had Ethicon known that she was buying the products in her personal capacity, or that she was going to provide the products to eSutures rather than use them in-house at Audubon.

234.    It is widely known in the healthcare industry that Ethicon issues chargebacks to its authorized distributors for healthcare institutions' purchases of Ethicon products at discounted prices, based on the institutions' representations that they will follow the terms of their pricing contracts.

235.    eSutures and Hovasse knew and intended that Hovasse's misrepresentations to Suture Express would be passed on to Ethicon and that Ethicon would rely on them in issuing chargebacks to Suture Express.

**N.    eSutures's Knowing Purchase and Sale of Stolen Ethicon Devices**

236.    eSutures also acts as a knowing, large-scale fence for stolen Ethicon medical devices.

237.    eSutures buys much of its inventory directly from hospital or surgery-center employees such as nurses, administrative staff, and surgical technicians.  eSutures buys surgical devices from these hospital workers in small and irregular (but often frequent) transactions, typically just one or two "eaches" of surgical devices at a time.  In making these purchases, eSutures does *not* buy from the hospital or surgery center that employs these workers: it is buying directly from the workers in their individual capacity, paying them individually, and giving no notice to their employer.

238.    There is no mystery as to how a hospital worker comes to personally own a small but steady supply of prescription-only surgical devices that he or she sells on the gray market.  eSutures very well knows – and common sense dictates – that these are products stolen straight off the shelves of medical facilities.

239.    Hospitals must keep surgical supplies stocked and easily accessible for surgeons and their teams to use.  Moreover, many surgical devices are small, individually sealed, and easy to pocket.  Surgical devices thus present easy targets for theft.  Hospital employees would have little incentive to steal supplies, however, if there were not an immediately accessible market in which to sell them.  eSutures creates the market for these stolen medical devices, and acts as a large-scale fencing operation under the cover of "buying from hospitals."

240.    The following are examples of individuals who work in medical facilities who sold stolen Ethicon surgical devices to eSutures.  Each of these examples comes from a list of eSutures's suppliers for just three Ethicon product lines.  eSutures sells hundreds of different Ethicon devices, and the full list of its suppliers of stolen product is huge.

241.    An individual who has been employed at a number of hospitals and surgical centers in Alabama sold Ethicon devices to eSutures using his home address and an @gmail.com account.  He sold to eSutures approximately 600 Ethicon devices, with over 120 different lot numbers, across more than 250 transactions – frequently selling just one or two loose a single loose device or two in each transaction.

242.    A "regional material manager" at a university medical center in New Jersey sold a dozen ETHICON SECURESTRAP® devices to eSutures, sometimes at over $1,000 each, using his home address and an @yahoo.com email address.

243.    A licensed practical nurse in Miami, Florida sold to eSutures 20 pouches of SURGICEL® FIBRILLAR, using his home address and an @yahoo.com email address.

244.    A registered nurse employed by the U.S. Department of Veterans Affairs sold to eSutures 15 loose pouches and 2 boxes of SURGICEL® FIBRILLAR devices – with a total of five different lot numbers.

245.    A registered nurse in Illinois made 14 different sales of Ethicon product to eSutures for a total of $5,950, all of which were sales of "eaches" of SURGICEL® devices.

246.    An "operating room inventory coordinator" at a medical center in South Carolina sold Ethicon surgical devices to eSutures on multiple occasions.

247.    A paramedic in Florida made 51 sales of Ethicon product to eSutures.

248.    Some of the individuals who steal Ethicon surgical devices and sell them to eSutures do so under the cover of a fly-by-night company that they own and run out of their basement or through a P.O box.

249.    For example, ███████████████, the principal of a company called ███████████ sold LIGACLIP® products to eSutures between February and December 2018. According to the criminal complaint filed in December 2018 in the U.S. District Court for the District of Colorado, ████████████ was caught on camera taking surgical supplies off the shelf at the Denver Veterans Affairs Medical Center.  ████████████ pled guilty to theft of government property, and was sentenced to five months' imprisonment and over $100,000 in restitution.

250.    eSutures also purchased Ethicon products from ████████████, whose principal, ███████████████, was convicted in February 2020 after a 13-day jury trial for engaging in an "elaborate scheme" to obtain FDA-regulated medical devices from manufacturers at deeply discounted prices by telling manufacturers that the devices would be shipped in the

Republic of Suriname under purported Surinamese government contracts.  ██████ would then sell the products at higher prices in the United States.  eSutures's contact at ██████████ was ████████████ ███████, who the government wrote "was extensively involved in [the] fraudulent scheme."

**O.     eSutures Falsely Advertises Itself as a Liquidator Who Purchases from Hospitals and Medical Centers**

251.    eSutures's business model is to purchase counterfeit surgical devices and mix them in with its stock of other unlawfully obtained surgical devices: stolen, fraudulently obtained, and diverted, unpackaged, and misbranded products.  But when it sells its product, eSutures advertises itself as a simple middleman who purchases overstock from one U.S. medical center and sells it to another U.S. medical center.  By holding itself out as a hospital-to-hospital liquidator and advertising its stock of Ethicon devices as being lawfully purchased from medical facilities, eSutures creates a market for its counterfeit and illegal devices by tricking customers into believing that they are purchasing legitimate U.S. hospital overstock.

252.    eSutures widely advertises itself as a liquidator who purchases primarily or entirely from U.S. hospitals and medical facilities.  eSutures's customer service representatives routinely make those claims directly to customers and potential customers in an effort to reassure its customers and potential customers that it sells only authentic, safe, originally packaged, and lawfully obtained surgical devices.

253.    eSutures advertises, and has advertised, on its website that it purchases its inventory primarily or entirely from U.S. hospitals and medical facilities.  For example, eSutures's current advertising on its website claims: "We have worked with facilities of every size, from entire hospital systems switching the brand of all their suture and endomechanicals down to veterinarians looking to sell a couple of boxes of expired sutures. … We have been in

59

business since 2000, and have yet to encounter a facility who has been dissatisfied with our service in any way." eSutures also currently claims on its website: "eSutures.com is a discount distributor. We purchase excess inventory, find a home for that product within the same marketplace, and we provide it on a just-in-time basis."

254. Despite these advertising claims, there is not a single hospital or medical facility on eSutures's list of its top 75 suppliers. The reality is that eSutures buys almost none of its products from hospitals or medical facilities. When asked at her deposition, eSutures's Chief Financial Officer was unable to name a single hospital or medical facility who supplies eSutures with product (and all of eSutures's other witnesses with knowledge either failed to appear or invoked the Fifth Amendment and refused to answer all questions).

255. eSutures's widely advertised narrative that it is merely a trader in hospital overstock is nothing more than a fabrication that allows it to sell dangerous counterfeits, stolen surgical supplies, and other unlawful medical devices.

**P.** **eSutures Entered Into a Prior Settlement with Ethicon and Intentionally Breached It**

256. In 2016, Ethicon caught eSutures unlawfully selling Ethicon products into the United Arab Emirates and Mexico. On May 2, 2016, Defendant Iaderosa Jr., on behalf of himself and eSutures, executed a Settlement and Release Agreement with Ethicon (the "Settlement Agreement"), promising to cease those unlawful sales in exchange for Ethicon foregoing immediate legal action.

257. Under the Settlement Agreement, "eSutures agree[d] that eSutures and any and all of eSutures's officers, directors, employees, successors, affiliates, and agents will cease and forever refrain from importing, distributing, selling, or knowingly aiding in the sale of any and all [Ethicon] Products into and/or in Mexico and/or UAE."

258. eSutures agreed that in the event it, Iaderosa Jr., or any of their officers, directors, employees, successors, affiliates, or agents sold or knowingly aided in the sale of any Ethicon product in Mexico or the United Arab Emirates, then Ethicon would be entitled to its "actual damages, statutory damages, and/or punitive damages," as well as "a permanent injunction prohibiting eSutures and any and all of eSutures's officers, directors, employees, successors, affiliates, and/or agents from importing, distributing, selling, and/or knowingly aiding in the sale of any [Ethicon] Products into and/or in Mexico and/or UAE." The Agreement also entitles Ethicon to "any costs and expenses, including actual attorneys' fees, investigator fees, and/or legal costs, incurred by [Ethicon] in connection with the enforcement of th[e] Agreement, including seeking, obtaining, enforcing, and collecting Actual Damages, and/or seeking, obtaining, and enforcing a Permanent Injunction" against eSutures.

259. eSutures never intended to abide by the unambiguous terms and conditions of the Settlement Agreement. It continued to sell diverted Ethicon products in Mexico and the United Arab Emirates, but did so using various schemes to conceal those sales from Ethicon.

260. For example, after entering the Settlement Agreement, eSutures continued selling Ethicon products to Pure Care Trading F.Z.E. ("Pure Care"), a distributor and known counterfeiter located in Dubai. Knowing that Pure Care was located in Dubai and that the product was to be sold into the United Arab Emirates, eSutures doctored the invoice to list Pure Care as a customer located in Saudi Arabia, writing: "Please note: I entered Sudi [sic] Arabia as the country on the invoice." eSutures then shipped Ethicon products to a Saudi warehouse, knowing and intending that Pure Care would send a courier to pick up the goods from Saudi Arabia and carry them to Pure Care's facilities in Dubai. In fact, eSutures wrote to Pure Care: "We cannot ship to UAE… It is fine to ship to UAE, as you're handling shipping." As eSutures

knew, the Settlement Agreement prohibited it from doing precisely what it was doing: knowingly aiding the sale of product into Dubai. eSutures knew it was violating the Settlement Agreement, but thought it was "fine to ship to UAE" because Ethicon would not know about its breach.

261.     Even more egregiously, Iaderosa Jr. set up a shell company in Dubai, U.A.E, called Magellan Medical Supply F.Z.E. ("Magellan") for the express purpose of importing medical devices, including Ethicon devices, into Dubai. Iaderosa Jr. and eSutures run Magellan from eSutures's offices in Illinois. In fact, eSutures internally referred to Magellan as eSutures's "Dubai Office." eSutures then used Magellan to purchase Ethicon products from unauthorized and, in eSutures's own words, "Unregistered Vendors" and import them into the United Arab Emirates, in flagrant and knowing violation of the Settlement Agreement.

262.     eSutures's straw purchases of devices through Magellan and sales to Pure Care each constitute separate breaches of the Settlement Agreement's prohibition against importing and selling Ethicon product in the United Arab Emirates.

263.     Since entering into the Settlement Agreement, eSutures also sold Ethicon devices into Mexico. Each of those sales also constitutes a separate, material breach of the Settlement Agreement.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(A))

264.     Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

265.     In violation of 15 U.S.C. § 1114(1)(a), Defendants, independently and in conspiracy with one another, used in commerce, without Ethicon's consent, either a reproduction, counterfeit, copy, or colorable imitation of the SURGICEL Trademarks, the

LIGACLIP trademark, the ETHICON SECURESTRAP trademark, the Ethicon Trademarks, and the SURGICEL Trade Dress, the LIGACLIP Trade Dress, and the ETHICON SECURESTRAP Trade Dress (collectively, the "Ethicon Marks and Trade Dress") and in connection with the sale, offering for sale, distribution, or advertising of counterfeit SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP®; in connection with the sale, offering for sale, distribution, or advertising of diverted and/or altered Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures; and in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

266.    Defendants' actions constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress.

267.    Defendants are directly, contributorily, and vicariously liable for their infringement.

268.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Ethicon Marks and Trade Dress, Ethicon will continue to be irreparably harmed.

269.    Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

270.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress and other damages in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
## FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(B))

271.    Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

272.    In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Ethicon Marks and Trade Dress belonging to Ethicon and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the offering for sale, distribution or advertising of counterfeit SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® medical devices; in connection with the sale, offering for sale, distribution, or advertising of diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures; and in connection with such use that is likely to cause confusion, to cause mistake, or to deceive.

273.    Defendants' actions constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress.

274.    Defendants are directly, contributorily, and vicariously liable for their infringement.

275.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Ethicon Marks and Trade Dress, Ethicon will continue to be irreparably harmed.

276. Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

277. As a direct and proximate result of Defendants' conduct, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress and other damages in an amount to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE**

278. Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

279. In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® medical devices, in connection with stolen Ethicon devices, and in connection with the diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Ethicon.

280. Defendants' actions constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress.

281. Defendants are directly, contributorily, and vicariously liable for their infringement.

282.     As a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Ethicon Marks and Trade Dress, Ethicon will continue to be irreparably harmed.

283.     Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

284.     As a direct and proximate result of Defendants' conduct, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress.

## FOURTH CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT UNDER
## ILLINOIS TRADEMARK REGISTRATION AND PROTECTION ACT

285.     Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

286.     In violation of the Illinois Trademark Registration and Protection Act, 765 Ill. Comp. Stat. 1036/1 *et seq.*, Defendants, independently and in conspiracy with one another, used in commerce, without Ethicon's consent, either a reproduction, counterfeit, copy, or colorable imitation of the Ethicon Marks and Trade Dress in connection with the sale, offering for sale, distribution, or advertising of counterfeit packaged SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® medical devices; in connection with the sale, offering for sale, distribution, or advertising of diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures; and in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

287.    Defendants' actions constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress.

288.    Defendants are directly, contributorily, and vicariously liable for their infringement.

289.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Ethicon Marks and Trade Dress, Ethicon will continue to be irreparably harmed.

290.    Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

291.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress and other damages in an amount to be proved at trial.

### FIFTH CLAIM FOR RELIEF
### FEDERAL FALSE ADVERTISING

292.    Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this Amended Complaint as if fully set forth herein.

293.    In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of the counterfeit SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® medical devices, and in connection with the sale of diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to and subvert Ethicon's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading

description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit SURGICEL®, LIGACLIP®, and ETHICON SECURESTRAP® products, and the diverted Ethicon products that are materially different from authentic Ethicon products.

294.    Defendants advertised, marketed, and promoted the counterfeit SURGICEL® products and the diverted Ethicon products that are materially different from authentic Ethicon products authorized for sale by Ethicon in the United States and that are not subject to Ethicon's quality-control measures, to the public, and/or to specific segments of the public, using the Ethicon Marks and Trade Dress, as well as other intellectual property belonging to Ethicon.

295.    For example, and without limitation, Defendants in connection with their sales of Ethicon products advertised that their products were lawfully obtained from hospitals and other medical facilities, when in reality they purchased almost none of their inventory from hospitals and medical facilities, and instead sold counterfeit, stolen, and unlawfully diverted and misbranded Ethicon devices.

296.    Defendants' actions constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress.

297.    Defendants are directly, contributorily, and vicariously liable for their infringement.

298.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Ethicon will continue to be irreparably harmed.

299.    Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

300.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress and other damages in an amount to be proved at trial.

**SIXTH CLAIM FOR RELIEF**
**FEDERAL DILUTION OF MARK**

301.    Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

302.    The Ethicon Marks and Trade Dress are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

303.    Defendants are selling and/or have sold counterfeit and diverted products bearing the Ethicon Marks and Trade Dress after such trademarks and trade dress became famous.

304.    By selling these counterfeit products and diverted products, Defendants, independently and in conspiracy with one another, have diluted and are diluting the distinctive quality of a mark or trade name owned by Ethicon in violation of 15 U.S.C. § 1125(c).

305.    Defendants' actions constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress.

306.    Defendants are directly, contributorily, and vicariously liable for their infringement.

307.    As a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in

the industry. Unless Defendants' conduct is restrained, Ethicon will continue to be irreparably harmed.

308. Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

309. As a direct and proximate result of Defendants' conduct, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress and other damages in an amount to be proved at trial.

### SEVENTH CLAIM FOR RELIEF
### ILLINOIS DILUTION OF MARK AND INJURY TO BUSINESS REPUTATION

310. Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

311. All of the Ethicon Marks and Trade Dress are individually distinctive within the meaning of 765 Ill. Comp. Stat. 1036/65.

312. By selling counterfeit and diverted products bearing the Ethicon Marks and Trade Dress, Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Ethicon's business reputation and/or have diluted and are continuing to dilute the distinctive quality of a mark or trade name owned by Ethicon, in violation of 765 Ill. Comp. Stat. 1036/65.

313. Defendants' actions constitute willful infringement of Ethicon's exclusive rights in the Ethicon Marks and Trade Dress.

314. Defendants are directly, contributorily, and vicariously liable for their infringement.

315. As a direct and proximate result of Defendants' conduct, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in

the industry.  Unless Defendants' conduct is restrained, Ethicon will continue to be irreparably

harmed.

316.    Ethicon has no adequate remedy at law that will compensate for the

continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

317.    As a direct and proximate result of Defendants' conduct, Ethicon has

suffered damages to the valuable Ethicon Marks and Trade Dress and other damages in an

amount to be proved at trial.

**EIGHTH CLAIM FOR RELIEF**
**ILLINOIS DECEPTIVE AND UNFAIR TRADE PRACTICES**

318.    Ethicon realleges and incorporates by reference paragraphs 1 through 263

of this First Amended Complaint as if fully set forth herein.

319.    In violation of 815 Ill. Comp. Stat. 510 *et seq.*, Defendants, independently

and in conspiracy with one another, are selling, offering for sale, and/or distributing low-quality,

dangerous counterfeit and diverted products unlawfully bearing the Ethicon Marks and Trade

Dress.

320.    Defendants' conduct is deceptive to ordinary members of the public and

harmful to the public interest.

321.    As a direct and proximate result of Defendants' deceptive conduct,

Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their

reputation in the industry.  Unless Defendants are restrained from further infringement of the

Ethicon Marks and Trade Dress, Ethicon will continue to be irreparably harmed.

322.    Ethicon has no adequate remedy at law that will compensate for the

continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

## NINTH CLAIM FOR RELIEF
## COMMON-LAW UNFAIR COMPETITION

323.     Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

324.     In violation of the common law of the State of Illinois and elsewhere, Defendants, independently and in conspiracy with one another, have unfairly competed with Ethicon by selling the counterfeit and diverted products.

325.     As a direct and proximate result of Defendants' unfair competition, Ethicon has suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Ethicon will continue to be irreparably harmed.

326.     Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

327.     As a direct and proximate result of Defendants' unfair competition, Ethicon has suffered damages to the valuable Ethicon Marks and Trade Dress and other damages in an amount to be proved at trial.

## TENTH CLAIM FOR RELIEF
## COMMON-LAW UNJUST ENRICHMENT

328.     Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

329.     By selling the counterfeit and diverted products bearing Ethicon's valuable trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Ethicon's expense in violation of the common law of Illinois and elsewhere.

330.     Moreover, by bribing employees of medical facilities to purchase discounted product under false pretenses for eSutures's use, causing Ethicon to pay a

reimbursement of an unwarranted discount, Defendants have been unjustly enriched at Ethicon's expense in violation of the common law of Illinois and elsewhere.

331.    Under principles of equity, Ethicon is entitled to restitution and/or disgorgement of Defendants' ill-gotten gains.

## ELEVENTH CLAIM FOR RELIEF
## COMMON-LAW TORTIOUS INTERFERENCE WITH CONTRACT

332.    Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

333.    In violation of the common law of the State of Illinois and elsewhere, Defendants, independently and in conspiracy with one another, have tortiously interfered with Ethicon's product pricing contracts with other parties by inducing individuals at healthcare institutions to purchase Ethicon products at discounted prices and sell them to Defendants, in violation of Ethicon's contracts.

334.    Defendants intentionally caused healthcare institutions to violate their contracts with Ethicon by corrupting employees of the healthcare institutions and conspiring with them to make numerous misrepresentations to Ethicon for their own enrichment.  These actions were wrongful and there was no justification for them.

## TWELFTH CLAIM FOR RELIEF
## BREACH OF SETTLEMENT AGREEMENT

335.    Ethicon realleges and incorporates by reference paragraphs 1 through 263 of this First Amended Complaint as if fully set forth herein.

336.    The Settlement Agreement is a valid and binding agreement between Ethicon and Defendants.

337.     Defendants, independently and in conspiracy with one another, have materially breached the Settlement Agreement by importing, distributing, selling, and aiding in the sale of Ethicon products in Mexico and United Arab Emirates after executing the Agreement.

338.     These actions were wrongful and intentional, and there was no justification for them.

339.     As a direct and proximate result of Defendants' breach of the Settlement Agreement, Ethicon has suffered damages, including, but not limited to, legal fees, litigation costs, and loss of sales, in an amount to be proved at trial.  The Settlement Agreement expressly entitles Ethicon to its actual damages, statutory damages, and punitive damages; a permanent injunction prohibiting Defendants from selling or aiding in the sale of any Ethicon products in Mexico and United Arab Emirates; and all costs and expenses, including attorneys' fees, investigator fees, and legal costs, incurred in connection with enforcing the Agreement and seeking and obtaining damages and a permanent injunction against Defendants.

340.     As a direct and proximate result of Defendants' conduct, Ethicon has also suffered irreparable harm to the valuable Ethicon Marks and Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Ethicon will continue to be irreparably harmed.

341.     Ethicon has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

## **PRAYER FOR RELIEF**

WHEREFORE, Ethicon demands judgment against Defendants as follows:

A.     preliminary and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them:

(i)      from selling any Ethicon medical device, whether genuine or counterfeit;

(ii)    from using any of the Ethicon Marks and Trade Dress or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of medical devices;

(iii)   from using any logo, trade name, or trademark confusingly similar to any of the Ethicon Marks and Trade Dress, which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of Defendants or of others are sponsored by, authorized by, or in any way associated with Ethicon;

(iv)   from directly, contributorily, and vicariously infringing any of the Ethicon Marks and Trade Dress;

(v)    from otherwise unfairly competing with Ethicon in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of SURGICEL®, ETHICON SECURESTRAP®, and LIGACLIP® products;

(vi)   from falsely representing themselves as being connected with Ethicon or sponsored by or associated with Ethicon or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that Defendants, or any of them, are associated with Ethicon;

(vii)    from using any reproduction, counterfeit, copy, or colorable imitation of any of the Ethicon Marks and Trade Dress in connection with the publicity, promotion, sale, or advertising of absorbable hemostats;

(viii)    from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being SURGICEL®, ETHICON SECURESTRAP®, or LIGACLIP® products and from offering such goods in commerce;

(ix)    from diluting the Ethicon Marks and Trade Dress;

(x)    from destroying any records documenting the manufacture, sale, offer for sale, distribution, advertisement, or receipt of any product purporting to be SURGICEL®, ETHICON SECURESTRAP®, or LIGACLIP® products;

(xi)    from claiming, whether directly or by implication, in any advertisement or promotional communication (including written and oral communications directly with customers or potential customers) that most or all of its Ethicon products are purchased from hospitals or medical centers;

(xii)    from selling any Ethicon product that has been removed from its outer carton and/or is not accompanied by its printed Instructions for Use;

(xiii)   from selling any Ethicon product that was stolen;

(xiv)   from importing, selling, or distributing any Ethicon product in Mexico or the United Arab Emirates; and

(xv)   from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (xii) above; and

B.    ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction; and

C.    ordering that all infringing material be turned over, seized, impounded, and/or destroyed; and

D.    awarding to Ethicon punitive damages from each Defendant in an amount to be ascertained at trial, but in no event less than $25 million; and

E.    awarding to Ethicon statutory or actual damages in an amount to be ascertained at trial, and costs and attorney's fees; and

F.    awarding to Ethicon an accounting, and an award of: (i) all ill-gotten profits from Defendants' manufacture, sale, and/or distribution of the counterfeit, materially different, falsely advertised, and otherwise infringing medical devices; (ii) Ethicon's lost profits; and (iii) Ethicon's remedial costs; and

G.    awarding to Ethicon pre-judgment and post-judgment interest; and

H.    awarding such other and further relief to Ethicon as may be just, proper, and equitable.

## **JURY DEMAND**

Ethicon hereby requests a trial by jury on all issues so triable.


Dated: July 31, 2020

Respectfully submitted,

*/s/* Bradley J. Andreozzi

BRADLEY J. ANDREOZZI (ARDC No. 6286557)
MATTHEW M. MORRISSEY (ARDC No. 6302575)
FAEGRE DRINKER BIDDLE & REATH LLP
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698
Tel:     (312) 569-1000
Fax:     (312) 569-3000
bradley.andreozzi@faegredrinker.com
matthew.morrissey@faegredrinker.com

and

GEOFFREY POTTER
ARON FISCHER
TIMOTHY A. WATERS
JOSHUA R. STEIN
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel:     (212) 336-2000
Fax:     (212) 336-2222
gpotter@pbwt.com
afischer@pbwt.com
twaters@pbwt.com
jstein@pbwt.com

*Attorneys for Plaintiffs Johnson & Johnson, Ethicon, Inc., Ethicon US, LLC, and Johnson & Johnson Health Care Systems Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2020, I caused the foregoing to be served on all counsel of record via the Court's ECF system as well as by serving the documents via electronic mail upon the following:

Mudassar Shah (*pro se*)
m.shah@esutures.com
mudassarshah79@yahoo.com

*/s/* Matthew M. Morrissey